STEVEN T. GUBNER – Bar No. 156593
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV - Bar No. 281020
JESSICA S. WELLINGTON – Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:      sgubner@bg.law
            sseflin@bg.law
            jbagdanov@bg.law
            jwellington@bg.law

Attorneys for Chapter 11 Debtor
and Debtor in Possession DCM-P3, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:21-bk-12507-TA |
| DCM-P3, LLC, | Chapter 11 |
| Debtor. | **DEBTOR'S MOTION TO: (1) APPROVE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES WITH SUCH LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES TO ATTACH TO PROCEEDS PURSUANT TO 11 U.S.C. §§ 363(b) AND (f); (2) APPROVE OVERBID PROCEDURES; (3) DETERMINE THAT BUYER IS ENTITLED TO PROTECTION PURSUANT TO 11 U.S.C. § 363(m); AND (4) PROVIDE RELATED RELIEF; DECLARATIONS OF SARINA BROWNDORF AND GREGORY BINGHAM IN SUPPORT THEREOF** |
| | **Property for Sale: 34 Black Hawk, Irvine, CA 92603** |
| | **<u>Hearing</u>** Date:  June 1, 2022 Time:  10:00 a.m. Place:  Courtroom 5B, 5th Floor  via ZoomGov |

2790951

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ......................................................................................................1

II.    FACTUAL BACKGROUND ....................................................................................2

    A.    The Bankruptcy Case ....................................................................................2

    B.    The Debtor's Marketing of the Property ........................................................4

III.    TERMS OF PROPOSED SALE ...............................................................................5

    A.    The Purchase Agreement ...............................................................................5

    B.    Overbid Procedures .......................................................................................7

IV.    PROPOSED DISTRIBUTION OF SALE PROCEEDS............................................8

V.    DISCUSSION ...........................................................................................................9

    A.    The Court Should Authorize the Sale of the Property in Accordance with the
        Purchase Agreement .....................................................................................9

        1.    Sound Business Purpose ...................................................................10

        2.    Fair and Reasonable Price.................................................................11

        3.    Adequate Marketing..........................................................................12

        4.    Good Faith ........................................................................................12

    B.    The Court Should Authorize the Proposed Sale Free and Clear of All Liens,
        Interests, and Encumbrances Pursuant to 11 U.S.C. § 363(f)................................12

        1.    The Property May Be Sold Free and Clear of the GF Capital Trust
            Deed, Verde Trust Deed, and Lissoy Trust Deed Pursuant to Section
            363(f)(2) ...........................................................................................13

        2.    The Property May Be Sold Free and Clear of the First Trust Deed
            Pursuant to Section 363(f)(3) ...........................................................14

        3.    The Property May Be Sold Free and Clear of the GF Capital Trust
            Deed, Verde Trust Deed, and Lissoy Trust Deed Pursuant to Section
            363(f)(4) ...........................................................................................14

    C.    The Court Should Find that the Buyer is a Good Faith Purchaser........................16

    D.    The Court Should Approve the Proposed Bidding Procedures .............................16

    E.    The Debtor Requests that the Court Continue the Effectiveness of the RFS
        Order to Allow Time for the Sale to be Consummated .........................................17

VI.    NOTICE...................................................................................................................17

VII.    CONCLUSION........................................................................................................18

i

DECLARATION OF SARINA BROWNDORF..................................................................20

DECLARATION OF GREGORY BINGHAM...............................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

2790951

# TABLE OF AUTHORITIES

Page

## CASES

*Big Shanty Land Corp. v. Comer Properties, Inc.*,
  61 B.R. 272, 278 (Bankr. N.D. Ga. 1985) ...............................................................11

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*,
  94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) ...............................................................13

*Higgins v.Vortex Fishing Systems, Inc. (In re Vortex Fishing Sys., Inc.)*,
  277 F.3d 1057, 1062 (9th Cir. 2002) .......................................................................14

*In re Abbotts Dairies*,
  788 F.2d at 149 ........................................................................................................12

*In re Alves*,
  52 B.R. 353 (Bankr. D.R.I. 1985) ...........................................................................10

*In re Canyon Partnership*,
  55 B.R. 520 (Bankr. S.D. Cal. 1985) .......................................................................11

*In re Chung King, Inc.*,
  753 F.2d 547 (7th Cir. 1985)); *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr.
  Mont. 1988).............................................................................................................11

*In re Daufuskie Island Props., LLC*,
  431 B.R. 626, 645 (Bankr. D.S.C. 2010) .................................................................14

*In re Eliot*,
  94 B.R. 343, 345 .....................................................................................................13

*In re Financial News Network, Inc.*,
  931 F.2d 217 (2d Cir. 1991).....................................................................................17

*In re Gabel*,
  61 B.R. 661 (Bankr. W.D. La. 1985) (implied consent is sufficient to authorize a sale
  under § 363(f)(2)) ....................................................................................................13

*In re Gerwer*,
  898 F.2d 730, 733 (9th Cir. 1990) ...........................................................................13

*In re Kellogg-Taxe*,
  2014 WL 1016045, at *6 (Bankr. C.D. Cal. Mar.17, 2014) (*citing In re Gaylord Grain
  L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004))...................................................14

*In re Paddlewheels, Inc.*,
  2007 WL 1035151 (Bankr. E.D.La. April 2, 2007).....................................................13

*In re Pine Coast Enterprise, Ltd.*,
  147 B.R. 30 (Bankr. N.D. Ill. 1992) .........................................................................16

*In re Wilde Horse Enterprises, Inc.*,
  136 B.R. 830 (Bankr. C.D. Cal. 1991)......................................................................10

*Kham and Nate's Shoes No. 2 v. First Bank,*
    908 F.2d 1351 (7th Cir. 1990) .......................................................................... 16

*Matter of Phoenix Steel Corp.,*
    82 B.R. 334 (Bankr. D. Del. 1987) .................................................................. 10

*Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.),*
    36 B.R. 856, 858 (Bankr. W.D. Mo. 1984) ....................................................... 13

*SEC v. Capital Cove Bancorp LLC,*
    2015 WL 9701154, at *7 (C.D. Cal. Oct.13, 2015) ........................................... 14

*T.C. Investors, et al. v. Joseph, et al. (In re M Capital Corp.),*
    290 B.R. 743 (9th Cir. BAP 2003) ................................................................... 16

*Walter v. Sunwest Bank (In re Walter),*
    83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) ............................................................... 10

## **STATUTES**

11 U.S.C. § 363(b) ........................................................................................................ 18

11 U.S.C. § 363(b)(1) ...................................................................................................... 9

11 U.S.C. § 363(b)(1) ...................................................................................................... 1

11 U.S.C. § 363(f) ..................................................................................................... 1, 12

11 U.S.C. § 363(f)(3) ..................................................................................................... 14

11 U.S.C. § 363(f)(4) ............................................................................................... 14, 15

Bankruptcy Code § 1107(a) ............................................................................................. 2

Bankruptcy Code § 1108 ................................................................................................. 2

## **RULES**

Federal Rule of Bankruptcy Procedure 2002(a) .............................................................. 17

Local Bankruptcy Rule 6004-1(f) .................................................................................... 17

iv

2790951

DCM-P3, LLC, the chapter 11 debtor herein (the "Debtor" or "DCM-P3"), hereby files its motion ("Motion") for entry of an order authorizing the sale ("Sale") of the residential real property located at 34 Black Hawk, Irvine, California 92603 ("Property") to Michael K. Kim, Trustee, and Elisa K. Yoo, Trustee, or their assignee (collectively, "Buyer"), on an "as-is" "where-is" and "with-all-faults" basis without any warranties expressed or implied, and without any contingencies pursuant to 11 U.S.C. §§ 363(b)(1) and (f), free and clear of liens, interests, claims, and encumbrances, with such liens, interests, claims, and encumbrances to attach to the Sale proceeds, net of expenses of sale, with the same priority and rights of enforcement as previously existed.

The Debtor seeks Court approval to sell the Property to Buyer pursuant to the terms and conditions set forth in the *California Residential Purchase Agreement and Joint Escrow Instructions*, the Debtor's *Counter-Offer*, and the *Amended Escrow Instructions* (collectively, the "Purchase Agreement") that set forth all terms and conditions of the proposed Sale, and which is attached hereto as **Exhibit 1**, and requests that the Court determine that Buyer is entitled to a good faith determination pursuant to 11 U.S.C. § 363(m). In addition to the foregoing, the Debtor seeks Court approval of the bidding procedures as set forth herein. The Debtor further seeks Court approval to pay the brokers' commissions, normal and customary escrow closing costs, and the specified undisputed tax liens on the Property through escrow as set forth herein.

In support thereof, the Debtor respectfully represents as follows:

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

By the Motion, the Debtor proposes to sell the Property to Buyer for a purchase price of Five Million Seven Hundred Thousand Dollars ($5,700,000) (the "Purchase Price"). The Buyer made an initial deposit of $177,000 into A&A Escrow Services, Inc. ("Escrow"). The balance of the Purchase Price will be paid by wire transfer upon entry of the order granting this Motion, but no later than the first business day that is after 14 calendar days following entry of the Court order and prior to closing of Escrow. All sale contingencies have been removed. The Debtor also seeks approval of the overbid procedures set forth below, and requests a finding that the Buyer is entitled to a good faith determination pursuant to 11 U.S.C. § 363(m).

2790951

The Sale proposed herein provides maximum benefit to the Estate. As discussed more fully below, the Property was heavily marketed and the Debtor engaged in numerous negotiations with multiple interested purchasers. In the Debtor's business judgment, the Purchase Price, subject to overbid, provides the best return to the estate and its creditors. Thus, the Debtor submits that this proposed Sale is in the best interest of creditors of the estate because the consideration for the Sale of the Property is reasonable, and the estate will benefit as a result of the Sale.

## II.    FACTUAL BACKGROUND

### A.    <u>The Bankruptcy Case</u>

On October 14, 2021 (the "Petition Date"), the Debtor and affiliated debtor Sarina Browndorf ("Ms. Browndorf" and collectively with DCM-P3, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Ms. Browndorf's bankruptcy case is pending before this Court as Bankr. Case No. 8:21-bk-12506-TA. DCM-P3 is a community property entity of Ms. Browndorf and her estranged non-debtor husband, Matthew Browndorf ("Mr. Browndorf"). The Debtor manages its financial affairs pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in either of the Debtors' chapter 11 cases.

The Debtor is a Delaware entity that was formed in 2015 to hold title to the Property. The Debtor is a disregarded entity for tax purposes, and it does not have any income. The Debtor did not have any bank accounts prepetition, and to the best of Ms. Browndorf's knowledge, the Browndorfs paid the Debtor's obligations, including expenses related to the Property.

Prepetition, on June 16, 2021, Ms. Browndorf filed a dissolution of marriage petition in the Superior Court of the State of California, County of Orange, commencing Case No. 21D003789 (the "Dissolution Action"), which is currently pending and is active and contentious. As of the Petition Date, the family court had not divided assets and liabilities between Browndorfs.

Shortly after the filing of the Dissolution Action, Mr. Browndorf filed an ex parte application with the family court and obtained a temporary restraining order prohibiting Ms. Browndorf from entering the Property, and temporarily giving him full custody of their minor child. Ms. Browndorf successfully opposed the ex parte application and restraining order, which the family court vacated.

2790951

Thereafter, Ms. Browndorf filed her own motion with the family court seeking a restraining order against Mr. Browndorf. On September 22, 2021, the family court entered a permanent restraining order against Mr. Browndorf for three years. The permanent restraining order also gave Ms. Browndorf sole use of the Property. On October 19, 2021, the family court entered an order granting Ms. Browndorf exclusive management and control of DCM-P3.

At all times during the Browndorf's marriage, Mr. Browndorf was in control of the Browndorfs' finances. Pre-petition, Mr. Browndorf allowed the Property to go into foreclosure, and a foreclosure sale was scheduled for October 18, 2021. However, the Debtors' bankruptcy filings stayed the sale. While Ms. Browndorf placed the Debtor into bankruptcy, Mr. Browndorf has refused to turn over most books and records or information regarding management of the entity and regarding his communications with the lienholders on the Property. Despite this fact, Ms. Browndorf has received sufficient information to contest multiple purported liens against the Property.

There is only one "purchase money mortgage" on the Property, and that was in the approximate amount of $2,800,000 as of the Petition Date as shown in the Debtor's schedules. Mr. Browndorf has voluntarily encumbered the Property with millions of dollars of disputed liens – even though the borrower(s) under the respective promissory notes are other community property entities and there is no evidence that the Debtor ever received any benefit from these encumbrances. For example, community property entity Distressed Capital Management, LLC ("DCM") is the borrower under a loan agreement (the "Verde Note") in favor of Verde Investments, Inc. ("Verde") and community property entity DCM-P1, LLC ("DCM-P1") is another guarantor; therefore, they are equally liable for payment of amounts due and owing under the Verde Note. As discussed below, the Debtors believe that these are fraudulent transfers and have commenced adversary proceedings against Verde (third position) and against the lienholders in the second and fourth positions to recover these transfers.

On January 10, 2022, Verde filed its *Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362 (Real Property)* [Doc. 46] (the "RFS Motion") seeking relief from the automatic stay to pursue its rights under state law as to the Property pursuant to Sections 362(d)(1) and (d)(2) of the

3

2790951

Bankruptcy Code.  On April 13, 2022, the Court granted the RFS Motion with the relief provided for in the order taking effect on June 6, 2022 [Doc. 78] (the "RFS Order").

**B.      The Debtor's Marketing of the Property**

On February 17, 2022, the Court approved the Debtor's application to employ Coldwell Banker Realty ("Broker") to act as real estate broker for the Sale of the Property [Doc. 60].  As set forth in the attached Declaration of Gregory Bingham, on February 21, 2022, Broker listed the Property on the Multiple Listing Service with a purchase price of $6,500,000.  On April 20, 2022, the listing price was reduced $6,200,000.  Broker extensively marketed the Property through, among other things:

    a.   Direct phone calls to 26 potential buyers;

    b.   Internet announcements and digital flyer sent to 950 Coldwell Banker agents in Orange County;

    c.   Digital ads and listings placed on Coldwell Banker websites, and websites such as Zillow.com, Realtor.com, Trulia.com, and Homes.com;

    d.   Digital ads were placed on social media sites such as Facebook and Instagram targeting the areas of Orange County, Los Angeles County, Pasadena, Sierra Madre, Arcadia, and northern San Diego;

    e.   Digital flyers were emailed to 2,200 real estate agents in Orange County and Los Angeles County;

    f.   A print ad was placed in the Orange County Register on March 26, 2022; and

    g.   A print ad was placed in View Magazine, Orange County on March 25, 2022.

The foregoing marketing efforts achieved results.  Specifically, there were over 16,152 views of the Property on the Coldwell Banker websites, and websites such as Zillow.com, Realtor.com, Trulia.com, and Homes.com.  Additionally, the Broker conducted 64 showings of the Property from February 22, 2022 through May 4, 2022.  The Broker received six offers to purchase the Property between $5 million and $6 million, which offers were submitted to the Debtor.

On March 23, 2022, the Buyer offered to purchase the Property for $5,500,000.  *See* **Exhibit 1.**  On March 30, 2022, the Debtor submitted a counteroffer to Buyer in the amount of $5,900,000,

which was accepted by Buyer.  On or around April 5, 2022, the Debtor accepted an offer for $6,000,000 from a different potential buyer, however, the potential buyer declined to proceed with the sale during the due diligence period.  After the sale to the first buyer fell through, on April 20, 2022, the Debtor accepted the Buyer's offer for $5,900,000, which was the best and highest offer for the Property at the time. Subsequently, after the Buyer conducted its due diligence, the parties agreed to a reduction of the sale price to $5,700,000 based on certain costs of deferred maintenance on the Property.

The Debtor desires to seek to liquidate the Property for the benefit of creditors of the estate. In order to maximize value to the estate, the Debtor seeks to sell the Property to Buyer free and clear of liens, interests, claims, and encumbrances with such liens, interests, claims, and encumbrances to attach to the sale proceeds, pursuant to the terms and conditions as set forth herein and in the Purchase Agreement.  Ms. Browndorf and her son currently reside at the Property and they are unable to pay the mortgage to the first lienholder.  In family court, Mr. Browndorf agreed to pay the mortgage to the first lien holder and represented to the family court that he was doing so. However, he has not made any mortgage payment since January 2022, and he has stopped paying Ms. Browndorf child and spousal support.  Therefore, the Debtor and the Broker believe that liquidating the Property through this bankruptcy case will result in the highest and best sale price of the Property (versus a foreclosure sale which is what will happen if the Property is not sold in this case).

### III.    TERMS OF PROPOSED SALE

#### A.    The Purchase Agreement

The Debtor and Buyer entered into the Purchase Agreement on or about April 20, 2022 and subsequent dates.  The following is a summary of the terms of the Purchase Agreement.  Parties interested in overbidding should consult the Purchase Agreement (**Exhibit 1** to the Browndorf Decl.) for the full and complete terms and conditions of the proposed Sale of the Property.  In the event the following summary of the terms of Sale is found to conflict with the Purchase Agreement, the terms of the Purchase Agreement shall be controlling.

1.    Sale Price:  Debtor proposes to sell the Property to the Buyer, subject to Court approval, for Five Million Seven Hundred Thousand Dollars ($5,700,000).

2790951

2. <u>Earnest Money Deposit</u>:  Buyer has deposited with Escrow a deposit in the amount of $177,000 ("Deposit").

3. <u>Broker's Commission</u>:  Subject to Court approval, the Debtor as seller will pay to the brokers through escrow real estate broker commissions totaling five percent (5%) of the Purchase Price ("Commission").  Broker and the Buyer's broker will share the Commission.  The Debtor will also pay the normal closing costs and costs of sale through Escrow, including the cost of a standard coverage title insurance policy, recording fees, documentary transfer taxes, and other normal and customary charges, pro-rations, costs, and fees.

4. <u>No Representations or Warranties</u>:  The Property will be sold by the Debtor on an **AS-IS, WHERE-IS** basis, without any representations or warranties regarding the condition of the Property.  Transfer of the Property shall be by Quitclaim Deed.

5. <u>Contingencies</u>:  As of the date of filing this Motion, any contingencies have been removed, and Buyer has funded the deposit.

6. <u>Liquidated Damages, Buyer Default</u>:  If, after Bankruptcy Court approval of the Sale to Buyer, the Buyer fails to complete the purchase contemplated by the Purchase Agreement, the Debtor shall retain the Deposit as liquidated damages.

7. <u>Overbid</u>:  The proposed Sale to Buyer is subject to overbid.  If the Court does not approve Buyer as purchaser of the Property, the Debtor and Buyer shall cancel escrow and Debtor shall authorize the Escrow Holder, as defined in the Purchase Agreement, to refund the Deposit to Buyer.

8. <u>Close of Escrow</u>:  Escrow shall close as soon as practicable after entry of the order approving the Sale ("Sale Order"), but no later than the later to occur of (i) the first business day after fourteen (14) days following the entry of the Sale Order or (ii) if the effectiveness of the Sale Order is stayed, the first business day after the Sale Order is no longer stayed.

9. <u>Bankruptcy Court Jurisdiction</u>:  The United States Bankruptcy Court for the Central District of California shall have exclusive jurisdiction to interpret and enforce the Purchase Agreement.

6

2790951

10.    <u>Tax Consequences</u>:  The Debtor does not anticipate that there will be negative tax consequences as a result of the Sale.

**B.    <u>Overbid Procedures</u>**

While the Debtor is prepared to consummate the Sale of the Property to Buyer pursuant to the terms of the Purchase Agreement, it is obliged to seek the maximum price for the Property. Accordingly, the Debtor requests that the Court authorize it to implement an overbid procedure regarding the sale of the Property per the following terms ("Bidding Procedures"):

1.    <u>Present at Hearing</u>:  The Buyer and each Qualified Bidder, defined below, must be present via ZoomGov at the hearing on the Motion or represented by an individual or individuals with the authority to participate in the overbid process;

2.    <u>Notice of Overbid</u>:  Any party wishing to participate in the overbid process must notify the Debtor in writing via email directed to counsel for the Debtor Susan K. Seflin and Jessica L. Bagdanov at sseflin@bg.law and jbagdanov@bg.law, respectively, of his/her/its intention to do so no later than close-of-business three (3) calendar days before the hearing on the Motion and must provide evidence of his/her/its financial ability to close;

3.    <u>Earnest Money Deposit</u>:  To be a qualified overbidder ("Qualified Overbidder"), each party participating in the overbid process (except for the Buyer, who has already paid the Deposit to the Debtor), must remit to the Debtor, care of its counsel of record at the address set forth on the top left of the first page of the Motion, at or prior to the hearing on the Motion, payment in the form of a cashier's check (no other form of payment shall be accepted) made payable to "DCM-P3, LLC" (payment made payable to any other party may, in the sole discretion of the Debtor and/or Debtor's counsel, be deemed inadequate and rejected) in a deposit amount of **$177,000.00** ("Overbid Deposit").  The Overbid Deposit shall not be refundable if such party is the successful bidder and is thereafter unable to complete the purchase of the Property per the terms of the proposed sale within fifteen (15) calendar days after entry of an order approving this Motion;

4.    <u>Initial Overbid</u>:  The initial overbid for the Property shall be **$5,725,000.00**, with subsequent overbids being made in minimum increments of **$5,000.00**;

5.    <u>Successful Overbidder Subject to Terms of Purchase Agreement</u>.  In the event that the Buyer is not the successful bidder for the Property, the successful bidder ("Successful Bidder") shall then become the buyer under the same terms and conditions as set forth in the Purchase Agreement, except the Purchase Price.  Under these circumstances, the Purchase Agreement with Buyer would no longer be effective and Buyer would be entitled to full refund of the Deposit.

## IV.    PROPOSED DISTRIBUTION OF SALE PROCEEDS

The Motion seeks authority to sell the Property free and clear of liens and encumbrances, except as set forth in the Purchase Agreement.  Specifically, the Purchase Agreement states that the Sale of the Property will be free and clear of all liens and encumbrances except for: (i) all general and special taxes for the fiscal year 2022 through 2023; and (ii) covenants, conditions, restrictions, reservations, rights, rights of way, and easements, and any oil, gas, or mineral reservations now of record.  The excepted encumbrances are listed as exceptions 1 through 15 in the Preliminary Title Report, attached as **Exhibit 2** to the Browndorf Decl.  As relevant to this Motion, the Preliminary Title Report identifies additional encumbrances as follows:

1.   Unpaid real property taxes due for the 2021-2022 tax years in the approximate amount of $28,801.29;

2.   A deed of trust in favor of Mortgages Electronic Registrations Systems, Inc., as beneficiary, as nominee for BOFI Federal Bank, in the principal amount of $2,795,000, recorded on June 26, 2015, which was subsequently assigned to Axos Bank by assignment recorded on July 9, 2020 (the "First Trust Deed").

3.   A deed of trust in favor of Michael K. Boone Living Trust and Nancy D. Nashu Living Trust in the amount of $850,000, recorded on August 8, 2016, which was subsequently assigned to GF Capital Group by assignment recorded on October 24, 2019 (the "GF Capital Trust Deed").

4.   A deed of trust in favor of Verde in the amount of $2,400,000 recorded on November 7, 2016 (the "Verde Trust Deed").

5.   A deed of trust in favor of Albert Lissoy in the amount of $2,255,287 recorded on November 8, 2019 (the "Lissoy Trust Deed").

As discussed below, the Debtor submits there are bona fide disputes as to the GF Capital, Verde, and Lissoy Trust Deeds attached to the Property. Accordingly, the Debtor seeks authorization for sale of the Property free and clear of these liens, with such liens to attach to sale proceeds, and proposes distribution of the Sale proceeds through Escrow as follows:

(a) Normal closing costs, including but not limited to the Debtor's share of escrow charges, the cost of a standard coverage title insurance policy, recording fees, documentary transfer taxes, pro-rated real property taxes, and other normal and customary charges, pro-rations, costs, and fees;

(b) Broker's commission of five percent (5%) of the Purchase Price;

(c) Payment to satisfy unpaid real property taxes due for the 2021-2022 tax years in the approximate amount of $28,801.29, subject to verification of amounts owed; and

(d) Payment to satisfy the First Trust Deed, subject to the Debtor's review and approval of a final payoff demand submitted by the lienholder.

After payment of these items, the Debtor will hold the remainder of the Sale proceeds pending further order(s) of the Court.

## V.    DISCUSSION

### A.    The Court Should Authorize the Sale of the Property in Accordance with the Purchase Agreement

The Sale as contemplated by the Purchase Agreement is in the best interests of the Debtor's estate and should be approved. Section 363 of the Bankruptcy Code authorizes the Debtor to sell estate property following notice and a hearing on terms that are fair and reasonable and the result of an arms-length transaction. Specifically, Section 363(b)(1) states in pertinent part that: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

In determining whether the sale of assets outside of the ordinary course of business should be approved, bankruptcy courts usually consider several factors, including: (1) whether a sufficient business reason exists for the sale; and (2) whether the proposed sale is in the best interest of the estate, which in turn consists of the following factors: (a) that terms of the sale are fair and reasonable; (b) that the proposed sale has been adequately marketed; (c) that the proposed sale terms

9

have been properly negotiated and proposed in good faith; and (d) that the purchaser is involved in an arms-length transaction with the seller. *See In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, *i.e.*, it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, and that it is an 'arms-length' transaction."); *Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335-356 (Bankr. D. Del. 1987) (In determining whether a proposed sale of equipment is proper under § 363, courts should consider whether the proposed sale is fair and equitable, whether there was a good business reason for completing the sale, and whether the transaction is proposed in good faith.); *In re Alves*, 52 B.R. 353, 355 (Bankr. D.R.I. 1985) (whether to approve a sale under § 363 depends upon the integrity of sale and the best interest of bankruptcy estate).

In the instant case, the Debtor has satisfied all of the applicable elements discussed above concerning the proposed sale of the Property.

### 1.    Sound Business Purpose

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. BAP 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under section 363(b).  The facts pertaining to the sale at issue here amply substantiate the Debtor's business decision that the contemplated Sale of the Property to the Buyer pursuant to the terms of the Purchase Agreement serves the best interests of the estate and merits the approval of this Court. Specifically, the Debtor has sound reasons for the Sale to maximize return to the estate and its creditors by liquidation of the Property, especially in light of the pending stay relief and foreclosure by Verde.  While the Property, at first look, appears over-encumbered, the Debtor submits that a number of the purported liens are subject to bona fide dispute and not valid against the Property. Thus, the Debtor believes there is equity in the Property available for creditors, and the Debtor believes a sale subject to overbid will result in a significantly higher sale amount than a foreclosure sale will generate. Thus, in the Debtor's business judgment, the proposed Sale to Buyer as

contemplated by the Purchase Agreement will maximize the benefit to the estate, and, therefore, represents a sound exercise of the Debtor's business judgment.

### 2.    Fair and Reasonable Price

In order for a sale to be approved under Section 363(b), the purchase price must be fair and reasonable. *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985). The trustee or debtor in possession is given substantial discretion in this regard. *Id.* In addition, Courts have broad discretion with respect to matters under Section 363(b). *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold. *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985); *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

As noted above, Broker engaged in expansive marketing efforts regarding the sale of the Property. As a result of these efforts, the Debtor received six offers between $5 million and $6 million to purchase the Property. After good-faith negotiations with several potential purchasers, the Debtor accepted the Buyer's offer as it was the highest and best offer obtained for the Property. In addition, the offer is well above the lowest offer the Debtor received for the Property. The Debtor believes that the offer from the Buyer represents an offer that is well within the range of reasonableness and neither Broker nor the Debtor believe that further marketing will result in any substantial incremental benefit to the estate. Nevertheless, the Property will continue to be listed on the Multiple Listing Service, and promoted on Zillow.com, Trulia.com, Realtor.com, Homes.com and Coldwell Banker websites pending the hearing on the Motion. The Debtor submits that this proposed Sale is in the best interest of the estate because the consideration for the Sale of the Property is reasonable and likely far in excess of what a foreclosure sale would generate, and the estate will likely benefit as a result of the Sale.

Based on the foregoing, the Debtor submits that the Purchase Price represents fair and reasonable value for the Property.

11

2790951

### 3.    Adequate Marketing

The intensive marketing efforts undertaken by Broker are set forth in detail above and are not repeated here. In consideration of the foregoing marketing efforts, the Property has been adequately marketed.

### 4.    Good Faith

When a Bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts Dairies*, 788 F.2d at 149. Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent creditor protections. *Id.* at 150.  The good faith requirement focuses principally on whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143,147 (3rd Cir. 1986); *Wilde Horse Enterprises*, 136 B.R. at 842.

Here, the terms of the Purchase Agreement are the result of good faith and arms-length negotiations between parties.  As also discussed below, other than in connection with the proposed Sale of the Property, the Buyer has no prior connections with Ms. Browndorf or the Debtor.  Thus, the Debtor respectfully submits that the good faith requirement has been satisfied.

In the Debtor's business judgment, the proposed Sale to Buyer as contemplated by the Purchase Agreement will maximize the benefit to the estate and its creditors, is fair and reasonable, and should be approved.

### B.    <u>The Court Should Authorize the Proposed Sale Free and Clear of All Liens, Interests, and Encumbrances Pursuant to 11 U.S.C. § 363(f)</u>

Pursuant to section 363(f) of the Bankruptcy Code, the Debtor may sell the Property free and clear of liens, interests, claims, and encumbrances, with such liens, interests, claims, and encumbrances to attach to the Sale proceeds, with the same priority and rights of enforcement as previously existed.  Specific to this Property, the Debtor seeks to sell the Property free and clear of the First Trust Deed, GF Capital Trust Deed, Verde Trust Deed, and Lissoy Trust Deed, with such purported liens to attach to sale proceeds.

12

1     The Court has the power to authorize the sale of property free and clear of liens, claims, or

interests.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990).  Section 363(f)

permits a sale of property "free and clear of any interest in such property of an entity other than the

estate" if ***any one*** of the following five conditions is met:

> (1) applicable nonbankruptcy law permits sale of such property free
> and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the

five conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp Homeowners

Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); *Mutual Life Ins. Co. of

New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 858 (Bankr. W.D. Mo.

1984).

### 1.    The Property May Be Sold Free and Clear of the GF Capital Trust Deed, Verde Trust Deed, and Lissoy Trust Deed Pursuant to Section 363(f)(2)

     In regard to section 363(f)(2), the "consent" of an entity asserting an interest in the

property sought to be sold, as referenced in Section 363(f)(2), can be implied if such entity fails to

make a timely objection to the sale after receiving notice of the sale.  *Elliot*, 94 B.R. at 345; *see also,

In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (9th Cir. BAP 1995) ("The issue here is

whether there was consent or non-opposition by Citicorp."); *In re Paddlewheels, Inc.*, 2007 WL

1035151 (Bankr. E.D.La. April 2, 2007) ("The Sale Motion complies with section 363(f) of the

Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel

to Purchaser or Whitney had no objection to the Sale."); *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La.

1985) (implied consent is sufficient to authorize a sale under § 363(f)(2)).

13

To the extent that lienholders of the GF Capital, Verde, and/or Lissoy Trust Deeds consent by one of the two means discussed above, the Court should approve the Sale of the Property free and clear of such alleged secured creditors' liens pursuant to Section 363(f)(2), provided that all alleged liens shall attach to the proceeds of the Sale with the same extent, validity, and priority as the alleged pre-petition liens.

**2.      The Property May Be Sold Free and Clear of the First Trust Deed Pursuant to Section 363(f)(3)**

Pursuant to Section 363(f)(3) of the Bankruptcy Code, the Debtor may sell the Property free and clear of the First Trust Deed if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property." The proposed Purchase Price is an amount well in excess of the total amount owed on the First Trust Deed. Thus, the Debtor submits that the Property may be sold pursuant to Section 363(f)(3) free and clear of the First Trust Deed.

**3.      The Property May Be Sold Free and Clear of the GF Capital Trust Deed, Verde Trust Deed, and Lissoy Trust Deed Pursuant to Section 363(f)(4)**

To satisfy Section 363(f)(4)'s requirement of "bona fide dispute", there need only be an objective basis for a factual or legal dispute as to the validity of the interest. *In re Kellogg-Taxe,* 2014 WL 1016045, at *6 (Bankr. C.D. Cal. Mar.17, 2014) (*citing In re Gaylord Grain L.L.C.,* 306 B.R. 624, 627 (8th Cir. BAP 2004)); *In re Daufuskie Island Props., LLC,* 431 B.R. 626, 645 (Bankr. D.S.C. 2010); *see also Higgins v.Vortex Fishing Systems, Inc. (In re Vortex Fishing Sys., Inc.),* 277 F.3d 1057, 1062 (9th Cir. 2002) (adopting objective test for determining whether claim supporting involuntary petition is subject to *bona fide* dispute). "[T]he moving party must 'provide *some* factual grounds to show some objective basis for the dispute." *SEC v. Capital Cove Bancorp LLC,* 2015 WL 9701154, at *7 (C.D. Cal. Oct.13, 2015) (emphasis added). ***The court "'need not determine the probable outcome of the dispute, but merely whether one exists.'"*** *Capital Cove Bancorp,* 2015 WL 9701154, at *7 (citing and quoting *Kellogg-Taxe,* 2014 WL 1016045, at *6 (emphasis added)).

14

Although there is no requirement that a complaint be filed to establish a bona fide dispute as to a lien or claim, here, the Debtor has commenced adversary proceedings against the alleged secured creditors holding the GF Capital, Verde, and Lissoy Trust Deeds.

*GF Capital and Lissoy:* On May 11, 2022, the Debtor filed a complaint against GF Capital, Inc. dba GF Capital Group and Albert Lissoy, the holders of the GF Capital and Lissoy Trust Deeds, commencing adversary proceeding no. 8:22-ap-01044-TA. A copy of the Debtor's complaint (without exhibits because they are voluminous) is attached hereto as **Exhibit 3.**

As shown in the complaint, through that adversary proceeding, the Debtor seeks to avoid, recover, and preserve certain transfers for the benefit of its estate, which transfers form the basis of these Trust Deeds. Taken together, the purported liens account for well over $8 million in alleged secured debt against the Property, yet the Debtor did not receive any of the funds allegedly loaned on account of the trust deeds. Indeed, the funds were loaned to Mr. Browndorf and the Debtor never received any amounts on account of the loans. Furthermore, the Debtor seeks disallowance of Proofs of Claim No. 8 and 9 filed in its bankruptcy case related to these fraudulent liens, as neither is a valid claim against the Debtor. Thus, the Debtor submits that there is a bona fide dispute as to the GF Capital and Lissoy Trust Deeds. Browndorf Decl., ¶ 20.

*Verde:* On May 10, 2022, the Debtors filed a complaint against Verde, commencing adversary proceeding no. 8:22-ap-01043-TA. A copy of this complaint (without exhibits because they are voluminous) is attached hereto as **Exhibit 4.**

Through that adversary proceeding, the Debtor seeks to avoid, recover, and preserve certain transfers for the benefit of its estate, which transfers form the basis of the Verde Trust Deed. The purported lien in favor of Verde accounts for well over $4 million in alleged secured debt against the Property, yet the Debtor did not receive any of the funds allegedly loaned on account of the trust deed. Indeed, the funds were loaned to Mr. Browndorf and the Debtor never received any amounts on account of the loan. Furthermore, the Debtors seek disallowance of Proof of Claim No. 3 in the Debtor's bankruptcy case and Proof of Claim No. 12 in Ms. Browndorf's bankruptcy case related to this fraudulent lien as neither is a valid claim against the Debtors. Thus, the Debtor submits that there is a bona fide dispute as to the Verde Trust Deed. Browndorf Decl., ¶ 22.

2790951

Based on the foregoing, the Debtor submits that the Property may be sold pursuant to Section 363(f)(4) free and clear of the GF Capital, Verde, and Lissoy Trust Deeds, provided that all alleged liens shall attach to the proceeds of the Sale with the same extent, validity, and priority as the alleged pre-petition liens.

### C.    The Court Should Find that the Buyer is a Good Faith Purchaser

Pursuant to Section § 363(m) of the Bankruptcy Code, the Court should make a finding that a buyer is a good faith purchaser.  A purchaser of property is protected from the effects of reversal on appeal of the authorization to sell or lease as long as the Court finds that the purchaser acted in good faith and the appellant fails to obtain a stay of the sale.  *See* 11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," courts have provided guidance as to the appropriate factors to consider. *See In re Pine Coast Enterprise, Ltd.*, 147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) ("The requirement that a purchaser act in good faith speaks to the integrity of its conduct in the course of the sale proceeding."); *Kham and Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1355 (7th Cir. 1990) (The purpose of § 363(m) is to disable courts from backtracking on promises with respect to bankruptcy sales in the absence of bad faith).  In *T.C. Investors, et al. v. Joseph, et al. (In re M Capital Corp.)*, 290 B.R. 743 (9th Cir. BAP 2003), the Bankruptcy Appellate Panel held that a bankruptcy court may not make a finding of good faith in the absence of evidence, but may make such a finding if appropriate evidence is presented.  290 B.R. at 746–747.

In the instant case, the Debtor requests that the Court make a finding that the Buyer is a good faith purchaser within the meaning of Section 363(m).  Neither Ms. Browndorf or the Debtor has relation to the Buyer and did not know the Buyer prior to its involvement in this bankruptcy case. Additionally, the Debtor submits that the Purchase Agreement was negotiated at arms-length, and the proposed Purchase Price is fair consideration for the Property.  Browndorf Decl.  As such, a finding of good faith within the meaning of Section 363(m) is appropriate.

### D.    The Court Should Approve the Proposed Bidding Procedures

The Bidding Procedures ensure that the estate receives the maximum benefit of the Sale, and the Debtor submits that sufficient cause exists to approve these Bidding Procedures.  Courts routinely have held that when the sale of substantial assets in bankruptcy is done on a competitive

16

bidding basis, as is proposed herein, it is appropriate to require parties submitting competing bids to submit bids that exceed an existing bid by a specified amount. *See, e.g., In re Financial News Network, Inc.*, 931 F.2d 217 (2d Cir. 1991) (authorizing overbids that exceeded the initial offer by 9.5 percent).

Here, the initial overbid exceeds the Purchase Price by $25,000 (or approx. 0.5%), with further overbids to be in increments of $5,000.00. The Debtor feels these amounts are appropriate and designed to ensure serious overbids, if there are any. The Debtor proposes that any Qualified Overbidder submit the Overbid Deposit amount to it pending the outcome of the hearing. Buyer has expended, and will continue to expend, considerable time, money, and energy pursuing the Purchase Agreement and contemplated Sale, and has engaged in extended and good faith negotiations with the Debtor. Thus, the proposed Bidding Procedures are appropriate and should be approved.

E.    **The Debtor Requests that the Court Continue the Effectiveness of the RFS Order to Allow Time for the Sale to be Consummated**

The Sale of the Property described herein, if approved by the Court, should close escrow by the end of June 2022. However, the RFS Order is effective beginning on June 6, 2022. Should the effectiveness of the RFS Order begin on June 6, 2022, there is a possibility that Verde could foreclose on the Property prior to the close of escrow, which would be detrimental to creditors of the estate and may expose the estate to liability to the Buyer. Accordingly, the Debtor requests that the Court continue the effectiveness of the RFS Order for 30 days to July 6, 2022, in order to allow sufficient time for escrow to close.

**VI.    NOTICE**

The Debtor submits that adequate notice of the proposed Sale has been given. Concurrently with the filing of this Motion, notice on the Court-approved form F 6004-2 was submitted to the Court's clerk for publication on the Court's website pursuant to Local Bankruptcy Rule 6004-1(f). Broker is updating the listing of the Property on the Multiple Listing Service to include the date, time, and location of the hearing and overbid terms. Finally, notice of this Motion has been provided to the Office of the United States Trustee, and all creditors and lienholders of record pursuant to Federal Rule of Bankruptcy Procedure 2002(a).

17

2790951

## VII.    CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Court enter an order granting the Motion and:

1.    Finding that notice of the Motion was adequate and proper under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules for the Central District of California;

2.    Authorizing sale of the Property to Buyer or the Successful Bidder free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances to attach to the sales proceeds, with the same priority and rights of enforcement as previously existed pursuant to 11 U.S.C. §§ 363(b) and (f);

3.    Authorizing the Debtor to execute any and all documents that may be necessary or convenient to consummate the Sale;

4.    Authorizing sale of the Property to Buyer or the Successful Bidder on the terms and conditions set forth herein, on an **AS-IS, WHERE-IS** basis, without any representations or warranties by the Debtor;

5.    Authorizing payment through escrow of normal closing costs, including but not limited to the Debtor's share of escrow fees and charges, the cost of a standard coverage title insurance policy, recording fees, documentary transfer taxes, pro-rated real property taxes, and other normal and customary charges, pro-rations, costs, and fees associated with the sale of real property;

6.    Authorizing payment through escrow of the Brokers' commission of five percent (5%) of the Purchase Price;

7.    Authorizing payment through escrow to satisfy the unpaid real property taxes for the 2021-2022 tax years, subject to verification of amounts owed;

8.    Authorizing payment through escrow to satisfy the First Trust Deed, subject to the Debtor's revie and approval of a final payoff demand submitted by the lienholder;

9.    Authorizing the Debtor to hold the balance of the Sale proceeds pending further order of the Court;

10.    Approving the proposed Bidding Procedures for the Sale of the Property;

2790951

11.     Finding that the Buyer or the Successful Bidder is a good faith purchaser of the

Property pursuant to 11 U.S.C. § 363(m) of the U.S. Bankruptcy Code and is entitled to all benefits

and protections provided thereby;

12.     Continuing the effectiveness of the RFS Order to July 6, 2022; and

13.     Granting such further relief as may be just and appropriate under the circumstances of

this case.

DATED:  May 11, 2022                                BG LAW LLP


                                                   By: /s/ Jessica L. Bagdanov
                                                       Susan K. Seflin
                                                       Jessica L. Bagdanov
                                                       Jessica S. Wellington
                                                   Attorneys for Chapter 11 Debtor
                                                   and Debtor in Possession DCM-P3, LLC

19

2790951

## DECLARATION OF SARINA BROWNDORF

I, Sarina Browndorf, declare:

1.      I have control and management of the chapter 11 debtor and debtor in possession herein, DCM-P3, LLC (the "Debtor") pursuant to family court order entered on October 19, 2021.  I have personal knowledge of the facts contained in this declaration and if called as a witness, I would and could competently testify thereto under oath.

2.      I submit this declaration in support of the Motion to which is appended.  All capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

3.      Concurrently with the filing of the Debtor's bankruptcy case, I also caused a chapter 11 bankruptcy case to be filed on my behalf.  My personal bankruptcy case is pending before this Court as Bankr. Case No. 8:21-bk-12506-TA.

4.      I commenced my personal bankruptcy case and the Debtor's bankruptcy case to, among other things, protect the equity in the Property as there was a foreclosure sale scheduled shortly after the Petition Date on October 18, 2021.

5.      The Debtor is a community property entity of myself and Mr. Browndorf.  The Debtor is a Delaware entity formed in 2015 to hold title to the Property.  I am informed that the Debtor does not conduct any business, has never had any income, and was formed merely to hold title to the Property.  To the best of my knowledge, myself and Mr. Browndorf paid the Debtor's obligations, including expenses related to the Property.

6.      In or around June 2021, I caused a dissolution of marriage petition to be filed in the Superior Court of the State of California, County of Orange, commencing the Dissolution Action, which is currently pending and has been very active and contentious.

7.      As of the Petition Date, the family court had not divided assets and liabilities between myself and Mr. Browndorf.

8.      At all times during my marriage to Mr. Browndorf, he was in in control of our finances.

2790951

9.      Since the Dissolution Action was commenced, I have become aware of wrongdoing by Mr. Browndorf and his concealment and transfer of assets while failing to fulfill his child and spousal support obligations.

10.     Mr. Browndorf is in possession and control of most documents and information relating to my community property assets, including information and documents relating to the Debtor.

11.     While I placed the Debtor into bankruptcy, Mr. Browndorf has refused to turn over most books and records or information regarding management of the entity and regarding his communications with the lienholders on the Property.  To the best of my knowledge, there is only one "purchase money mortgage" on the Property, and that is in the approximate amount of $2.5 million (and this amount was approximately $2.8 million as of the Petition Date as set forth in the Debtor's schedules).  Mr. Browndorf has apparently voluntarily encumbered the Property with millions of dollars in additional disputed liens – even though the borrower(s) under the respective promissory notes are other community property entities.

12.     With the assistance of the Debtor's Broker, my initial investigation of the Property revealed that the Property had a fair market value of approximately $6,500,000.  Thus, Broker marketed the Property beginning in February 2022 via the Multiple Listing Service, and listed the Property for sale with a purchase price of $6,500,000.

13.     In April 2022, I, as manager of the Debtor, accepted an offer to purchase the Property for $6,000,000.  However, after during the due diligence period, the potential buyer declined to proceed with the sale.  After the sale of the first buyer fell through, I accepted the Buyer's offer, which was the next best and highest offer to purchase the Property.  Subsequently, the Buyer conducted its due diligence and we agreed to a reduction of the sale price to $5,700,000 based on certain costs of deferred maintenance on the Property.

14.     A true and correct copy of the fully executed Purchase Agreement is attached hereto as **Exhibit 1**.

21

2790951

15.    On April 15, 2022, I received a preliminary title report regarding the Property prepared by Stewart Title of California, Inc.  A true and correct copy of the preliminary title report is attached hereto as **Exhibit 2**.

16.    On May 11, 2022, I caused a complaint to be filed against GF Capital Inc. dba GF Capital Group and Albert Lissoy. A true and correct copy of the complaint in this action (without exhibits) is attached hereto as **Exhibit 3.**

17.    Through that adversary proceeding, the Debtor seeks to avoid, recover, and preserve certain transfers for the benefit of its estate, which transfers form the basis of the GF Capital and Lissoy Trust Deeds. Taken together, the purported liens account for well over $8 million in alleged secured debt against the Property, yet the Debtor did not receive any of the funds allegedly loaned on account of the trust deeds.  Indeed, the funds were loaned to Mr. Browndorf and the Debtor never received any amounts on account of the loans.  Furthermore, the Debtor seeks disallowance of Proofs of Claim No. 8 and 9 filed in its bankruptcy case related to these fraudulent liens, as neither is a valid claim against the Debtor.  Thus, I submit that there is a bona fide dispute as to the GF Capital and Lissoy Trust Deeds.

18.    On May 10, 2022, I caused a complaint to be filed against Verde.  A true and correct copy of the complaint (without exhibits) is attached hereto as **Exhibit 4.**

19.    Through that adversary proceeding, the Debtor and I seek to avoid, recover, and preserve certain transfers for the benefit of the estate, which transfers form the basis of the Verde Trust Deed.  The purported lien in favor of Verde accounts for well over $4 million in alleged secured debt against the Property, yet the Debtor did not receive any of the funds allegedly loaned on account of the trust deed.  Indeed, the funds were loaned to Mr. Browndorf and the Debtor never received any amounts on account of the loan.  Furthermore, the Debtor seeks disallowance of Proof of Claim No. 3 in the Debtor's bankruptcy case and I seek disallowance of Proof of Claim No. 12 in my bankruptcy case related to this fraudulent lien as neither is a valid claim.  Thus, I submit that there is a bona fide dispute as to the Verde Trust Deed.

20.    Based on the foregoing, I, on behalf of the Debtor, request that the Court approve the terms of the Sale as those terms are terms are set forth in full in the Motion.  As noted, the Debtor

2790951

seeks authority to sell the Property free and clear of liens, interests, claims, and encumbrances, with such liens, interests, claims, and encumbrances to attach to the Sale proceeds, with the same priority and rights of enforcement as previously existed.

21.    I am informed and believe that Buyer has deposited with escrow a deposit in the amount of $177,000.

22.    I am informed by Broker and believe that the Buyer removed all contingencies to the Sale of the Property as of the filing of the Motion.

23.    Neither myself nor the Debtor has any relation to the Buyer and I did not know the Buyer prior to their involvement in this bankruptcy case.  The Purchase Agreement was negotiated at arms-length, and I believe the proposed Purchase Price is fair consideration for the Property. I do not believe that a foreclosure sale would generate a price higher than the Purchase Price. Based on the foregoing, I, on behalf of the Debtor, request that the Motion be approved as in the best interests of the estate and that Buyer be provided with the protections of 11 U.S.C. § 363(m).

24.    Based on the above, and in my business judgment, I believe that the Purchase Price of $5,700,000.00 is a fair and reasonable price for the estate's interest in the Property, and that the Motion should be granted.

25.    I, on behalf of Debtor, am also requesting that the Court continue the effectiveness of the RFS Order to July 6, 2022, in order to allow time for the Sale to be consummated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May, 2022, at Irvine, California.

_____
Sarina Browndorf

## DECLARATION OF GREGORY BINGHAM

I, Gregory Bingham, declare:

1.       I am a licensed real estate professional employed by Coldwell Banker Realty, a licensed California real estate broker ("Coldwell").  Coldwell and I are employed as the Debtor's real estate broker in this case and I am authorized on behalf of Coldwell to make this declaration.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.       I make this declaration in support of the Motion. All initial capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion.

3.       The Property was listed for sale for Six Million Five Hundred Thousand ($6,500,000.00) beginning on February 21, 2022.  On April 20, 2022, the listing price was reduced to $6,200,000.

4.       I marketed the Property through, among other things:

    a.   Direct phone calls to 26 potential buyers;

    b.   Internet announcement and digital flyers sent to 950 Coldwell Banker agents in Orange County;

    c.   Digital ads and listing placed on Coldwell Banker websites, and websites such as Zillow.com, Realtor.com, Trulia.com, and Homes.com;

    d.   Digital ads were placed on social media sites such as Facebook and Instagram targeting the areas of Orange County, Los Angeles County, Pasadena, Sierra Madre, Arcadia, and northern San Diego;

    e.   Digital flyers were emailed to 2,200 real estate agents in Orange County and Los Angeles County;

    f.   A print ad was placed in the Orange County Register on March 26, 2022; and

    g.   A print ad was placed in View Magazine, Orange County on March 25, 2022.

5.       The foregoing marketing efforts achieved results as there were over 16,152 views of the Property on Coldwell Banker websites, and websites such as Zillow.com, Realtor.com, Trulia.com, and Homes.com.

2790951

6.      I received numerous inquiries regarding the Property and conducted approximately 64 showings of the Property from February 22, 2022 through May 4, 2022.

7.      I received six written offers to purchase the Property between $5 million and $6 million, all of which were submitted to the Debtor.

8.      The Debtor initially accepted an offer to purchase the Property for $6,000,000. However, the potential buyer declined to proceed with the sale during the due diligence period.

9.      After the sale to the first buyer fell through, the Debtor accepted the Buyer's offer to purchase the Property for $5,900,000, which was the highest and best offer for the Property at the time.  Thereafter, the parties agreed to reduce the purchase price to $5,700,000 (still subject to overbid).

10.      In my opinion, the Purchase Price of $5,700,000 is on the upper end of the range of reasonableness and should be accepted.  I do not believe that further marketing will not result in any substantial incremental price increase.  Notwithstanding, the Property will continue to be listed on the Multiple Listing Service, and promoted on Zillow.com, Trulia.com, Realtor.com, Homes.com and Coldwell Banker websites pending the hearing on the Motion.

11.      I will update the listing of the Property on the Multiple Listing Service to include the date, time, and location of the hearing and overbid terms.  As of the filing of the Motion, Buyer has removed all contingencies for the purchase of the Property.

12.      Neither I nor Coldwell have any relation to the Buyer, nor did we know the Buyer prior to the transactions herein described regarding the Sale of the Property.  The Purchase Agreement was negotiated at arms' length, and I believe the proposed Purchase Price is fair consideration for the Property.

/ / /

/ / /

/ / /

/ / /

/ / /

25

2790951

13.    I do not believe that a foreclosure sale would generate a sale amount in excess of the Purchase Price.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of May, 2022, at Newport Beach, California.


_____
Gregory Bingham

2790951

EXHIBIT "1"

DocuSign Envelope ID: C2F7E933-7A34-4DDC-B82C-56470FE21B34

**A&A**

**ESCROW SERVICES, INC.**

415 N. Crescent Drive, Suite 320
Beverly Hills, CA 90210

Phone: (310) 550-6055
Fax: (310) 550-6130

Antonia Delgado
Sr. Escrow Officer

Date: May 5, 2022
Escrow No.: 105534-AA

### AMENDED ESCROW INSTRUCTIONS

Property Address:      34 Black Hawk, Irvine, CA 92603

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

Buyer and Seller herein acknowledge that the purchase price of subject property has been reduced. Therefore Escrow Holder is authorized and instructed to amend the purchase price to be **$5,700,000.00.**

Buyer hereby approves and removes all of Buyer's contingencies in this escrow.

The following language which is contained in the original Counter Offer, last paragraph on page 9 is hereby deleted in its entirety:

"Subject to residents vacating residence prior to removal of contingencies. Upon residents vacating, Buyers shall have walk through of home to confirm home condition remains the same as initial inspection before contingencies are lifted".

MATTERS OF RECORD ONLY BETWEEN BUYER AND SELLER, WITH WHICH ESCROW HOLDER IS SPECIFICALLY INSTRUCTED NOT TO BE CONCERNED, AND WHICH ESCROW HOLDER IS SPECIFICALLY RELEASED FROM ANY/ALL LIABILITY AND/OR RESPONSIBILITY IN CONNECTION THEREWITH WITH REFERENCE TO THESE ITEMS:

Property shall be delivered vacant no later than 5PM on the day of close of escrow.

Seller shall file a Sale Motion on May 11, 2022 with the Bankruptcy Court to approve the sale.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Bankruptcy Case In re DCM-P3, LLC, Bankruptcy Case No.: 8:21-bk-12507-TA

By: _____
Sarina Browndorf, in her capacity as manager of DCM-P3, LLC, Chapter 11 Debtor and Debtor in Possession

**BUYERS:**

_____
Michael Kim

28

DocuSign Envelope ID: 33A6CA54-F227-4522-9A00-6F5399B6D633

**A&A**

**ESCROW SERVICES, INC.**

415 N. Crescent Drive, Suite 320
Beverly Hills, CA 90210

Phone:  (310) 550-6055
Fax:  (310) 550-6130

Antonia Delgado
Sr. Escrow Officer

Date:  May 5, 2022
Escrow No.:  105534-AA

### AMENDED ESCROW INSTRUCTIONS

Property Address:      34 Black Hawk,  Irvine, CA  92603

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS FOLLOWS:

Buyer and Seller herein acknowledge that the purchase price of subject property has been reduced. Therefore Escrow Holder is authorized and instructed to amend the purchase price to be **$5,700,000.00.**

Buyer hereby approves and removes all of Buyer's contingencies in this escrow.

The following language which is contained in the original Counter Offer, last paragraph on page 9 is hereby deleted in its entirety:

"Subject to residents vacating residence prior to removal of contingencies. Upon residents vacating, Buyers shall have walk through of home to confirm home condition remains the same as initial inspection before contingencies are lifted".

MATTERS OF RECORD ONLY BETWEEN BUYER AND SELLER, WITH WHICH ESCROW HOLDER IS SPECIFICALLY INSTRUCTED NOT TO BE CONCERNED, AND WHICH ESCROW HOLDER IS SPECIFICALLY RELEASED FROM ANY/ALL LIABILITY AND/OR RESPONSIBILITY IN CONNECTION THEREWITH WITH REFERENCE TO THESE ITEMS:

Property shall be delivered vacant no later than 5PM on the day of close of escrow.

Seller shall file a Sale Motion on May 11, 2022 with the Bankruptcy Court to approve the sale.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**

Bankruptcy Case In re DCM-P3, LLC, Bankruptcy Case No.: 8:21-bk-12507-TA

By: _____
    Sarina Browndorf, in her capacity as manager of DCM-P3, LLC, Chapter 11 Debtor and Debtor in Possession

**BUYERS:**

DocuSigned by:

*Michael k. kim*
Michael K. Kim, Trustee

DocuSigned by:

*Elisa k. Yoo*
Elisa K. Yoo, Trustee

29

DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

### COUNTER-OFFER

This agreement (the "Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Michael Kim (the "Buyer") from DCM-P3, LLC, by and through its manager Sarina Browndorf and solely in its capacity as chapter 11 debtor in the bankruptcy case *In re DCM-P3, LLC*, 8:21-bk-12507-TA (C.D. Cal.) (the "Seller"), of the real property more commonly known as 34 Black Hawk, Irvine, California 92603 (the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety Buyer's written Residential Property Purchase Agreement and all attachments in support thereof dated March 23, 2022 (the "Offer") and any oral or written negotiations since the Offer.

**PURCHASE PRICE; DEPOSIT; ESCROW.** The purchase price for the Property shall be $ $5,900,000.00 (the "Purchase Price"). Buyer shall make an initial deposit of $ $177,000.00 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable to "A&A Escrow Services, Inc." (the "Escrow Holder") which shall be delivered to A&A Escrow Services, Inc., 415 N Crescent Drive, Suite 320, Beverly Hills, California 90210, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

**FINANCIAL WHEREWITHAL.** Buyer shall deliver to the Seller, within two (2) business days of (i) acceptance of this Counter-Offer by Buyer, (ii) Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and (iii) Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit, loan commitment, or other form acceptable to Seller in Seller's sole discretion. In the event that either (i) Buyer fails timely to provide any such proof, or (ii) Seller determines, in Seller's sole discretion, that any proof of funds provided to Seller by Buyer is unacceptable, Seller shall have the right, at Seller's option, to provide written notice to Buyer that this Counter-Offer is terminated. In the event that Seller exercises such termination right, this Counter-Offer shall terminate effective as of the date of Seller's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Seller shall each be relieved of any further obligations hereunder.

**ESCROW INSTRUCTIONS.** Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions. Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale. Prior to the Seller's filing of its motion to approve the sale of the Property, Buyer shall be free to assign this Agreement to another person or entity (the "Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in his sole discretion), but Buyer shall remain liable

DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder. Buyer shall not assign this Agreement to another person or entity after the Seller has filed its motion for approval of the sale of the Property with the Bankruptcy Court.

**BUYER'S DUE DILIGENCE AND CANCELLATION RIGHT.** Buyer shall have 17 calendar days from the date of execution hereof to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which Buyer desires for the Sale of the Property, including, but not limited to performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer. Buyer may, not later than the end of the 17 calendar day due diligence period, provide Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of those matters (the "Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation within such due diligence period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for (i) Buyer's review of a preliminary title report and underlying documents respecting the title to the Property (as set forth below), and (ii) Bankruptcy Court approval of this Agreement and the Sale (as set forth below).

**APPRAISAL AND FINANCING.** Buyer shall have 17 calendar days from the date of execution hereof to remove the appraisal and financing contingencies. Buyer may, not later than the end of the 17 day due diligence period, provide Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to remove the financing and appraisal contingencies (the "Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation within such due diligence period, all such contingencies shall be automatically removed and Buyer's obligation to proceed shall be non-contingent except as provided herein for (i) Buyer's review of a preliminary title report and underlying documents respecting the title to the Property (as set forth below), and (ii) Bankruptcy Court approval of this Agreement and the Sale (as set forth below).

**TITLE; TITLE INSURANCE.** Within three (3) business days after acceptance of this Agreement, Stewart Title Company or such other title company of Seller's choice (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review. Buyer shall have 17 business days after receipt of the preliminary title report and underlying documents in which to provide Seller written notice (the "Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use or marketability of the Property for the purpose for which it is currently used or intended to be used. Such notice must refer to the specific exception(s) in Schedule B of the preliminary title report and the specific underlying document(s) which are the basis for Buyer's disapproval. Within five (5) business days after receipt of the Notice of title Disapproval, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the Sale, in which event Buyer's and Seller's obligations under this Agreement shall be

31

DocuSign Envelope ID: ... B3-...960F
DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

terminated and Buyer shall receive a full refund of the Initial Deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the Sale shall proceed. Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report, providing title insurance coverage by endorsement against such exception(s), or providing that the order approving the Sale entered by the Bankruptcy Court shall resolve such exception. At the close of the Sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary title report, subject to any corrections as in this paragraph above, free and clear of all monetary liens, subject to the terms of the Agreement and the order approving the Sale. Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

**REMOVAL OF CONTINGENCIES; COURT CONFIRMATION; CLOSING; DELIVERY OF POSSESSION.** If Buyer does not give Seller written Notice of Cancellation or Notice of Title Disapproval as and when provided in this Agreement, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale. Seller shall then file a motion with the Bankruptcy Court to confirm the Sale, which sale shall be subject to qualified overbids as approved by the Bankruptcy Court. Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the Sale, subject only to Bankruptcy Court confirmation as set forth below. If the Bankruptcy Court confirms the Sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the Sale, but no later than the later to occur of (i) the first business day after fourteen (14) calendar days following the entry of the operative Order of the Bankruptcy Court approving the Sale or (ii) if the effectiveness of the Order of the Bankruptcy Court approving the Sale is stayed, the first business day after the Order is no longer stayed (the "Closing Date"). The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

**BANKRUPTCY SALE.** Buyer acknowledges that Seller is a chapter 11 debtor in possession duly appointed to administer the bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and its brokers and agents (collectively, the "Seller's Brokers") have not and will not determine the condition or fitness for use of the Property for any particular purpose. The Sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Seller's Brokers herein. Transfer of the Property shall be by Quitclaim Deed. All parties acknowledge that Seller is a party to this Agreement solely in its capacity as chapter 11 debtor in possession and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against Seller, its manager Sarina Browndorf, or the estate in connection with this transaction, the the Seller and Ms. Browndorf shall in no event have any personal liability whatsoever , it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of the Seller's bankruptcy estate.

**PERSONAL PROPERTY.** All personal property is excluded from the purchase price. The Savant system and all attached components are included in the purchase price.

**TAXES; PRORATIONS; COSTS OF SALE.** All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The Sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the Sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this Sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

**BANKRUPTCY COURT APPROVAL; OVERBIDDING.** The Sale is subject to notice to creditors, approval by the Bankruptcy Court, and better qualified bids received by Seller through and including the Bankruptcy Court hearing to confirm the Sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so, and Seller holds sole and absolute discretion with regard to the foregoing. Buyer acknowledges and agrees that if the Bankruptcy Court approves the Sale to a different buyer (the "Successful Overbidder") at the hearing on the Sale, the Seller may hold the Buyer's deposit pending close of the Sale to the Successful Overbidder and, if the Successful Overbidder does not timely close its purchase of the Property, the Seller has the right to close the Sale to the Buyer at the Purchase Price hereunder, or such higher price as the Buyer may have bid at the hearing on the Sale.

**BROKERS.** Seller is represented by Coldwell Banker. Buyer is represented by Keller Williams Irvine. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property as follows: 2.5% to Coldwell Banker and 2.5% to Keller Willliams Irvine in connection with the closing of the Sale. Seller's Brokers and Buyer's Brokers are collectively referred to herein as the "Brokers". No commission or compensation shall be due or payable to Brokers in connection with this Agreement or Sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder, or other person entitled to any fee, commission, or other compensation in connection with the Sale and Buyer shall indemnify, defend, protect, and hold Seller and the related bankruptcy estate harmless of, from, and against any claims, demands, actions, causes of action, losses, liabilities, costs, and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions, or other compensation of any kind are hereafter asserted.

**MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of

Case 8:21-bk-12507-TA  Doc 88  Filed 05/11/22  Entered 05/11/22 14:45:31  Desc
Main Document  Page 39 of 123

DocuSign Envelope ID: ...
DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

any resulting actual damage to the Property, Seller may, at Seller's sole option: (i) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the Initial Deposit shall be refunded to Buyer without interest; or (ii) make required repairs at the bankruptcy estate's expense; or (iii) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the Sale; or (iv) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart (b), (c), or (d) of this paragraph, Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property. Conditions related to the Covid-19 pandemic shall not constitute a material change in condition under this Counter-Offer.

**REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the Sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the Sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Initial Deposit (plus any increase thereof by Buyer). In the event Buyer fails to close the Sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under this Agreement, Buyer's Initial Deposit (plus any increase thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. This provision shall apply equally to the Initial Deposit (and any increase thereof by Buyer) without interest. If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement. Release of funds will require mutual, signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT TIME OF ANY INCREASED DEPOSIT, BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R.FORM RID [    [Buyer's Initials]

**BANKRUPTCY COURT JURISDICTION.** The United States Bankruptcy Court for the Central District of California, Santa Ana Division shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the State of California, the United States of America, and title 11 of the United States Code.

**"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.** Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Seller's Brokers have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) the value of the Property; (ii) the income to be derived from the Property; (iii) the suitability of the Property, or lack

Page 5 of 10

34

thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) the habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) the manner, quality, state of repair, or lack of repair of the Property; (vi) the nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) the compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) the manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) the compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601, et seq.), the Clean Water Act (33 U.S.C. § 1251, et seq.), California Health and Safety Code §§ 25117 or 25316, or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any due diligence materials or preliminary report regarding title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter. Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Brokers have provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Brokers shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

**BROKERS.** Seller's Brokers herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer. In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Seller's Brokers, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

Page 6 of 10

DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

**OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.** Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property. In deciding to proceed with the Sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller. Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor Seller's Brokers nor any other person has made or makes any representations as to the accuracy or completeness of such information. Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Seller's Brokers from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation. NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER. Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

**PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.**

      A.    BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER. Seller and Seller's Brokers strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

      B.    Buyer shall select and employ, at Buyer's sole expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s), to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of

occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's interests, in, on, or affecting the Property, and to approve or disapprove said inspection within the period and in the manner set forth in this Agreement.

**RETROFITTING.** All required retrofitting including but not limited to the payment of City Report, installation of smoke and carbon monoxide detectors, low flow toilets and compliance with all governmental agencies shall be Buyer's responsibility for cost and completion.

**COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.** Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements, or improvements to the Property except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants, and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

**WRITTEN AFFIRMATION OF SELLER REQUIRED.** Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several counter-offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's "Affirmation of Agreement" attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

**ATTORNEYS' FEES.** In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation,

DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA-1FACEA6CD290

all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**EXPIRATION OF COUNTER-OFFER.** This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller, on or before 5:00 p.m., Pacific time, on April 2, 2022. Such acceptance shall nevertheless be subject to the receipt of Seller's Affirmation of Agreement.

**AGREED AND ACCEPTED:**

BUYER:

Dated: 4/2/2022          4/2/2022

By:

Michael Kim

SELLER (subject to execution of Seller's Affirmation of Agreement):

Dated: 3/30/2022 | 5:33 EDT

By:

Sarina Browndorf, in her capacity as manager of DCM-P3, LLC, chapter 11 debtor and debtor in possession

Subject to residents vacating residence prior to removal of contingencies. Upon residents vacating, buyers shall have walk through of home to confirm home condition remains the same as initial inspection before contingencies are lifted.

DocuSign Envelope ID: CEFB26BE-D181-4376-8BEA...

## EXHIBIT "A"

### SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and any qualified overbidders.  Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this Agreement.

SELLER

Dated:  4/20/2022  |  7:42  EDT

By:  _____

Sarina Browndorf, in her capacity as manager of DCM-P3, LLC, chapter 11 debtor and debtor in possession

39



## CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
(C.A.R. FORM RPA, 12/21)

Date Prepared: _March 23, 2022_

1. **OFFER:**
   A. **THIS IS AN OFFER FROM** _Michael K. Kim - Trustee, Elisa K. Yoo - Trustee_ ("Buyer").
   B. **THE PROPERTY to be acquired is** _34 Black Hawk_ , situated
      in _Irvine_ (City), _Orange_ (County), California, _92603_ (Zip Code),
      Assessor's Parcel No(s). _46403124_ ("Property").
      **(Postal/Mailing address may be different from city jurisdiction. Buyer is advised to investigate.)**
   C. THE TERMS OF THE PURCHASE ARE SPECIFIED BELOW AND ON THE FOLLOWING PAGES.
   D. Buyer and Seller are referred to herein as the "Parties." Brokers and Agents are **not** Parties to this Agreement.
2. **AGENCY:**
   A. **DISCLOSURE:** The Parties each acknowledge receipt of a "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD) if represented by a real estate licensee. Buyer's Agent is not legally required to give to Seller's Agent the AD form Signed by Buyer. Seller's Agent is not legally obligated to give to Buyer's Agent the AD form Signed by Seller.
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction.

   **Seller's Brokerage Firm** _Coldwell Banker Realty_ License Number _00616212_
   Is the broker of (check one): [X] the Seller; or [ ] both the Buyer and Seller (Dual Agent).
   **Seller's Agent** _Greg Bingham_ License Number _01309137_
   Is (check one): [X] the Seller's Agent. (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).
   **Buyer's Brokerage Firm** _Keller Williams Realty Irvine_ License Number _01926151_
   Is the broker of (check one): [X] the Buyer; or [ ] both the Buyer and Seller (Dual Agent).
   **Buyer's Agent** _Hannah Park_ License Number _02029205_
   Is (check one): [X] the Buyer's Agent. (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).
   C. [ ] More than one Brokerage represents [ ] Seller, [ ] Buyer. See, Additional Broker Acknowledgement (C.A.R. Form ABA).
   D. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a [X] "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).
3. **TERMS OF PURCHASE AND ALLOCATION OF COSTS:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs provide further explanation. This form is 16 pages. The Parties are advised to read all 16 pages.

| | Paragraph # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| A | 5, 5B (cash) | **Purchase Price** | $ _5,500,000.00_ | [ ] All Cash |
| B | | **Close of Escrow (COE)** | [X] _30_ Days after Acceptance OR on [ ] _____ (date) | |
| C | 32A | **Expiration of Offer** | 3 calendar days after all Buyer Signature(s) or _____ (date), at 5PM or _____ [ ] AM/ [ ] PM | |
| D(1) | 5A(1) | **Initial Deposit Amount** | $ _165,000.00_ ( _3.0_ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | within 3 (or _____ ) business days after Acceptance by wire transfer OR [ ] |
| D(2) | 5A(2) | [ ] **Increased Deposit** (Money placed into escrow after the initial deposit. Use form DID at time increased deposit is made.) | $ _____ ( _____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | Upon removal of all contingencies OR [ ] _____ (date) OR [ ] |
| E(1) | 5C(1) | **Loan Amount(s):** First Interest Rate Points | $ _3,850,000.00_ ( _70.0_ % of purchase price) Fixed rate or [ ] initial adjustable rate not to exceed _____ % Buyer to pay zero points or up to _____% of the loan amount | Conventional or, if checked, [ ] FHA [ ] VA (CAR Forms FVAC, HID attached) [ ] Seller Financing [ ] Other: |
| | | If FHA or VA checked, Deliver list of lender required repairs | 17 (or _____ ) Days after Acceptance | |
| E(2) | 5C(2) | **Additional Financed Amount** Interest Rate Points | $ _____ ( _____ % of purchase price) Fixed rate or [ ] initial adjustable rate not to exceed _____ % Buyer to pay zero points or up to _____% of the loan amount | Conventional or, if checked, [ ] Seller Financing [ ] Other: |
| E(3) | 7A | **Occupancy Type** | Primary, or if checked, [ ] Secondary [ ] Investment | |
| F | 5D | **Balance of Down Payment** | $ _1,485,000.00_ | |
| | | **PURCHASE PRICE TOTAL** | $ _5,500,000.00_ | |

© 2021, California Association of REALTORS®, Inc.

**RPA 12/21 (PAGE 1 OF 16)** Buyer's Initials X _MK_ _EbY_ Seller's Initials _SBrownA___

## CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 1 OF 16)

Keller Williams Realty Irvine, 4010 Barranca Pkwy #100 Irvine CA 92604 Phone: 949.656070 Fax: 34 Black Hawk
Hannah Park Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com

40

DocuSign Envelope ID: B1B4578D-EF7E-485E-A767-2DF583-2D4C9607

Property Address: 34 Black Hawk, Irvine, CA 92603                                Date: March 23, 2022

| | Paragraph # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| G(1) | 5E | Seller Credit, if any, to Buyer | ☐ $ _____ ( _____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | Seller credit to be applied to closing costs OR ☐ Other: |
| G(2) | | ADDITIONAL FINANCE TERMS: | | |
| H(1) | 5B | Verification of All Cash (sufficient funds) | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| H(2) | 6A | Verification of Down Payment and Closing Costs | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| H(3) | 6B | Verification of Loan Application | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | ☐ Prequalification ☒ Preapproval ☐ Fully underwritten preapproval |
| I | | Intentionally Left Blank | | |
| J | 16 | Final Verification of Condition | 5 (or _____) Days prior to COE | |
| K | 23 | Assignment Request | 17 (or _____) Days after Acceptance | |
| L | 8 | CONTINGENCIES | TIME TO REMOVE CONTINGENCIES | CONTINGENCY REMOVED |
| L(1) | 8A | Loan(s) | 17 (or _____) Days after Acceptance | ☐ No loan contingency |
| L(2) | 8B | Appraisal: Appraisal contingency based upon appraised value at a minimum of purchase price or ☐ $ _____ | 17 (or _____) Days after Acceptance | ☐ No appraisal contingency Removal of appraisal contingency does not eliminate appraisal cancellation rights in FVAC. |
| L(3) | 8C, 12 | Investigation of Property | 17 (or _____) Days after Acceptance | REMOVAL OR WAIVER OF CONTINGENCY: |
| | | Informational Access to Property Buyer's right to access the Property for informational purposes is **NOT** a contingency, does **NOT** create cancellation rights, and applies even if contingencies are removed. | 17 (or _____) Days after Acceptance | Any contingency in L(1)-L(7) may be removed or waived by checking the |
| L(4) | 8D, 14A | Review of Seller Documents | 17 (or _____) Days after Acceptance, or 5 Days after receipt, whichever is later | applicable box above or attaching a Contingency Removal (C.A.R. Form |
| L(5) | 8E, 13A | Preliminary ("Title") Report | 17 (or _____) Days after Acceptance, or 5 Days after receipt, whichever is later | CR) and checking the applicable box therein. Removal or Waiver at |
| L(6) | 8F, 11K | Common Interest Disclosures required by Civil Code § 4525 or this Agreement | 17 (or _____) Days after Acceptance, or 5 Days after receipt, whichever is later | time of offer is against Agent advice. See paragraph 8H. |
| L(7) | 8G, 9B(6) | Review of leased or liened items (Such as for solar panels or propane tanks or PACE or HERO liens) | 17 (or _____) Days after Acceptance, or 5 Days after receipt, whichever is later | ☐ CR attached |
| L(8) | 8J | Sale of Buyer's Property Sale of Buyer's property is not a contingency, UNLESS checked here: ☐ C.A.R. Form COP attached | | |
| M | | Possession | Time for Performance | Additional Terms |
| M(1) | | Time of Possession | Upon notice of recordation, OR ☐ 6 PM or _____ ☐ AM/☐ PM on date specified, as applicable, in 3M(2) or attached TOPA. | |
| M(2) | 7C | Seller Occupied or Vacant units | COE date or, if checked below, ☐ _____ days after COE (29 or fewer days) ☐ _____ days after COE (30 or more days) | C.A.R. Form SIP attached if 29 or fewer days. C.A.R. Form RLAS attached if 30 or more days. |
| M(3) | | Tenant Occupied units | See Tenant Occupied Property Addendum (C.A.R. form TOPA) | If tenant occupied ☐ TOPA or ☐ Other, attached |
| N | | Documents/Fees/Compliance | Time for Performance | |
| N(1) | 14A | Seller Delivery of Documents | 7 (or _____) Days after Acceptance | |
| N(2) | 19B | Sign and return Escrow Holder Provisions and Instructions | 5 (or _____) Days after receipt | |
| N(3) | 11K(2) | Time to pay fees for ordering HOA Documents | 3 (or _____) Days after Acceptance | |
| N(4) | 10B(1) | Install smoke alarm(s), CO detector(s), water heater bracing | 7 (or _____) Days after Acceptance | |
| N(5) | 28 | Evidence of representative authority | 3 Days after Acceptance | |
| O | | Intentionally Left Blank | | |

RPA 12/21 (PAGE 2 OF 16)          Buyer's Initials X M Kelly          Seller's Initials S Brown AB



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 2 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          34 Black Hawk

41

DocuSign Envelope ID: B1B4578D-EF7E-485E-A767-

Property Address: 34 Black Hawk, Irvine, CA 92603     Date: *March 23, 2022*

| P | Items Included and Excluded | |
|---|---|---|
| P(1) | 9 | Items Included - All items specified in Paragraph 9B are included and the following, if checked: |

☐ Stove(s), oven(s), stove/oven combo(s);
☐ Refrigerator(s);
☐ Wine Refrigerator(s);
☒ Washer(s);
☒ Dryer(s);
☐ Dishwasher(s);
☐ Microwave(s);

☐ Video doorbell(s);
☐ Security camera equipment;
☐ Security system(s)/alarm(s), other than separate video doorbell and camera equipment;
☐ Smart home control devices;
☐ Wall mounted brackets for video or audio equipment;

☐ Above-ground pool(s) / ☐ spa(s);
☒ Bathroom mirrors, unless excluded below;
☐ Electric car charging systems and stations;
☐ Potted trees/shrubs;

Additional Items Included:
☒ mirrors on all walls, outdoor furniture in the outdoor loggia

| P(2) | 9 | Excluded Items: |
|---|---|---|
| | | ☐ _____ ; ☐ _____ ☐ _____ ; |

| Q | Allocation of Costs | | | |
|---|---|---|---|---|
| | Paragraph # | Item Description | Who Pays (if Both is checked, cost to be split equally unless Otherwise Agreed) | Additional Terms |
| Q(1) | 10A, 11A | Natural Hazard Zone Disclosure Report, including tax information | ☐ Buyer ☒ Seller ☐ Both<br><br>☐ Provided by: *Seller's Choice of Reputable Company* | ☒ Environmental<br>☐ Other |
| Q(2) | | *Termite* Report | ☐ Buyer ☒ Seller ☐ Both | |
| Q(3) | | _____ Report | ☐ Buyer ☐ Seller ☐ Both | |
| Q(4) | 10B(1) | Smoke alarms, CO detectors, water heater bracing | ☐ Buyer ☒ Seller ☐ Both | |
| Q(5) | 10A 10B(2) | Government Required Point of Sale **inspections, reports** | ☐ Buyer ☐ Seller ☐ Both | |
| Q(6) | 10B(2)(A) | Government Required Point of Sale **corrective/remedial actions** | ☐ Buyer ☐ Seller ☐ Both | |
| Q(7) | 19B | Escrow Fees | ☐ Buyer ☐ Seller ☐ Both<br>☒ Each to pay their own fees | Escrow Holder:<br>*See Text Overflow Addendum* |
| Q(8) | 13 | Owner's title insurance policy | ☐ Buyer ☒ Seller ☐ Both | Title Company (if different from Escrow Holder):<br>*See Text Overflow Addendum* |
| Q(9) | | Buyer's Lender title insurance policy | Buyer | Unless Otherwise Agreed, Buyer shall purchase any title insurance policy insuring Buyer's lender. |
| Q(10) | | County transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both | |
| Q(11) | | City transfer tax, fees | ☐ Buyer ☒ Seller ☐ Both | |
| Q(12) | 11K(2) | HOA fee for preparing disclosures | Seller | |
| Q(13) | | HOA certification fee | Buyer | |
| Q(14) | | HOA transfer fees | ☐ Buyer ☒ Seller ☐ Both | Unless Otherwise Agreed, Seller shall pay for separate HOA move-out fee and Buyer shall pay for separate move-in fee. Applies if separately billed or itemized with cost in transfer fee. |
| Q(15) | | Private transfer fees | Seller, or if checked, ☐ Buyer ☐ Both | |
| Q(16) | | _____ fees or costs | ☐ Buyer ☐ Seller ☐ Both | |
| Q(17) | | _____ fees or costs | ☐ Buyer ☐ Seller ☐ Both | |
| Q(18) | 10C | Home warranty plan: _____ | ☐ Buyer ☐ Seller ☐ Both<br>☒ Buyer waives home warranty plan<br>Issued by: _____ | Cost not to exceed $ _____ |

| R | OTHER TERMS: |
|---|---|
| | |

RPA 12/21 (PAGE 3 OF 16)     Buyer's Initials X ____ / ____     Seller's Initials ____ 

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 3 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com     34 Black Hawk

Property Address: 34 Black Hawk , Irvine, CA 94003      Date: *March 23, 2022*

4. **PROPERTY ADDENDA AND ADVISORIES:** (check all that apply)
   A. **PROPERTY TYPE ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:
      ☐ Probate Agreement Purchase Addendum (C.A.R. Form PA-PA)
      ☐ Manufactured Home Purchase Addendum (C.A.R. Form MH-PA)
      ☐ Tenant Occupied Property Addendum (C.A.R. Form TOPA) (Should be checked whether current tenants will remain or not.)
      ☐ Tenancy in Common Purchase Addendum (C.A.R. Form TIC-PA)
      ☐ Stock Cooperative Purchase Addendum (C.A.R. Form COOP-PA)
      ☐ Other

   B. **OTHER ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:
      ☐ Addendum # _____ (C.A.R. Form ADM)    ☐ Short Sale Addendum (C.A.R. Form SSA)
      ☐ Back Up Offer Addendum (C.A.R. Form BUO)    ☐ Court Confirmation Addendum (C.A.R. Form CCA)
      ☐ Septic, Well, Property Monument and Propane Addendum (C.A.R. Form SWPI)
      ☐ Buyer Intent to Exchange Addendum (C.A.R. Form BXA)   ☐ Seller Intent to Exchange Addendum (C.A.R. Form SXA)
      ☐ Other    ☐ Other

   C. **BUYER AND SELLER ADVISORIES:** (Note: All Advisories below are provided for reference purposes only and are not intended to be incorporated into this Agreement.)
      ☒ Buyer's Investigation Advisory (C.A.R. Form BIA)    ☒ Fair Housing and Discrimination Advisory (C.A.R. Form FHDA)
      ☒ Wire Fraud Advisory (C.A.R. Form WFA)    ☒ Cal. Consumer Privacy Act Advisory (C.A.R. Form CCPA)
           (Parties may also receive a privacy disclosure from their own Agent.)
      ☐ Wildfire Disaster Advisory (C.A.R. Form WFDA)    ☐ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
      ☐ Trust Advisory (C.A.R. Form TA)    ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)
      ☐ REO Advisory (C.A.R. Form REO)    ☐ Probate Advisory (C.A.R. Form PA)
      ☐ Other    ☐ Other

5. **ADDITIONAL TERMS AFFECTING PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **DEPOSIT:**
      (1) **INITIAL DEPOSIT:** Buyer shall deliver deposit directly to Escrow Holder. If a method other than wire transfer is specified in **paragraph 3D(1)** and such method is unacceptable to Escrow Holder, then upon notice from Escrow Holder, delivery shall be by wire transfer.
      (2) **INCREASED DEPOSIT:** Increased deposit specified in **paragraph 3D(2)** is to be delivered to Escrow Holder in the same manner as the Initial Deposit. If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount by signing a new liquidated damages clause (C.A.R. Form DID) at the time the increased deposit is delivered to Escrow Holder.
      (3) **RETENTION OF DEPOSIT:** Paragraph 29, if initialed by all Parties or otherwise incorporated into this Agreement, specifies a remedy for Buyer's default. Buyer and Seller are advised to consult with a qualified California real estate attorney before adding any other clause specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase. Any such clause shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code.
   B. **ALL CASH OFFER:** If an all cash offer is specified in **paragraph 3A**, no loan is needed to purchase the Property. This Agreement is NOT contingent on Buyer obtaining a loan. Buyer shall, within the time specified in **paragraph 3H(1)**, Deliver written verification of funds sufficient for the purchase price and closing costs.
   C. **LOAN(S):**
      (1) **FIRST LOAN:** This loan will provide for conventional financing **UNLESS** FHA, VA, Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(1)**.
      (2) **ADDITIONAL FINANCED AMOUNT:** If an additional financed amount is specified in **paragraph 3E(2)**, that amount will provide for conventional financing **UNLESS** Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(2)**.
      (3) **BUYER'S LOAN STATUS:** Buyer authorizes Seller and Seller's Authorized Agent to contact Buyer's lender(s) to determine the status of any Buyer's loan specified in **paragraph 3E**, or any alternate loan Buyer pursues, whether or not a contingency of this Agreement. If the contact information for Buyer's lender(s) is different from that provided under the terms of **paragraph 6B**, Buyer shall Deliver the updated contact information within 1 Day of Seller's request.
      (4) **FHA/VA:** If FHA or VA is checked in **paragraph 3E(1)**, a FHA/VA amendatory clause (C.A.R. Form FVAC) shall be incorporated and Signed by all Parties. Buyer shall, within the time specified in **paragraph 3E(1)**, Deliver to Seller written notice (C.A.R. Form RR or AEA) **(i)** of any lender requirements that Buyer requests Seller to pay for or otherwise correct or **(ii)** that there are no lender requirements. Notwithstanding Seller's agreement that Buyer may obtain FHA or VA financing, Seller has no obligation to pay or satisfy any or all lender requirements unless agreed in writing.
   D. **BALANCE OF PURCHASE PRICE (DOWN PAYMENT, paragraph 3F) (including all-cash funds)** to be deposited with Escrow Holder pursuant to Escrow Holder instructions.
   E. **LIMITS ON CREDITS TO BUYER:** Any credit to Buyer as specified in **paragraph 3G(1)** or Otherwise Agreed, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender, if any, and made at Close Of Escrow. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then **(i)** the Contractual Credit from Seller shall be reduced to the Lender Allowable Credit, and **(ii)** in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

6. **ADDITIONAL FINANCING TERMS:**
   A. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Written verification of Buyer's down payment and closing costs, within the time specified in **paragraph 3H(2)** may be made by Buyer or Buyer's lender or loan broker pursuant to **paragraph 6B**.
   B. **VERIFICATION OF LOAN APPLICATIONS:** Buyer shall Deliver to Seller, within the time specified in **paragraph 3H(3)** a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in **paragraph 3E**. If any loan specified in **paragraph 3H(3)** is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate.

RPA 12/21 (PAGE 4 OF 16)    Buyer's Initials X _____ / _____    Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 4 OF 16)**

DocuSign Envelope ID: B1B4578D-EF7E-485E-A767-...

Property Address: *34 Black Hawk, Irvine, CA 92603*                                    Date: *March 23, 2022*

**C. BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including, but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price, and to sell to Buyer in reliance on Buyer's specified financing. Buyer shall pursue the financing specified in this Agreement, even if Buyer also elects to pursue an alternative form of financing. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in this Agreement but shall not interfere with closing at the purchase price on the COE date (**paragraph 3B**) even if based upon alternate financing. Buyer's inability to obtain alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

**7. CLOSING AND POSSESSION:**

**A. OCCUPANCY:** Buyer intends to occupy the Property as indicated in **paragraph 3E(3)**. Occupancy may impact available financing.

**B. CONDITION OF PROPERTY ON CLOSING:**

(1) Unless Otherwise Agreed: (i) the Property shall be delivered **"As-Is"** in its PRESENT physical condition as of the date of Acceptance; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow or at the time possession is delivered to Buyer, if not on the same date. If items are not removed when possession is delivered to Buyer, all items shall be deemed abandoned. Buyer, after first Delivering to Seller written notice to remove the items within **3 Days**, may pay to have such items removed or disposed of and may bring legal action, as per this Agreement, to receive reasonable costs from Seller.

(2) **Buyer is strongly advised to conduct Investigations of the entire Property in order to determine its present condition. Seller and Agents may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had all required permits issued and/or finalized.**

**C. SELLER REMAINING IN POSSESSION AFTER CLOSE OF ESCROW:** If Seller has the right to remain in possession after Close Of Escrow pursuant to **paragraph 3M(2)** or as Otherwise Agreed, (i) the Parties are advised to consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; (ii) Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan; and (iii) consult with a qualified California real estate attorney where the Property is located to determine the ongoing rights and responsibilities of both Buyer and Seller with regard to each other, including possible tenant rights, and what type of written agreement to use to document the relationship between the Parties.

**D. At Close Of Escrow:** (i) Seller assigns to Buyer any assignable warranty rights for items included in the sale; and (ii) Seller shall Deliver to Buyer available Copies of any such warranties. Agents cannot and will not determine the assignability of any warranties.

**E.** Seller shall, on Close Of Escrow unless Otherwise Agreed and even if Seller remains in possession, provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems, intranet and Internet-connected devices included in the purchase price, garage door openers, and all items included in either **paragraph 3P** or **paragraph 9**. If the Property is a condominium or located in a common interest development, Seller shall be responsible for securing or providing any such items for Association amenities, facilities, and access. Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

**8. CONTINGENCIES AND REMOVAL OF CONTINGENCIES:**

**A. LOAN(S):**

(1) This Agreement is, **unless otherwise specified in paragraph 3L(1) or an attached CR form**, contingent upon Buyer obtaining the loan(s) specified. If contingent, Buyer shall act diligently and in good faith to obtain the designated loan(s). **If there is no appraisal contingency or the appraisal contingency has been waived or removed**, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan and Buyer is able to satisfy lender's non-appraisal conditions for closing the loan.

(2) Buyer is advised to investigate the insurability of the Property as early as possible, as this may be a requirement for lending. Buyer's ability to obtain insurance for the Property, including fire insurance, is part of Buyer's Investigation of Property contingency. Failure of Buyer to obtain insurance may justify cancellation based on the Investigation contingency but not the loan contingency.

(3) Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement, unless Otherwise Agreed.

(4) If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.

(5) NO LOAN CONTINGENCY: If "No loan contingency" is checked in **paragraph 3L(1)**, obtaining any loan specified is NOT a contingency of this Agreement. If Buyer does not obtain the loan specified, and as a result is unable to purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

**B. APPRAISAL:**

(1) This Agreement is, **unless otherwise specified in paragraph 3L(2) or an attached CR form**, contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the amount specified in **paragraph 3L(2)**, without requiring repairs or improvements to the Property. Appraisals are often a reliable source to verify square footage of the subject Property. However, the ability to cancel based on the measurements provided in an appraisal falls within the Investigation of Property contingency. The appraisal contingency is solely limited to the value determined by the appraisal. For any cancellation based upon this appraisal contingency, Buyer shall Deliver a Copy of the written appraisal to Seller, upon request by Seller.

(2) **NO APPRAISAL CONTINGENCY:** If "No appraisal contingency" is checked in **paragraph 3L(1)**, then Buyer may not use the loan contingency specified in **paragraph 3L(1)** to cancel this Agreement if the sole reason for not obtaining the loan is that the appraisal relied upon by Buyer's lender values the property at an amount less than that specified in **paragraph 3L(2)**. If Buyer is unable to obtain the loan specified solely for this reason, Seller may be entitled to Buyer's deposit or other legal remedies.

**C. INVESTIGATION OF PROPERTY:** This Agreement is, as specified in **paragraph 3L(3)**, contingent upon Buyer's acceptance of the condition of, and any other matter affecting, the Property. **See paragraph 12.**

**D.** REVIEW OF SELLER DOCUMENTS: This Agreement is, as specified in **paragraph 3L(4)**, contingent upon Buyer's review of Seller's documents required in **paragraph 14A**.

RPA 12/21 (PAGE 5 OF 16)     Buyer's Initials X    Seller's Initials 

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 5 OF 16)**

Property Address: 34 Black Hawk , Irvine, CA 92603        Date: *March 23, 2022*

E. **TITLE:**
   (1) This Agreement is, as specified in **paragraph 3L(5)**, contingent upon Buyer's ability to obtain the title policy provided for in **paragraph 13G** and on Buyer's review of a current Preliminary Report and items that are disclosed or observable even if not on record or not specified in the Preliminary Report, and satisfying Buyer regarding the current status of title. Buyer is advised to review all underlying documents and other matters affecting title, including, but not limited to, any documents or deeds referenced in the Preliminary Report and any plotted easements.
   (2) Buyer has **5 Days** after receipt to review a revised Preliminary Report, if any, furnished by the Title Company and cancel the transaction if the revised Preliminary Report reveals material or substantial deviations from a previously provided Preliminary Report.

F. **CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES (IF APPLICABLE):** This Agreement is, as specified in **paragraph 3L(6)**, contingent upon Buyer's review of Common Interest Disclosures required by Civil Code § 4525 and under **paragraph 11K** ("CI Disclosures").

G. **BUYER REVIEW OF LEASED OR LIENED ITEMS CONTINGENCY:** Buyer's review of and ability and willingness to assume any lease, maintenance agreement or other ongoing financial obligation, or to accept the Property subject to any lien, disclosed pursuant to **paragraph 9B(6)**, is, as specified in **paragraph 3L(7)**, a contingency of this Agreement. Any assumption of the lease shall not require any financial obligation or contribution by Seller. Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement if Buyer, by the time specified in **paragraph 3L(7)**, refuses to enter into any necessary written agreements to accept responsibility for all obligations of Seller-disclosed leased or liened items.

H. **REMOVAL OR WAIVER OF CONTINGENCIES WITH OFFER: Buyer shall have no obligation to remove a contractual contingency unless Seller has provided all required documents, reports, disclosures, and information pertaining to that contingency.** If Buyer does remove a contingency without first receiving all required information from Seller, Buyer is relinquishing any contractual rights that apply to that contingency. **If Buyer removes or waives any contingencies without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Agent.**

I. **REMOVAL OF CONTINGENCY OR CANCELLATION:**
   (1) **For any contingency specified in paragraph 3L or 8, Buyer shall, within the applicable period specified, remove the contingency or cancel this Agreement.**
   (2) For the contingencies for review of Seller Documents, Preliminary Report, and Condominium/Planned Development Disclosures, Buyer shall, within the time specified in **paragraph 3L** or **5 Days** after receipt of Seller Documents or CI Disclosures, whichever occurs later, remove the applicable contingency in writing or cancel this Agreement.
   (3) If Buyer does not remove a contingency within the time specified, Seller, after first giving Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), shall have the right to cancel this Agreement.

J. **SALE OF BUYER'S PROPERTY:** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer unless the Sale of Buyer's Property (C.A.R. Form COP) is checked as a contingency of this Agreement in **paragraph 3L(8)**.

9. **ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**
   A. **NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the Multiple Listing Service (MLS), flyers, marketing materials, or disclosures are NOT included in the purchase price or excluded from the sale unless specified in this paragraph or **paragraph 3P** or as Otherwise Agreed. Any items included herein are components of the home and are not intended to affect the price. All items are transferred without Seller warranty.
   B. **ITEMS INCLUDED IN SALE:**
      (1) All EXISTING fixtures and fittings that are attached to the Property;
      (2) EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances and appliances for which special openings or encasements have been made (whether or not checked in **paragraph 3P**), window and door screens, awnings, shutters, window coverings (which includes blinds, curtains, drapery, shutters or any other materials that cover any portion of the window), attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment (including, but not limited to, any cleaning equipment such as motorized/automatic pool cleaners, pool nets, pool covers), garage door openers/remote controls, mailbox, in-ground landscaping, water features and fountains, water softeners, water purifiers, light bulbs (including smart bulbs) and all items specified as included in **paragraph 3P, if currently existing at the time of Acceptance.**
      **Note:** If Seller does not intend to include any item specified as being included above because it is not owned by Seller, whether placed on the Property by Agent, stager or other third party, the item should be listed as being excluded in **paragraph 3P** or excluded by Seller in a counter offer.
      (3) Security System includes any devices, hardware, software, or control units used to monitor and secure the Property, including but not limited to, any motion detectors, door or window alarms, and any other equipment utilized for such purpose. If checked in **paragraph 3P**, all such items are included in the sale, whether hard wired or not.
      (4) Home Automation (Smart Home Features) includes any electronic devices and features including, but not limited to, thermostat controls, kitchen appliances not otherwise excluded, and lighting systems, that are connected (hard wired or wirelessly) to a control unit, computer, tablet, phone, or other "smart" device. Any Smart Home devices and features that are physically affixed to the real property, and also existing light bulbs, are included in the sale. Buyer is advised to use a counter offer to address more directly any items to be excluded.
      (5) Non-Dedicated Devices: If checked in **paragraph 3P**, all smart home and security system control devices are included in the sale, except for any non-dedicated personal computer, tablet, or phone used to control such features. Buyer acknowledges that a separate device and access to wifi or Internet may be required to operate some smart home features and Buyer may have to obtain such device after Close Of Escrow. Buyer is advised to change all passwords and ensure the security of any smart home features.
      (6) LEASED OR LIENED ITEMS AND SYSTEMS: Seller, within the time specified in **paragraph 3N(1)**, shall (i) disclose to Buyer if any item or system specified in **paragraph 3P** or **9B** or otherwise included in the sale is leased, or not owned by Seller, or is subject to any maintenance or other ongoing financial obligation, or specifically subject to a lien or other encumbrance or loan, and (ii) Deliver to Buyer all written materials (such as lease, warranty, financing, etc.) concerning any such item.
      (7) Seller represents that all items included in the purchase price, unless Otherwise Agreed, (i) are owned by Seller and shall be transferred free and clear of liens and encumbrances, except the items and systems identified pursuant to **paragraph 9B(6)**, and (ii) are transferred without Seller warranty regardless of value. Seller shall cooperate with the identification of any software or applications and Buyer's efforts to transfer any services needed to operate any Smart Home Features or other items included in this Agreement, including, but not limited to, utilities or security systems.

RPA 12/21 (PAGE 6 OF 16)    Buyer's Initials \_\_\_\_ / \_\_\_\_    Seller's Initials \_\_\_\_ / \_\_\_\_

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 6 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    34 Black Hawk

45

C. **ITEMS EXCLUDED FROM SALE:** Unless Otherwise Agreed, the following items are excluded from sale: (i) All items specified in **paragraph 3P(2)**; (ii) audio and video components (such as flat screen TVs, speakers and other items) if any such item is not itself attached to the Property, even if a bracket or other mechanism attached to the component or item is attached to the Property; (iii) furniture and other items secured to the Property for earthquake or safety purposes. **Unless otherwise specified in paragraph 3P(1), brackets attached to walls, floors or ceilings for any such component, furniture or item will be removed and holes or other damage shall be repaired, but not painted.**

10. **ALLOCATION OF COSTS:**
    A. **INSPECTIONS, REPORTS AND CERTIFICATES:** Paragraphs **3Q(1), (2), (3), and (5)** only determines who is to pay for the inspection, test, certificate or service ("Report") mentioned; **it does not determine who is to pay for any work recommended or identified in the Report. Agreements for payment of required work should be specified elsewhere in paragraph 3Q, or 3R, or in a separate agreement (such as C.A.R. Forms RR, RRRR, ADM or AEA).**
    B. **GOVERNMENT REQUIREMENTS AND CORRECTIVE OR REMEDIAL ACTIONS:**
       (1) **LEGALLY REQUIRED INSTALLATIONS AND PROPERTY IMPROVEMENTS:** Any required installation of smoke alarm or carbon monoxide device(s) or securing of water heater shall be completed within the time specified in **paragraph 3N(4)** and paid by the Party specified in **paragraph 3Q(4)**. If Buyer is to pay for these items, Buyer, as instructed by Escrow Holder, shall deposit funds into escrow or directly to the vendor completing the repair or installation. Prior to Close Of Escrow, Seller shall Deliver to Buyer written statement(s) of compliance in accordance with any Law, unless Seller is exempt. If Seller is to pay for these items and does not fulfill Seller's obligation in the time specified, and Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for Buyer's costs.
       (2) **POINT OF SALE REQUIREMENTS:**
           (A) Point of sale inspections, reports and repairs refer to any such actions required to be completed before or after Close Of Escrow that are required in order to close under any Law and paid by Party specified in **paragraphs 3Q(5) and 3Q(6)**. Unless Parties Otherwise Agree to another time period, any such repair, shall be completed prior to final verification of Property. If Buyer agrees to pay for any portion of such repair, Buyer, shall (i) directly pay to the vendor completing the repair or (ii) provide an invoice to Escrow Holder, deposit funds into escrow sufficient to pay for Buyer's portion of such repair and request Escrow Holder pay the vendor completing the repair.
           (B) Buyer shall be provided, within the time specified in **paragraph 3N(1)**, unless Parties Otherwise Agree to another time period, a Copy of any required government-conducted or point-of-sale inspection report prepared pursuant to this Agreement or in anticipation of this sale of the Property.
       (3) **REINSPECTION FEES:** If any repair in **paragraph 10B(1)** is not completed within the time specified and the lender requires an additional inspection to be made, Seller shall be responsible for any corresponding reinspection fee. If Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for those costs.
       (4) **INFORMATION AND ADVICE ON REQUIREMENTS:** Buyer and Seller are advised to seek information from a knowledgeable source regarding local and State mandates and whether they are point of sale requirements or requirements of ownership. Agents do not have expertise in this area and cannot ascertain all of the requirements or costs of compliance.
    C. **HOME WARRANTY:**
       (1) Buyer shall choose the coverages, regardless of any optional coverages indicated, of the home warranty plan and Buyer shall pay any cost of that plan, chosen by Buyer, that exceeds the amount allocated to Seller in **paragraph 3Q(18)**. Buyer is informed that home warranty plans have many optional coverages, including but not limited to, coverages for Air Conditioner and Pool/Spa. Buyer is advised to investigate these coverages to determine those that may be suitable for Buyer.
       (2) **If Buyer waives the purchase of a home warranty plan in paragraph 3Q(18), Buyer may still purchase a home warranty plan, at Buyer's expense, prior to Close Of Escrow.**

11. **STATUTORY AND OTHER DISCLOSURES (INCLUDING LEAD-BASED PAINT HAZARD DISCLOSURES) AND CANCELLATION RIGHTS:**
    A. **TDS, NHD, AND OTHER STATUTORY AND SUPPLEMENTAL DISCLOSURES:**
       (1) Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer: unless exempt, fully completed disclosures or notices required by §§ 1102 et. seq. and 1103 et. seq. of the Civil Code ("Statutory Disclosures"). Statutory Disclosures include, but are not limited to, a Real Estate Transfer Disclosure Statement (C.A.R. Form TDS), Natural Hazard Disclosure Statement ("NHD"), notice or actual knowledge of release of illegal controlled substance, notice of special tax and/or assessments (or, if allowed, substantially equivalent notice regarding the Mello-Roos Community Facilities Act of 1982 and Improvement Bond Act of 1915) and, if Seller has actual knowledge, of industrial use and military ordnance location (C.A.R. Form SPQ or ESD), and, if the Property is in a high or very high fire hazard severity area, the information, notices, documentation, and agreements required by §§ 1102.6(f) and 1102.19 of the Civil Code (C.A.R. Form FHDS).
       (2) The Real Estate Transfer Disclosure Statement required by this paragraph is considered fully completed if Seller has completed the section titled Coordination with Other Disclosure Forms by checking a box (Section I), and Seller has completed and answered all questions and Signed the Seller's Information section (Section II) and the Seller's Agent, if any, has completed and Signed the Seller's Agent's section (Section III), or, if applicable, an Agent Visual Inspection Disclosure (C.A.R. Form AVID). Section V acknowledgment of receipt of a Copy of the TDS shall be Signed after all previous sections, if applicable, have been completed. Nothing stated herein relieves a Buyer's Agent, if any, from the obligation to (i) conduct a reasonably competent and diligent visual inspection of the accessible areas of the Property and disclose, on Section IV of the TDS, or an AVID, material facts affecting the value or desirability of the Property that were or should have been revealed by such an inspection or (ii) complete any sections on all disclosures required to be completed by Buyer's Agent.
       (3) Seller shall, within the time specified in **paragraph 3N(1)**, provide "Supplemental Disclosures" as follows: (i) unless exempt from the obligation to provide a TDS, complete a Seller Property Questionnaire (C.A.R. Form SPQ) by answering all questions and Signing and Delivering a Copy to Buyer; (ii) if exempt from the obligation to provide a TDS, complete an Exempt Seller Disclosure (C.A.R. Form ESD) by answering all questions and Signing and Delivering a Copy to Buyer.
       (4) In the event Seller or Seller's Agent, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer under this paragraph, Seller shall, in writing, promptly provide a subsequent or amended TDS, Seller Property Questionnaire or other document, in writing, covering those items. Any such document shall be deemed an amendment to the TDS or SPQ. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies of which Buyer is otherwise aware, or which are discovered by Buyer or disclosed in reports or documents provided to or ordered and paid for by Buyer.

RPA 12/21 (PAGE 7 OF 16)        Buyer's Initials ___ ___        Seller's Initials ___ ___

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 7 OF 16)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com        34 Black Hawk    46

DocuSign Envelope ID: B1B4578D-EF7E-485E-A767-

Property Address: 34  Black Hawk , Irvine, CA 92603                                    Date: *March 23, 2022*

**B. LEAD DISCLOSURES:**

    (1) Seller shall, within the time specified in **paragraph 3N(1)**, for any residential property built before January 1, 1978, unless exempted by Law, Deliver to Buyer a fully completed Federal Lead-Based Paint Disclosures (C.A.R. Form LPD) and pamphlet ("Lead Disclosures").

    (2) Buyer shall, within the time specified in **paragraph 3L(3)**, have the opportunity to conduct a risk assessment or to inspect for the presence of lead-based paint hazards.

**C. HOME FIRE HARDENING DISCLOSURE AND ADVISORY:** For any transaction where a TDS is required, the property is located in a high or very high fire hazard severity zone, and the home was constructed before January 1, 2010 , Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer: **(i)** a home hardening disclosure required by law; and **(ii)** a statement of features of which the Seller is aware that may make the home vulnerable to wildfire and flying embers; and **(iii)** a final inspection report regarding compliance with defensible space requirements if one was prepared pursuant to Government Code § 51182 (C.A.R. Form FHDS).

**D. DEFENSIBLE SPACE DISCLOSURE AND ADDENDUM:** For any transaction in which a TDS is required and the property is located in a high or very high fire hazard severity zone, Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer **(i)** a disclosure of whether the Property is in compliance with any applicable defensible space laws designed to protect a structure on the Property from fire; and **(ii)** an addendum allocating responsibility for compliance with any such defensible space law (C.A.R. Form FHDS).

**E. WAIVER PROHIBITED:** Waiver of Statutory, Lead, and other Disclosures in **paragraphs 11A(1), 11B, 11C,** and **11D** are prohibited by Law.

**F. RETURN OF SIGNED COPIES:** Buyer shall, within the time specified in **paragraph 3L(3)** OR **5 Days** after Delivery of any disclosures specified in paragraphs **11 A, B, C** or **D**, and defensible space addendum in **paragraph 11D**, whichever is later, return Signed Copies of the disclosures, and if applicable, addendum, to Seller.

**G. TERMINATION RIGHTS:**

    (1) **Statutory and Other Disclosures:** If any disclosure specified in paragraphs **11A, B, C,** or **D**, or subsequent or amended disclosure to those just specified, is Delivered to Buyer after the offer is Signed, Buyer shall have the right to terminate this Agreement within **3 Days** after Delivery in person, or **5 Days** after Delivery by deposit in the mail, or by an electronic record or email satisfying the Uniform Electronic Transactions Act (UETA), by giving written notice of rescission to Seller or Seller's Authorized Agent. If Buyer does not rescind within this time period, Buyer has been deemed to have approved the disclosure and shall not have the right to cancel.

    (2) **Defensible Space Compliance:** If, by the time specified in **paragraph 11F**, Buyer does not agree to the terms regarding defensible space compliance Delivered by Seller, as indicated by mutual signatures on the FHDS, then Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement.

**H. WITHHOLDING TAXES:** Buyer and Seller hereby instruct Escrow Holder to withhold the applicable required amounts to comply with federal and California withholding Laws and forward such amounts to the Internal Revenue Service and Franchise Tax Board, respectively. However, no federal withholding is required if, prior to Close Of Escrow, Seller Delivers **(i)** to Buyer and Escrow Holder a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law (FIRPTA); **OR (ii)** to a qualified substitute (usually a title company or an independent escrow company) a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law AND the qualified substitute Delivers to Buyer and Escrow Holder an affidavit signed under penalty of perjury (C.A.R. Form QS) that the qualified substitute has received the fully completed Seller's affidavit and the Seller states that no federal withholding is required; **OR (iii)** to Buyer other documentation satisfying the requirements under Internal Revenue Code § 1445 (FIRPTA). No withholding is required under California Law if, prior to Close Of Escrow, Escrow Holder has received sufficient documentation from Seller that no withholding is required, and Buyer has been informed by Escrow Holder.

**I. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to § 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov**. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**J. NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at **http://www.npms.phmsa.dot.gov/**. To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Website. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**K. CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**

    **(1)** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer whether the Property is a condominium or is located in a planned development, other common interest development, or otherwise subject to covenants, conditions, and restrictions (C.A.R. Form SPQ or ESD).

    **(2)** If the Property is a condominium or is located in a planned development or other common interest development with a HOA, Seller shall, within the time specified in **paragraph 3N(3)**, order from, and pay any required fee as specified in **paragraph 3Q(12)** for the following items to the HOA (C.A.R. Form HOA-IR): **(i)** Copies of any documents required by Law (C.A.R. Form HOA-RS); **(ii)** disclosure of any pending or anticipated claim or litigation by or against the HOA; **(iii)** a statement containing the location and number of designated parking and storage spaces; **(iv)** Copies of the most recent 12 months of HOA minutes for regular and special meetings; **(v)** the names and contact information of all HOAs governing the Property; **(vi)** pet restrictions; and **(vii)** smoking restrictions ("CI Disclosures"). Seller shall itemize and Deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Seller shall, as directed by Escrow Holder, deposit funds into escrow or direct to HOA or management company to pay for any of the above.

**L. NATURAL AND ENVIRONMENTAL HAZARDS:** Seller shall, within the time specified in **paragraph 3N(1)**, if required by Law: **(i)** Deliver to Buyer the earthquake guide and environmental hazards booklet, and for all residential property with 1-4 units and any manufactured or mobile home built before January 1, 1960, fully complete and Deliver the Residential Earthquake Risk Disclosure Statement; and **(ii)** even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

RPA 12/21 (PAGE 8 OF 16)          Buyer's Initials X _____ _____          Seller's Initials _____ _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 8 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          34 Black Hawk

47

Property Address: *34 Black Hawk , Irvine, CA 92603*  Date: *March 23, 2022*

**M. KNOWN MATERIAL FACTS:** Seller shall, within the time specified in **paragraph 3N(1)**, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including, but not limited to, known insurance claims within the past five years, or provide Buyer with permission to contact lender to get such information (C.A.R. Form ARC), and make any and all other disclosures required by Law.

**12. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

  **A.** Buyer shall, within the time specified in **paragraph 3L(3)**, have the right, at Buyer's expense unless Otherwise Agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations").

  **B.** Buyer Investigations include, but are not limited to:

    (1) Inspections regarding any physical attributes of the Property or items connected to the Property, such as:

      (A) A general home inspection.

      (B) An inspection for lead-based paint and other lead-based paint hazards.

      (C) An inspection specifically for wood destroying pests and organisms. Any inspection for wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be separated into sections for evident infestation or infections (Section 1) and for conditions likely to lead to infestation or infection (Section 2).

      (D) Any other specific inspections of the physical condition of the land and improvements.

    (2) All other Buyer Investigations, such as insurance, not specified above. See, Buyer's Investigation Advisory (C.A.R. Form BIA) for more.

    (3) A review of reports, disclosures or information prepared by or for Seller and Delivered to Buyer pursuant to **paragraphs 3, 10, 11,** and **14A**.

  **C.** Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations, except for minimally invasive testing required to prepare a Pest Control Report, which shall not include any holes or drilling though stucco or similar material; or (ii) inspections by any governmental building or zoning inspector or government employee, unless required by Law.

  **D.** Seller shall make the Property available for all Buyer Investigations. Seller is not obligated to move any existing personal property. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is delivered to Buyer. Buyer shall, (i) by the time specified in **paragraph 3L(3)**, complete Buyer Investigations and satisfy themselves as to the condition of the Property, and either remove the contingency or cancel this Agreement, and (ii) by the time specified in **paragraph 3L(3)** or **3 Days** after receipt of any Investigation report, whichever is later, give Seller at no cost, complete Copies of all such reports obtained by Buyer, which obligation shall survive the termination of this Agreement. This Delivery of Investigation reports shall not include any appraisal, except an appraisal received in connection with an FHA or VA loan.

  **E. Buyer indemnity and Seller protection for entry upon the Property:** Buyer shall: (i) keep the Property free and clear of liens; (ii) repair all damage arising from Buyer Investigations; and (iii) indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

**13. TITLE AND VESTING:**

  **A.** Buyer shall, within the time specified in **paragraph 3N(1)**, be provided a current Preliminary Report by the person responsible for paying for the title report in **paragraph 3Q(8)**. If Buyer is responsible for paying, Buyer shall act diligently and in good faith to obtain such Preliminary Report within the time specified. The Preliminary Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. The company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government entities.

  **B.** Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: (i) monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing. For any lien or matter not being transferred upon sale, Seller will take necessary action to deliver title free and clear of such lien or matter.

  **C.** Seller shall within **7 Days** after request, give Escrow Holder necessary information to clear title.

  **D.** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer all matters known to Seller affecting title, whether of record or not.

  **E.** If Buyer is a legal entity and the Property purchase price is at least $300,000 and the purchase price is made without a bank loan or similar form of external financing, a Geographic Targeting Order (GTO) issued by the Financial Crimes Enforcement Network, U.S. Department of the Treasury, requires title companies to collect and report certain information about the Buyer, depending on where the Property is located. Buyer agrees to cooperate with the title company's effort to comply with the GTO.

  **F.** Buyer shall, after Close Of Escrow, receive a recorded grant deed or any other conveyance document required to convey title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's vesting instructions. The recording document shall contain Buyer's post-closing mailing address to enable Buyer's receipt of the recorded conveyance document from the County Recorder. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

**RPA 12/21 (PAGE 9 OF 16)**  Buyer's Initials   Seller's Initials 

Property Address: *34 Black Hawk , Irvine, CA 92603*                                          Date: *March 23, 2022*

    G. Buyer shall receive a "ALTA/CLTA Homeowner's Policy of Title Insurance" or equivalent policy of title insurance, if applicable to the type of property and buyer. Escrow Holder shall request this policy. If a ALTA/CLTA Homeowner's Policy of Title Insurance is not offered, Buyer shall receive a CLTA Standard Coverage policy unless Buyer has chosen another policy and instructed Escrow Holder in writing of the policy chosen and agreed to pay any increase in cost. Buyer should consult with the Title Company about the availability, and difference in coverage, and cost, if any, between a ALTA/CLTA Homeowner's Policy and a CLTA Standard Coverage policy and other title policies and endorsements. Buyer should receive notice from the Title Company on its Preliminary (Title) Report of the type of coverage offered. If Buyer is not notified on the Preliminary (Title) Report or is not satisfied with the policy offered, and Buyer nonetheless removes the contingency for Review of the Preliminary Report, Buyer will receive the policy as specified in this paragraph.

14. **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).**

    A. **SELLER DELIVERY OF DOCUMENTS:** Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer all reports, disclosures and information ("Reports") for which Seller is responsible as specified in **paragraphs 9B(6), 10, 11A, 11B, 11C, 11D, 11H, 11K, 11L, 11M, 13A, and 13D.**

    B. **BUYER REVIEW OF DOCUMENTS; REPAIR REQUEST; CONTINGENCY REMOVAL OR CANCELLATION**

        (1) Buyer has the time specified in **paragraph 3** to: (i) perform Buyer Investigations; review all disclosures, reports, lease documents to be assumed by Buyer pursuant to **paragraph 9B(6)**, and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property; and (ii) Deliver to Seller Signed Copies of Statutory and Other Disclosures Delivered by Seller in accordance with **paragraph 11.**

        (2) Buyer may, within the time specified in **paragraph 3L(3)**, request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests (C.A.R. Form RR or RRRR). If Seller does not agree or does not respond, Buyer is not contractually entitled to have the repairs or other requests made and may only cancel based on contingencies in this Agreement.

        (3) Buyer shall, by the end of the times specified in **paragraph 3L** (or as Otherwise Agreed), Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement (C.A.R. Form CR or CC). However, if any report, disclosure, or information for which Seller is responsible, other than those in **paragraph 11A** or **11B**, is not Delivered within the time specified in **paragraph 3N(1)**, then Buyer has **5 Days** after Delivery of any such items, or the times specified in **paragraph 3L**, whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement. If Delivery of any Report occurs after a contractual contingency pertaining to that Report has already been waived or removed, the Delivery of the Report does not revive the contingency but there may be a right to terminate for a subsequent or amended disclosure under **paragraph 11G**.

        (4) **Continuation of Contingency:** Even after the end of the time specified in **paragraph 3L** and before Seller cancels, if at all, pursuant to **paragraph 14C**, Buyer retains the right, in writing, to either (i) remove remaining contingencies, or (II) cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to **paragraph 14C(1)**.

    C. **SELLER RIGHT TO CANCEL:**

        (1) **SELLER RIGHT TO CANCEL; BUYER CONTINGENCIES:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

        (2) **SELLER RIGHT TO CANCEL; BUYER CONTRACT OBLIGATIONS:** Seller, after first Delivering to Buyer a Notice to Buyer to Perform, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): **(i)** Deposit funds as required by **paragraph 3D(1)** or **3D(2)** or if the funds deposited pursuant to **paragraph 3D(1)** or **3D(2)** are not good when deposited; **(ii)** Deliver updated contact information for Buyer's lender(s) as required by **paragraph 5C(3)**; **(III)** Deliver a notice of FHA or VA costs or terms, if any, as specified by **paragraph 5C(4)** (C.A.R. Form RR); **(iv)** Deliver verification, or a satisfactory verification if Seller reasonably disapproves of the verification already provided, as required by **paragraph 5B** or **6A**; **(v)** Deliver a letter as required by **paragraph 6B**; **(vi)** In writing assume or accept leases or liens specified in **paragraph 8G**; **(vii)** Return Statutory and Other Disclosures as required by **paragraph 11F**; **(viii)** Cooperate with the title company's effort to comply with the GTO as required by **paragraph 13E**; **(ix)** Sign or initial a separate liquidated damages form for an increased deposit as required by **paragraphs 5A(2) and 29**; **(x)** Provide evidence of authority to Sign in a representative capacity as specified in **paragraph 28**; or **(xi)** Perform any additional Buyer contractual obligation(s) included in this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer and other expenses already paid by Escrow Holder pursuant to this Agreement prior to Seller's cancellation.

        (3) **SELLER RIGHT TO CANCEL; SELLER CONTINGENCIES:** Seller may cancel this Agreement by good faith exercise of any Seller contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed or waived in writing.

    D. **BUYER RIGHT TO CANCEL:**

        (1) **BUYER RIGHT TO CANCEL; SELLER CONTINGENCIES:** If, by the time specified in this Agreement, Seller does not Deliver to Buyer a removal of the applicable contingency or cancellation of this Agreement, then Buyer, after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer and other expenses already paid by Escrow Holder pursuant to this Agreement prior to Buyer's cancellation.

        (2) **BUYER RIGHT TO CANCEL; SELLER CONTRACT OBLIGATIONS:** If, by the time specified, Seller has not Delivered any item specified in **paragraph 3N(1)** or Seller has not performed any Seller contractual obligation included in this Agreement by the time specified, Buyer, after first Delivering to Seller a Notice to Seller to Perform, may cancel this Agreement.

        (3) **BUYER RIGHT TO CANCEL; BUYER CONTINGENCIES:** Buyer may cancel this Agreement by good faith exercise of any Buyer contingency included in **paragraph 8**, or Otherwise Agreed, so long as that contingency has not already been removed in writing.

RPA 12/21 (PAGE 10 OF 16)     Buyer's Initials X      Seller's Initials 

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 10 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com     *34 Black Hawk*

49

Property Address: _____ Date: March 23, 2022

E. **NOTICE TO BUYER OR SELLER TO PERFORM:** The Notice to Buyer to Perform or Notice to Seller to Perform shall: **(i)** be in writing; **(ii)** be Signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 Days** after Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform or Notice to Seller to Perform may not be Delivered any earlier than **2 Days** prior to the Scheduled Performance Day to remove a contingency or cancel this Agreement or meet an obligation specified in **paragraph 14**, whether or not the Scheduled Performance Day falls on a Saturday, Sunday or legal holiday. If a Notice to Buyer to Perform or Notice to Seller to Perform is incorrectly Delivered or specifies a time less than the agreed time, the notice shall be deemed invalid and void, and Seller or Buyer shall be required to Deliver a new Notice to Buyer to Perform or Notice to Seller to Perform with the specified timeframe.

F. **EFFECT OF REMOVAL OF CONTINGENCIES:**
   (1) **REMOVAL OF BUYER CONTINGENCIES:** If Buyer removes any contingency or cancellation rights, unless Otherwise Agreed, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for the non-delivery of any reports, disclosures or information outside of Seller's control and for any Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.
   (2) **REMOVAL OF SELLER CONTINGENCIES:** If Seller removes any contingency or cancellation rights, unless Otherwise Agreed, Seller shall conclusively be deemed to have: **(i)** satisfied themselves regarding such contingency, **(ii)** elected to proceed with the transaction; and **(iii)** given up any right to cancel this Agreement based on such contingency.

G. **DEMAND TO CLOSE ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a Demand to Close Escrow (C.A.R. Form DCE). The DCE shall: **(i)** be Signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 Days** after Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** prior to the Scheduled Performance Day for the Close Of Escrow. If a DCE is incorrectly Delivered or specifies a time less than the above timeframe, the DCE shall be deemed invalid and void, and Seller or Buyer shall be required to Deliver a new DCE.

H. **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign and Deliver mutual instructions to cancel the sale and escrow and release deposits, if any, to the Party entitled to the funds, less **(i)** fees and costs paid by Escrow Holder on behalf of that Party, if required by this Agreement; and **(ii)** any escrow cancellation fee charged to that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. A release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award. **A Party may be subject to a civil penalty of up to $1,000 for refusal to Sign cancellation instructions if no good faith dispute exists as to which Party is entitled to the deposited funds (Civil Code § 1057.3). Note: Neither Agents nor Escrow Holder are qualified to provide any opinion on whether either Party has acted in good faith or which Party is entitled to the deposited funds. Buyer and Seller are advised to seek the advice of a qualified California real estate attorney regarding this matter.**

15. **REPAIRS:** Repairs shall be completed prior to final verification of condition unless Otherwise Agreed. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. Buyer acknowledges that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: **(i)** obtain invoices and paid receipts for Repairs performed by others; **(ii)** prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and **(iii)** provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.

16. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property condition within the time specified in **paragraph 3J**, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to **paragraph 7B**; **(ii)** Repairs have been completed as agreed; and **(iii)** Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

17. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless Otherwise Agreed, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, Seller rental payments, HOA regular assessments due prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. Seller shall pay any HOA special or emergency assessments due prior to Close Of Escrow. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special or emergency assessments that are due after Close Of Escrow. Property will be reassessed upon change of ownership. Any supplemental tax bills delivered to Escrow Holder prior to closing shall be prorated and paid as follows: **(i)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). Seller agrees all service fees, maintenance costs and utility bills will be paid current up and through the date of Close Of Escrow. TAX BILLS AND UTILITY BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

18. **BROKERS AND AGENTS:**
   A. **COMPENSATION:** Seller or Buyer, or both, as applicable, agree to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer.
   B. **SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Agent: **(i)** Does not decide what price Buyer should pay or Seller should accept; **(ii)** Does not guarantee the condition of the Property; **(iii)** Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; **(iv)** Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; **(v)** Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Agent; **(vi)** Shall not be responsible for inspecting public records or permits concerning the title or use of Property; **(vii)** Shall not be responsible for identifying the location of boundary lines or other items affecting title; **(viii)** Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; **(ix)** Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; **(x)** Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and **(xi)** Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

**RPA 12/21 (PAGE 11 OF 16)**   Buyer's Initials X _____   Seller's Initials _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 11 OF 16)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   34 Black Hawk   50

Property Address: *34 Black Hawk , Irvine, CA 92603*                    Date: *March 23, 2022*

19. **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
   A. **The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow Instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: **paragraphs 1, 3A, 3B, 3D-G, 3N(2), 3Q, 3R, 4A, 4B, 5A(1-2) 5D, 5E, 10B(2)(A), 10B(3), 10C, 11H, 11K(2), 13 (except 13D), 14H, 17, 18A, 19, 23, 25, 27, 28, 32, 33, and paragraph 3 of the Real Estate Brokers Section.** If a Copy of the separate compensation agreement(s) provided for in **paragraph 18A or paragraph C of the Real Estate Brokers Section** is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned.
   B. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller shall Sign and return Escrow Holder's general provisions or supplemental instructions within the time specified in **paragraph 3N(2)**. Buyer and Seller shall execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 Days**, shall pay to Escrow Holder or HOA or HOA management company or others any fee required by **paragraphs 3, 8, 10, 11**, or elsewhere in this Agreement.
   C. A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days** after **Acceptance**. Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title Company when received from Seller, if a separate company is providing title insurance. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under **paragraph 11H**, Escrow Holder shall deliver to Buyer, Buyer's Agent, and Seller's Agent a Qualified Substitute statement that complies with federal Law. If Escrow Holder's Qualified Substitute statement does not comply with federal law, the Parties instruct escrow to withhold all applicable required amounts under **paragraph 11H**.
   D. Agents are not a party to the escrow, except for Brokers for the sole purpose of compensation pursuant to **paragraph 18A and paragraph 3 of the Real Estate Brokers Section**. If a Copy of the separate compensation agreement(s) provided for in either of those paragraphs is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s).Buyer and Seller irrevocably assign to Brokers compensation specified in **paragraph 18A**, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.
   E. Buyer and Seller acknowledge that Escrow Holder may require invoices for expenses under this Agreement. Buyer and Seller, upon request by Escrow Holder, within **3 Days** or within a sufficient time to close escrow, whichever is sooner, shall provide any such Invoices to Escrow Holder.
   F. Upon receipt, Escrow Holder shall provide Buyer, Seller, and each Agent verification of Buyer's deposit of funds pursuant to **paragraphs 5A(1) and 5A(2)**. Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify each Agent: **(i)** if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller Instruct Escrow Holder to cancel escrow.
   G. A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within **3 Days** after mutual execution of the amendment.
20. **SELECTION OF SERVICE PROVIDERS:** Agents do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Agent or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.
21. **MULTIPLE LISTING SERVICE ("MLS"):** Agents are authorized to report to the MLS that an offer has been accepted and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS. Buyer acknowledges that: **(i)** any pictures, videos, floor plans (collectively, "Images") or other information about the Property that has been or will be inputted into the MLS or Internet portals, or both, at the instruction of Seller or in compliance with MLS rules, will not be removed after Close Of Escrow; **(ii)** California Civil Code § 1088(c) requires the MLS to maintain such Images and information for at least three years and as a result they may be displayed or circulated on the Internet, which cannot be controlled or removed by Seller or Agents; and **(iii)** Seller, Seller's Agent, Buyer's Agent, and MLS have no obligation or ability to remove such Images or information from the Internet.
22. **ATTORNEY FEES AND COSTS:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in **paragraph 30A**.
23. **ASSIGNMENT:** Buyer shall have the right to assign all of Buyer's interest in this Agreement to Buyer's own trust or to any wholly owned entity of Buyer that is in existence at the time of such assignment. Otherwise, Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee. Such consent shall not be unreasonably withheld. Prior to any assignment, Buyer shall disclose to Seller the name of the assignee and the amount of any monetary consideration between Buyer and assignee. Buyer shall provide assignee with all documents related to this Agreement including, but not limited to, the Agreement and any disclosures. If assignee is a wholly owned entity or trust of Buyer, that assignee does not need to re-sign or initial all documents provided. Whether or not an assignment requires seller's consent, at the time of assignment, assignee shall deliver a letter from assignee's lender that assignee is prequalified or preapproved as specified in **paragraph 6B**. Should assignee fail to deliver such a letter, Seller, after first giving Assignee an Notice to Buyer to Perform, shall have the right to terminate the assignment. Buyer shall, within the time specified in **paragraph 3K**, Deliver any request to assign this Agreement for Seller's consent. If Buyer fails to provide the required information within this time frame, Seller's withholding of consent shall be deemed reasonable. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless Otherwise Agreed by Seller (C.A.R. Form AOAA).
24. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.
25. **DEFINITIONS and INSTRUCTIONS:** The following words are defined terms in this Agreement, shall be indicated by initial capital letters throughout this Agreement, and have the following meaning whenever used:
   A. **"Acceptance"** means the time the offer or final counter offer is fully executed, in writing by the recipient Party and is Delivered to the offering Party or that Party's Authorized Agent.

**RPA 12/21 (PAGE 12 OF 16)**        Buyer's Initials X ___ / ___        Seller's Initials ___ / ___

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 12 OF 16)**

Property Address: 34 Black Hawk , Irvine, CA 92603      Date: March 23, 2022

B. **"Agent"** means the Broker, salesperson, broker-associate or any other real estate licensee licensed under the brokerage firm identified in **paragraph 2B**.

C. **"Agreement"** means this document and any counter offers and any incorporated addenda or amendments, collectively forming the binding agreement between the Parties. Addenda and amendments are incorporated only when Signed and Delivered by all Parties.

D. **"As-Is"** condition: Seller shall disclose known material facts and defects as specified in this Agreement. Buyer has the right to inspect the Property and, within the time specified, request that Seller make repairs or take other corrective action, or exercise any contingency cancellation rights in this Agreement. Seller is only required to make repairs specified in this Agreement or as Otherwise Agreed.

E. **"Authorized Agent"** means an individual real estate licensee specified in the Real Estate Broker Section.

F. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the Parties.

G. **"Close Of Escrow"**, including "COE", means the date the grant deed, or other evidence of transfer of title, is recorded for any real property, or the date of Delivery of a document evidencing the transfer of title for any non-real property transaction.

H. **"Copy"** means copy by any means including photocopy, facsimile and electronic.

I. **Counting Days** is done as follows unless Otherwise Agreed: (1) The first Day after an event is the first full calendar date following the event, and ending at 11:59 pm. For example, if a Notice to Buyer to Perform (C.A.R. form NBP) is Delivered at 3 pm on the 7th calendar day of the month, or Acceptance of a counter offer is personally received at 12 noon on the 7th calendar day of the month, then the 7th is Day "0" for purposes of counting days to respond to the NBP or calculating the Close Of Escrow date or contingency removal dates and the 8th of the month is Day 1 for those same purposes. (2) All calendar days are counted in establishing the first Day after an event, (3) All calendar days are counted in determining the date upon which performance must be completed, ending at 11:59 pm on the last day for performance ("Scheduled Performance Day"). (4) After Acceptance, if the Scheduled Performance Day for any act required by this Agreement, including Close Of Escrow, lands on a Saturday, Sunday, or legal holiday, the performing party shall be allowed to perform on the next day that is not a Saturday, Sunday or legal holiday ("Allowable Performance Day"), and ending at 11:59 pm. (5) For the purposes of COE, any day that the Recorder's office in the County where the Property is located is closed, the COE shall occur on the next day the Recorder's office in that County is open. (6) COE is considered Day 0 for purposes of counting days Seller is allowed to remain in possession, if permitted by this Agreement.

J. **"Day"** or **"Days"** means calendar day or days. However, delivery of deposit to escrow is based on business days.

K. **"Deliver", "Delivered" or "Delivery"** of documents, unless Otherwise Agreed, means and shall be effective upon personal receipt of the document by Buyer or Seller or their Authorized Agent. Personal receipt means (i) a Copy of the document, or as applicable, link to the document, is in the possession of the Party or Authorized Agent, regardless of the Delivery method used (i.e. e-mail, text, other), or (ii) an Electronic Copy of the document, or as applicable, link to the document, has been sent to any of the designated electronic delivery addresses specified in the Real Estate Broker Section on page 16. After Acceptance, Agent may change the designated electronic delivery address for that Agent by, in writing, Delivering notice of the change in designated electronic delivery address to the other Party. Links could be, for example, to DropBox or GoogleDrive or other functionally equivalent program. If the recipient of a link is unable or unwilling to open the link or download the documents or otherwise prefers Delivery of the documents directly, Recipient of a link shall notify the sender in writing, within **3 Days** after Delivery of the link (C.A.R. Form RFR). In such case, Delivery shall be effective upon Delivery of the documents and not the link. Failure to notify sender within the time specified above shall be deemed consent to receive, and Buyer opening, the document by link.

L. **"Electronic Copy" or "Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

M. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

N. **"Legally Authorized Signer"** means an individual who has authority to Sign for the principal as specified in **paragraph 32** or **paragraph 33**.

O. **"Otherwise Agreed"** means an agreement in writing, signed by both Parties and Delivered to each.

P. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

Q. **"Sign" or "Signed"** means either a handwritten or Electronic Signature on an original document, Copy or any counterpart.

26. **TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the terms and conditions herein. The individual Liquidated Damages and Arbitration of Disputes paragraphs are incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a Counter Offer or addendum. **If at least one but not all Parties initial, a Counter Offer is required until agreement is reached.** Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance and to market the Property for backup offers after Acceptance. The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing. By signing this offer or any document in the transaction, the Party Signing the document is deemed to have read the document in its entirety.

27. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as Otherwise Agreed, this Agreement shall be interpreted, and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

28. **LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer identified in **paragraph 32** or **33** appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer (i) represents that the entity for which that person is acting already exists and is in good standing to do business in California and (ii) shall Deliver to the other Party and Escrow Holder, within the time specified in **paragraph 3N(5)**, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

RPA 12/21 (PAGE 13 OF 16)     Buyer's Initials X M H Ebll     Seller's Initials S Brown A

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 13 OF 16)**

Property Address: 34 Black Hawk , Irvine, CA 92603                                    Date: March 23, 2022

29. **LIQUIDATED DAMAGES** (By initialing in the space below, you are agreeing to Liquidated Damages):
**If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT THE TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R. FORM DID).**

Buyer's Initials _____ / _____                                    Seller's Initials _____ / _____

30. **MEDIATION:**
   A. The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. The mediation shall be conducted through the C.A.R. Real Estate Mediation Center for Consumers (www.consumermediation.org) or through any other mediation provider or service mutually agreed to by the Parties. The Parties **also agree to mediate any disputes or claims with Agents(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Agent.** Mediation fees, if any, shall be divided equally among the Parties involved, and shall be recoverable under the prevailing party attorney fees clause. If, for any dispute or claim to which this paragraph applies, any Party **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.
   B. **ADDITIONAL MEDIATION TERMS: (i) Exclusions from this mediation agreement are specified in paragraph 31B; (ii) The obligation to mediate does not preclude the right of either Party to seek a preservation of rights under paragraph 31C; and (iii) Agent's rights and obligations are further specified in paragraph 31D. These terms apply even if the Arbitration of Disputes paragraph is not initialed.**

31. **ARBITRATION OF DISPUTES:**
   A. **The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Agents(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Agent. The arbitration shall be conducted through any arbitration provider or service mutually agreed to by the Parties, OR** ☐ **_____ . The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the Parties mutually agree to a different arbitrator. Enforcement of, and any motion to compel arbitration pursuant to, this agreement to arbitrate shall be governed by the procedural rules of the Federal Arbitration Act, and not the California Arbitration Act, notwithstanding any language seemingly to the contrary in this Agreement. The Parties shall have the right to discovery in accordance with Code of Civil Procedure § 1283.05. The arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction.**
   B. **EXCLUSIONS: The following matters are excluded from mediation and arbitration: (i) Any matter that is within the jurisdiction of a probate, small claims or bankruptcy court; (ii) an unlawful detainer action; and (iii) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985.**
   C. **PRESERVATION OF ACTIONS: The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies; or (iii) the filing of a mechanic's lien.**
   D. **AGENTS: Agents shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Agents(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.**
   E. **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

   **"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

Buyer's Initials _____ / _____                                    Seller's Initials _____ / _____

RPA 12/21 (PAGE 14 OF 16)                Buyer's Initials _____ / _____        Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 14 OF 16)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com        34 Black Hawk        53

DocuSign Envelope ID: B1B4578D-E7E-485E-A767-8C0276Bb7C8

Property Address: *34 Black Hawk , Irvine, CA 92603*          Date: *March 23, 2022*

32. **BUYER'S OFFER**

   A. **EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless by the date and time specified in **paragraph 3C**, the offer is Signed by Seller and a Copy of the Signed offer is Delivered to Buyer or Buyer's Authorized Agent. **Seller has no obligation to respond to an offer made.**

   B. ☐ **ENTITY BUYERS: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**
   (1) One or more Buyers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.
   (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 28** for additional terms.
   (3) The name(s) of the Legally Authorized Signer(s) is/are: _____
   (4) If a trust, identify Buyer as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust). If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #: _____

   C. The RPA has 16 pages. Buyer acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

   D. **BUYER SIGNATURE(S):**

   (Signature) By _____          Date: 3/23/2022
   Printed name of BUYER: *Michael K. Kim - Trustee*
   ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
   (Signature) By: *Elisa K. Yoo*          Date: 3/23/2022
   Printed name of BUYER: *Elisa K. Yoo - Trustee*
   ☐ Printed name of Legally Authorized Signer: _____ Title, if applicable, _____
   ☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

33. **ACCEPTANCE**

   A. **ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement and authorizes Agent to Deliver a Signed Copy to Buyer.
   **Seller's acceptance is subject to the attached Counter Offer or Back-Up Offer Addendum, or both, checked below.**
   Seller shall return and include the entire agreement with any response.
   ☒ **Seller Counter Offer** (C.A.R. Form SCO or SMCO)
   ☐ **Back-Up Offer Addendum** (C.A.R. Form BUO)

   B. ☐ **Entity Sellers: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure form (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**
   (1) One or more Sellers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.
   (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 28** for additional terms.
   (3) The name(s) of the Legally Authorized Signer(s) is/are: _____
   (4) If a trust, identify Seller as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust). If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #: _____

   C. The RPA has 16 pages. Seller acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

   D. **SELLER SIGNATURE(S):**

   (Signature) By, *S Browndor*          Date: 4/20/2022 | 7:42 E
   Printed name of SELLER: *Dum-P3 LLC*
   ☐ Printed Name of Legally Authorized Signer: *Sarina Browndorf*          Title, if applicable, _____
   (Signature) By, _____          Date: _____
   Printed name of SELLER: _____
   ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
   ☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

   ┌─────────────────────────────────────────────────────────────────────────┐
   │ **OFFER NOT ACCEPTED:** ____/____  No Counter Offer is being made. This offer was not accepted by Seller _____ (date) │
   │              Seller's Initials │
   └─────────────────────────────────────────────────────────────────────────┘

**RPA 12/21 (PAGE 15 OF 16)**          Buyer's Initials           Seller's Initials 

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 15 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com   34 Black Hawk

54

Property Address: 34 Black Hawk , Irvine, CA 92603                          Date: *March 23, 2022*

**REAL ESTATE BROKERS SECTION:**
1. **Real Estate Agents are not parties to the Agreement between Buyer and Seller.**
2. **Agency relationships are confirmed as stated in paragraph 2.**
3. **Cooperating Broker Compensation:** Seller's Broker agrees to pay Buyer's Broker and Buyer's Broker agrees to accept, out of Seller's Broker's proceeds in escrow, the amount specified in the MLS, provided Buyer's Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS. If Seller's Broker and Buyer's Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Property is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.
4. **Presentation of Offer:** Pursuant to the National Association of REALTORS® Standard of Practice 1-7, if Buyer's Agent makes a written request, Seller's Agent shall confirm in writing that this offer has been presented to Seller.
5. **Agents' Signatures and designated electronic delivery address:**

A. Buyer's Brokerage Firm *Keller Williams Realty Irvine*       Lic. # *01926151*
By *Hannah Park*       *Hannah Park* Lic. # *02029205*       Date *3/23/2022*
By — D8BF0951392F451...       Lic. #       Date
☐ More than one agent from the same firm represents Buyer. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
☐ More than one brokerage firm represents Buyer. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

**Designated Electronic Delivery Address(es):**
Email       Text #
Alternate:
☐ if checked, Delivery shall be made to the alternate designated electronic delivery address only.
Address *4010 Barranca Pkwy #100*       City *Irvine*       State *CA*    Zip *92604*

B. Seller's Brokerage Firm *Coldwell Banker Realty*       Lic. # *00616212*
By *Gregory Bingham*       *Greg Bingham* Lic. # *01309137*       Date *3/20/2022 | 4:48 PDT*
By — 7F4CBBB1D33143E...       Lic. #       Date
☐ More than one agent from the same firm represents Seller. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
☐ More than one brokerage firm represents Seller. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

**Designated Electronic Delivery Address(es)** (To be filled out by Seller's Agent):
Email       Text #
Alternate:
☐ if checked, Delivery shall be made to the alternate designated electronic delivery address only.
Address *840 Newport Ctr Dr Ste 100*       City *Newport Beach*       State *CA*    Zip *92660*

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (If checked, ☐ a deposit in the amount of $ _____ ), Counter Offer numbers _____ and _____, and agrees to act as Escrow Holder subject to paragraph 19 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.
Escrow Holder is advised by _____ that the date of Acceptance of the Agreement is _____
Escrow Holder *Seller's choice of reputable company* _____ Escrow # _____
By _____ Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder has the following license number # _____
☐ Department of Financial Protection and Innovation, ☐ Department of Insurance, ☐ Department of Real Estate.

**PRESENTATION OF OFFER:** _____ / _____ Seller's Brokerage Firm presented this offer to Seller on _____ (date).
      Agent or Seller Initials

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

RPA 12/21 (PAGE 16 OF 16)       Buyer's Initials X ____ / ____       Seller's Initials ____ / ____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 16 OF 16)**

EXHIBIT "2"

**Mindy Beckham**
Title Officer

Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
Phone:  (805) 367-5628
Fax:
wlvtitle@stewart.com

# PRELIMINARY REPORT

Order No.:           1569971
Your File No.:       105534 AA
Buyer/Borrower Name:  Michael Kim and Elisa Yoo
Seller Name:         Dcm-P3 Llc

Property Address:  34 Black Hawk, Irvine, CA  92603

In response to the above referenced application for a Policy of Title Insurance, Stewart Title of California, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Stewart Title Guaranty Company Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referenced to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions, and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on covered Risks of said policy or policies are set forth in Exhibit A attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limits of Liability for certain coverages are also set forth in Exhibit A.  Copies of the policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should be carefully considered.

It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report, (and any supplements or amendments thereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance a binder or commitment should be requested.

| Dated as of April 15, 2022 at 7:30AM | |
|---|---|
| | **Update No. 2** |

**When replying, please contact:**   Mindy Beckham, Title Officer

Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
(805) 367-5628
wlvtitle@stewart.com

**IF ANY DECLARATION, GOVERNING DOCUMENT (FOR EXAMPLE, COVENANT, CONDITION OR RESTRICTION) OR DEED IDENTIFIED AND/OR LINKED IN THIS TITLE PRODUCT CONTAINS ANY RESTRICTION BASED ON AGE, RACE COLOR, RELIGION, SEX, GENDER, GENDER IDENTITY, GENDER EXPRESSION, SEXUAL ORIENTATION, FAMILIAL STATUS, MARITAL STATUS, DISABILITY, VETERAN OR MILITARY STATUS, GENETIC INFORMATION, NATIONAL ORIGIN, SOURCE OF INCOME AS DEFINED IN SUBDIVISION (p) OF SECTION 12955, OR ANCESTRY, THAT RESTRICTION VIOLATES STATE AND FEDERAL FAIR HOUSING LAWS AND IS VOID, AND MAY BE REMOVED PURSUANT TO SECTION 12956.2 OF THE GOVERNMENT CODE BY SUBMITTING A "RESTRICTIVE COVENANT MODIFICATION" FORM, TOGETHER WITH A COPY OF THE ATTACHED DOCUMENT WITH THE UNLAWFUL PROVISION REDACTED TO THE COUNTY RECORDER'S OFFICE. THE "RESTRICTIVE COVENANT MODIFICATION" FORM CAN BE OBTAINED FROM THE COUNTY RECORDER'S OFFICE AND MAY BE AVAILABLE ON ITS WEBSITE. THE FORM MAY ALSO BE AVAILABLE FROM THE PARTY THAT PROVIDED YOU WITH THIS DOCUMENT. LAWFUL RESTRICTIONS UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON FAMILIAL STATUS.**

# <u>PRELIMINARY REPORT</u>

**The form of Policy of Title Insurance contemplated by this report is:**

☐  Standard Coverage Owner's Policy

☐  Extended Coverage Owner's Policy

☒  CLTA/ALTA Homeowners Policy

☐  Standard Coverage Loan Policy

☒  Extended Coverage Loan Policy

☐  Short Form Residential Loan Policy

☐

# <u>SCHEDULE A</u>

**The estate or interest in the land hereinafter described or referred to covered by this report is:**

A fee as to Parcel(s) 1.  An easement more particularly described below as to Parcel(s) 2.

**Title to said estate or interest at the date hereof is vested in:**

<u>DCM-P3, LLC, a Delaware Limited Liability Company, subject to bankruptcy proceedings filed by DCM-P3, LLC, Debtor, pending in the United States Bankruptcy Court for the Central District of California, Case No. 21-12507 filed on October 15, 2021</u>

# <u>LEGAL DESCRIPTION</u>

**The land referred to herein is situated in the State of California, County of Orange, City of Irvine and described as follows:**

Parcel 1:

Lot 97 of Tract No. 15941, in the City of Irvine, County of Orange, State of California, as shown on a Map recorded in Book 809, Pages 13 to 32 inclusive of Miscellaneous Maps, records of Orange County, California.

Excepting therefrom all oil, gas and mineral rights as reserved by various Deeds of record.

Also excepting therefrom any and all water, water rights or interest therein, appurtenant or relating to the Land  or owned or used by the Irvine Company in connection with or with respect to the Land  (no matter how acquired by Grantor), whether such water, water rights or interest therein, shall be riparian, overlying, appropriative, littoral, percolating, prescriptive, adjudicated, statutory or contractual, together with the right and power to explore, drill, redrill, remove and store the same from or in the Land  or to divert or otherwise utilize such water, water rights or interests therein, on any other property owned or leased by Grantor; but without, however, any right to enter upon the surface of the Land  in the exercise of such rights, as reserved in Deed from the Irvine Company, a Delaware Corporation, recorded February 1, 2001 as Instrument No. 20010061022, of Official Records.

Parcel 2:

Non-exclusive easements for ingress, egress, access, maintenance, repairs, drainage, encroachment, use, and enjoyment, as described in the Master Declaration of Covenants, Conditions and Restrictions and reservation of easements for Shady Canyon (the "Master Declaration"), recorded March 7, 2001 as Instrument No. 20010128871 and/or in the Notice of Annexation to Shady Canyon (Phase 5 Custom) ("Notice of Annexation"), recorded August 30, 2001 as Instrument No. 20010606069, both of Official Records of Orange County, California.

APN:  464-031-24

(End of Legal Description)

MAP

THE MAP CONNECTED HEREWITH IS BEING PROVIDED AS A COURTESY AND FOR INFORMATIONAL PURPOSES ONLY; THIS MAP SHOULD NOT BE RELIED UPON. FURTHERMORE, THE PARCELS SET OUT ON THIS MAP MAY NOT COMPLY WITH LOCAL SUBDIVISION OR BUILDING ORDINANCES. STEWART ASSUMES NO LIABILITY, RESPONSIBILITY OR INDEMNIFICATION RELATED TO THE MAPS NOR ANY MATTERS CONCERNING THE CONTENTS OF OR ACCURACY OF THE MAP.

# <u>SCHEDULE B</u>

**At the date hereof, exceptions to coverage in addition to the printed exceptions and exclusions contained in said policy or policies would be as follows:**

**Taxes:**

A.   Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2022 - 2023.

B.   Assessment by the City of Irvine improvement district, bond number 002600541(1).

C.   The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

D.   Taxes and/or assessments affecting the land, if any, for Community Facility Districts including Mello Roos Districts which may exist by virtue of assessment maps or notices filed by said districts. Said taxes and/or assessments are typically collected with the County taxes; however, some districts may remove these taxes and/or assessment from the County taxes and assess and collect them separately.

E.   Prior to recording, the final amount due for taxes must be confirmed with tax collector.

**Exceptions:**

1.   Water rights, claims or title to water in or under the property, whether or not shown by the public records.

2.   Ownership of, or rights to, minerals or other substances, subsurface and surface, of whatsoever kind, including, but not limited to coal, ores, metals, lignite, oil, gas, geothermal resources, brine, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether the ownership or rights arise by lease, grant, exception, conveyance, reservation or otherwise, and whether or not appearing in the Public Records or listed in Schedule B. Stewart Title Guaranty Company and its issuing agent make no representation as to the present ownership of any such interests. There may be leases, grants, exceptions, or reservations of interests that are not listed.

3.   Easements or servitudes appearing in the public records affecting the common area. Reference is hereby being made to various documents and maps of record for full and further particulars.

4.   Easements and rights of way for ingress and egress and utilities affecting the easement parcel(s) described in the legal description as conveyed and reserved by various deeds of record.

5.   The terms, provisions and conditions contained in that certain document, entitled "Agreement Providing for Exemption of Land from Water Standby Charge", recorded May 5, 1993, as Instrument No. 93-0300858, of Official Records.

6.   Easements for sewer, domestic water, reclaimed water, utility and ingress and egress purposes, as shown and dedicated to the Irvine Ranch Water District on the Map of said Tract, which easements shall be subject to the same terms and conditions as are shown in that certain easement recorded February 14, 1991, as Instrument No. 91-070315, of Official Records of

Orange County, with an added condition that no trees shall be planted in said easements without prior written consent from The Irvine Ranch Water District, over a portion of the land.

7.  Matters as shown on the Tract  Map No. 15941 filed in Book 809, Pages 13 to 32, of Miscellaneous Maps which cites, among other things, the following:
    1. Pipeline easement for sewer, water, utility
    Reference is hereby made to the record for full and further particulars.

8.  Easements, covenants and conditions contained in the Deed from the Irvine Company, a Delaware Corporation, as Grantor, to Irvine Community Development Company, a Delaware Corporation, as Grantee, recorded February 1, 2001, as Instrument No. 20010061022, of Official Records. Reference being made to said document for full particulars.

9.  The terms, provisions and conditions contained in that certain document, entitled "Custom Lot Declaration of Covenants, Conditions and Restrictions for Shady Canyon", recorded March 7, 2001 as Instrument No. 01-128870 and re-recorded March 14, 2001 as Instrument No. 01-148050, both of Official Records

10. Covenants, conditions, restrictions, easements, matters, charges and assessments as set forth in a document recorded March 7, 2001, as Instrument No. 20010128871, of Official Records, but omitting any restrictions based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

    Note: Section 12956.1 of the Government Code provides the following: If this document contains any restriction based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

    The provisions of said covenants, conditions and restrictions were extended to include the herein described land by instrument recorded on August 30, 2001, as Instrument No. 20010606069, of Official Records.

    Said Covenants, Conditions and Restrictions have been modified by an instrument, recorded on September 17, 2001, as Instrument No. 20010653986, of Official Records.

    Said covenants, conditions and restrictions have been modified by a document, recorded March 16, 2002, as Instrument No. 20020190259, of Official Records.

11. Easement and rights incidental thereto for public utilities to Southern California Edison Company, as set forth in a document recorded May 30, 2001, as Instrument No. 20010350558, of Official Records.

    An instrument entitled "Partial Quitclaim of Easement" recorded March 12, 2002, as Instrument No. 20020204303, of Official Records; Reference being made to the record threrof for full particulars.

12. Covenants, conditions, restrictions, easements, matters, charges and assessments as set forth in a document recorded June 14, 2001, as Instrument No. 20010392409, of Official Records,

but omitting any restrictions based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Note: Section 12956.1 of the Government Code provides the following: If this document contains any restriction based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Said Covenants, Conditions and Restrictions have been modified by an instrument, recorded on January 24, 2002, as Instrument No. 20020065249, of Official Records.

13. Covenants, conditions, restrictions, easements, matters, charges and assessments as set forth in a document recorded August 29, 2001, as Instrument No. 20010604046, of Official Records, but omitting any restrictions based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Note: Section 12956.1 of the Government Code provides the following: If this document contains any restriction based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

The provisions of said covenants, conditions and restrictions were extended to include the herein described land by instrument recorded on August 30, 2001, as Instrument No. 20010606068, of Official Records.

14. Easement and rights incidental thereto for public utilities to Pacific Bell Telephone Company, a California corporation, as set forth in a document recorded February 13, 2002, as Instrument No. 20020125025, of Official Records.

15. Easement and rights incidental thereto for public utilities to Pacific Bell Telephone company, a California corporation, as set forth in a document recorded December 4, 2002, as Instrument No. 20021094674, of Official Records.

16. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount | : $2,795,000.00 |
| Trustor | : DCM-P3, LLC, a Delaware Limited Liability Company |
| Trustee | : Chicago Title Insurance Company |
| Beneficiary | : Mortgage Electronic Registration Systems, Inc, as nominee for BOFI |

Federal Bank
Recorded            : June 26, 2015, as Instrument No. 2015000333129, of Official Records.

The beneficial interest of Mortgage Electronic Registration Systems, Inc., as beneficiary, as nominee for BOFI Federal Bank, its successors and assigns having been assigned of record to Axos Bank interest by assignment recorded on July 9, 2020, as Instrument No. 2020000325884, of Official Records.

A substitution of trustee which names Clear Recon Corp. as trustee recorded on July 9, 2020, as Instrument No. 2020000325885, of Official Records.

17.    Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount              : $850,000.00
Trustor             : DCM-P3, LLC, a Delaware Limited Liability Company
Trustee             : Zieve Brodnax & Steele, LLC
Beneficiary         : Michael K. Boone Living Trust as to an undivided $750,000.00/ $850,000.00 and Nancy D. Nashu, a widow, as to an undivided $100,000.00/$850,000.00
Recorded            : August 8, 2016, as Instrument No. 2016000365199, of Official Records

An agreement to modify the above Deed of Trust was recorded on September 18, 2017, as Instrument No. 2017000394420, of Official Records.

An agreement to modify the above Deed of Trust was recorded on September 12, 2018, as Instrument No. 2018000333500, of Official Records.

The above instrument has been subordinated to "Deed of Trust" recorded on November 7, 2016, as Instrument No. 2016000551301, of Official Records by that certain agreement recorded on September 18, 2017, as Instrument No. 2017000394421, of Official Records.

The above instrument has been subordinated to "Deed of Trust" recorded on November 7, 2016, as Instrument No. 2016000551301, of Official Records by that certain agreement recorded on September 12, 2018, as Instrument No. 2018000333501, of Official Records.

A substitution of trustee which names Zieve, Brodnax & Steele, LLP as trustee recorded on March 6, 2019, as Instrument No. 2019000069239, of Official Records.

A Notice of default recorded on March 6, 2019, as Instrument No. 2019000069240, of Official Records.

A Notice of Trustee's Sale recorded on June 11, 2019, as Instrument No. 2019000200690, of Official Records.

Said instrument has been assigned by mesne assignments of record, the last assignment of which  recorded October 24, 2019, as Instrument No. 2019000419313, of Official Records

A Notice of Trustee's Sale recorded on February 22, 2021, as Instrument No. 2021000123079, of Official Records.

To avoid delays in recording, you must submit the following documents for review and approval:
    (a) the original note.
    (b) the original deed of trust.
    (c) the request for reconveyance.
    (d) a final payoff demand executed by the record beneficiary(ies).
        (i) if the beneficiary(ies) is a trust, you must provide a full copy of the trust and any amendments thereto, and all trustees must sign the payoff demand. In certain situations, you

may be permitted to provide the STG Certification of Trust.
    (ii) if a servicing agent prepares the demand on behalf of the beneficiary(ies), you must provide a full copy of the servicing agreement and the beneficiary(ies) must still sign and approve the payoff demand.
Please contact your title officer to discuss the above requirements.
The right is reserved to add requirements or additional items after completion of such review.

18.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount             : $2,400,000.00
Trustor            : DCM-P3, LLC, a Delaware Limited Liability Company
Trustee            : First American Title Company
Beneficiary        : Verde Investments, Inc., an Arizona Corporation
Recorded           : November 7, 2016, as Instrument No. 2016000551301, of Official Records

A Notice of default recorded on March 11, 2019, as Instrument No. 2019000073894, of Official Records.

A Notice of default recorded on August 31, 2021, as Instrument No. 2021000544438, of Official Records.

To avoid delays in recording, you must submit the following documents for review and approval:
    (a) the original note.
    (b) the original deed of trust.
    (c) the request for reconveyance.
    (d) a final payoff demand executed by the record beneficiary(ies).
    (i) if the beneficiary(ies) is a trust, you must provide a full copy of the trust and any amendments thereto, and all trustees must sign the payoff demand. In certain situations, you may be permitted to provide the STG Certification of Trust.
    (ii) if a servicing agent prepares the demand on behalf of the beneficiary(ies), you must provide a full copy of the servicing agreement and the beneficiary(ies) must still sign and approve the payoff demand.
Please contact your title officer to discuss the above requirements.
The right is reserved to add requirements or additional items after completion of such review.

19.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
Amount             : $2,255,287.00
Trustor            : DCM-P3, LLC
Trustee            : Chicago Title Company, a California Corporation
Beneficiary        : Albert Lissoy
Recorded           : November 8, 2019, as as Instrument No. 2019000446471, of Official Records.

To avoid delays in recording, you must submit the following documents for review and approval:
    (a) the original note.
    (b) the original deed of trust.
    (c) the request for reconveyance.
    (d) a final payoff demand executed by the record beneficiary(ies).
    (i) if the beneficiary(ies) is a trust, you must provide a full copy of the trust and any amendments thereto, and all trustees must sign the payoff demand. In certain situations, you may be permitted to provide the STG Certification of Trust.
    (ii) if a servicing agent prepares the demand on behalf of the beneficiary(ies), you must provide a full copy of the servicing agreement and the beneficiary(ies) must still sign and approve the payoff demand.

Please contact your title officer to discuss the above requirements.
The right is reserved to add requirements or additional items after completion of such review.

20.  In order to insure, provide for review and approval prior to recording, a copy of the proposed draft of the order from the Bankruptcy Court authorizing the contemplated transaction. Once approved, provide a certified copy of a final, non-appealable order.
Additional requirements or items may be requested upon review of the required documents set forth above.

21.  The requirement that a letter be provided from each Homeowner's Association stating that all liens/dues are current.

22.  In order to insure a conveyance, acquisition or encumbrance by the limited liability company named below, you must provide the following:
Limited liability company: DCM-P3 LLC
(a) A certified copy of the articles of organization (Form LLC-1), and any filed amendment (Form LLC-2) or restatement (Form LLC-10), if applicable.
(b) A copy of the operating agreement and any amendments.
Additional requirements or items may be requested upon review of the required documents set forth above.

23.  To assist in the clarifying, confirming and eliminating certain title matters, provide to Stewart Title, prior to recording, a completed Statement of Information for all identified and known Sellers/Owners in this transaction.

(End of Exceptions)

# <u>NOTES AND REQUIREMENTS</u>

A. Property taxes for the fiscal year 2021 - 2022 shown below are paid. For proration purposes the amounts are:
1st Installment: $28,801.29
2nd Installment: $28,801.29
Parcel No.          :  464-031-24
Code Area / Tracer No.  :  26-365

B. There are no transfers or conveyances shown in the public records within 24 months of the date of this report. If you have knowledge of any transfers or conveyances, please contact your title officer immediately for further research and review.

C. There are no items in this preliminary report that will cause Stewart Title Guaranty Company to decline to attach the CLTA Endorsement Form 116.01-06 (or similar ALTA 22-06 equivalent), indicating that there is located a Residence within a Planned Unit Development known as 34 Black Hawk, Irvine, California.

D. There are no items in this preliminary report that will cause Stewart Title Guaranty Company to decline to attach the CLTA Endorsement Form 100.2-06 (or a similar ALTA 9 equivalent) to an ALTA Loan Policy, when issued.

E. A Preliminary Change of Ownership Report must be completed by the transferee (buyer) prior to the transfer of property in accordance with the provisions of Section 480.3 of the Revenue and Taxation Code. The Preliminary Change of Ownership Report should be submitted to the recorder concurrent with the recordation of any document effecting a change of ownership. If a document evidencing a change of ownership (i.e. Deed, Affidavit-Death Joint Tenant) is presented to the recorder for recording without a preliminary change of ownership report, the recorder may charge an additional $20.00.

F. Additional Requirements for "Short Sale" Transactions in which a lender will accept less than the outstanding balance of its loan as full satisfaction of the obligation: The Company will require, prior to the issuance of a policy of title insurance, evidence that the first-position trust deed holder has received and acknowledged all payments to be made to subordinate-position lien holders, regardless of whether such payments are to be made from proceeds or from contributions by real estate brokers and/or buyers in the subject transaction, or from other third-party sources. Evidence shall include but not be limited to:  (a) a written demand from the first-position trust deed holder acknowledging and approving payments to subordinate-position lien holders from proceeds and otherwise; or (b) a supplemental letter or amended demand from the first-position lien holder acknowledging payments to be made to subordinate lien holders from sources other than proceeds (including broker commissions and additional buyer deposits).

# CALIFORNIA "GOOD FUNDS" LAW

California Insurance Code Section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies.  The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement.  Funds received by Stewart Title of California, Inc. via wire transfer may be disbursed upon receipt.  Funds received via cashier's checks or teller checks drawn on a California Bank may be disbursed on the next business day after the day of deposit.  If funds are received by any other means, recording and/or disbursement may be delayed, and you should contact your title or escrow officer.  All escrow and sub-escrow funds received will be deposited with other escrow funds in one or more non-interest bearing escrow accounts in a financial institution selected by Stewart Title of California, Inc..  Stewart Title of California, Inc. may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with the financial institution, and Stewart Title of California, Inc. shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by Stewart Title of California, Inc..  Such benefits shall be deemed additional compensation to Stewart Title of California, Inc. for its services in connection with the escrow or sub-escrow.

If any check submitted is dishonored upon presentation for payment, you are authorized to notify all principals and/or their respective agents of such nonpayment.

# Procedures to Accompany the Restrictive Covenant Modification Form

The law prohibits unlawfully restrictive covenants based upon:

"…age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry… Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

As the individual holding or acquiring an interest in the property, you may have any unlawfully restrictive covenants "removed", which means "redacted."

To have the unlawfully restrictive covenant removed, you may prepare and submit to the county recorder's office, a "Restrictive Covenant Modification" form (RCM) together with a copy of the attached document with the unlawfully restrictive covenant redacted. This request must be submitted to the county recorder's office and must include your return address so the county recorder can notify you of the action taken by the county counsel.

The process at the county recorder's office is as follows:
- The county recorder takes the RCM with the redacted document and the original document attached and submits it to the county counsel for review to determine if, from a legal standpoint, the language was an unlawfully restrictive covenant and thus the redacted version should be indexed and recorded.
- The county counsel shall inform the county recorder of his/her determination within a reasonable amount of time, not to exceed three months from the date of your request.
- If county counsel determined that the redacted language was unlawful then, once recorded, the redacted document is the only one that effects the property and this modified document has the same effective date as the original document.
- If county counsel determined that the redacted language was not unlawful then county counsel will return the RCM package to the county recorder and the county recorder will advise the requestor that same the request has been denied and the redacted document has not been recorded.
- The modification document shall be indexed in the same manner as the original document and shall contain a recording reference to the original document.

**RECORDING REQUESTED BY**

AND WHEN RECORDED MAIL TO

NAME

ADDRESS

CITY
STATE & ZIP

| TITLE ORDER NO. | ESCROW NO. | APN NO. |
|---|---|---|

# RESTRICTIVE COVENANT MODIFICATION
### (Unlawfully Restrictive Covenant Modification Pursuant to Government Code Section 12956.2)

I(We)_____
have or are acquiring an ownership interest of record in the property located at _____
_____ that is covered by the
document described below.

The following reference document contains a restriction based on age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in Section 12955 of the Government Code, or ancestry, that violates state and federal fair housing laws and is void. Pursuant to Section 12956.2 of the Government Code, this document is being recorded solely for the purpose of eliminating that restrictive covenant as shown on page(s)_____of the document recorded on _____ in book_____and page _____ or instrument number_____of  the  official  records  of  the  County  of _____, State of California.

Attached hereto is a true, correct and complete copy of the document referenced above, with the unlawful restrictive covenant redacted.

This modification document shall be indexed in the same manner as the original document pursuant to subdivision (d) of Section 12956 of the Government.

The effective date of the terms and conditions of the modification document shall be the same as the effective date of the original document.

_____
(Signature of Submitting Party)

_____
(Printed Name)

_____
(Signature of Submitting Party)

_____
(Printed Name)

_____ County Counsel, or their designee, pursuant to Government Code Section 12956.2, hereby states that it has been determined that the original document referenced above _____ Does _____ Does Not contain an unlawful restriction and this modification may be recorded.

County Counsel
By:
_____
Date:
_____

70



Stewart Title of California, Inc.
2801 Townsgate Rd #111
Westlake Village, CA  91361
Phone:  (805) 367-5628
Fax:
wlvtitle@stewart.com

**Date:**                            January 27, 2022
**Title Officer:**            RESWARE_SP_GetPartnerName_Title»
**Order No.:**              1569971
**Property Address:**  34 Black Hawk, Irvine, CA  92603

# UNLAWFULLY RESTRICTIVE COVENANTS
# ACKNOWLEDGMENT AND INDEMNIFICATION

**STEWART TITLE OF CALIFORNIA, INC.
IS LICENSED BY THE STATE OF CALIFORNIA UNDER THE DEPARTMENT OF INSURANCE LICENSE NO. 388**

The undersigned hereby acknowledge receipt of (1) the statutory required language describing unlawfully restrictive covenants in the title product from Stewart Title of California, Inc. ("Stewart Title"); (2) a copy of the Restrictive Covenant Modification (RCM) form; and (3) the procedures describing how to have, when applicable, an unlawfully restrictive covenant of record updated.

The undersigned further acknowledge that he/she/they have received, read, understand and accept these documents in connection with the above described transaction and have received a copy of this acknowledgment as evidenced by the signature below.

The undersigned acknowledges and understands that Stewart Title will rely upon this acknowledgement as evidence that Stewart Title has fulfilled its duties and obligations under the law with respect to unlawfully restrictive covenants. The undersigned jointly and severally agree to hold harmless Stewart Title of California, Inc., its officers, employees, agents, parent, affiliated and subsidiary companies, including Stewart Title Guaranty Company, and successors and assigns from and against any and all damages or liability and agree to reimburse Stewart Title for all losses, costs, charges, attorneys' fees or other expenses which shall or may at any time be suffered, sustained or incurred by reason of, or in consequence of or related to these unlawfully restrictive covenants and the RCM form and submission.

_____          _____
Michael Kim                                                      Elisa Yoo


Dcm-P3 Llc

By:_____

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.:  1569971
Escrow No.:  1569971

The land referred to herein is situated in the State of California, County of Orange, City of Irvine and described as follows:

Parcel 1:

Lot 97 of Tract No. 15941, in the City of Irvine, County of Orange, State of California, as shown on a Map recorded in Book 809, Pages 13 to 32 inclusive of Miscellaneous Maps, records of Orange County, California.

Excepting therefrom all oil, gas and mineral rights as reserved by various Deeds of record.

Also excepting therefrom any and all water, water rights or interest therein, appurtenant or relating to the Land  or owned or used by the Irvine Company in connection with or with respect to the Land  (no matter how acquired by Grantor), whether such water, water rights or interest therein, shall be riparian, overlying, appropriative, littoral, percolating, prescriptive, adjudicated, statutory or contractual, together with the right and power to explore, drill, redrill, remove and store the same from or in the Land  or to divert or otherwise utilize such water, water rights or interests therein, on any other property owned or leased by Grantor; but without, however, any right to enter upon the surface of the Land  in the exercise of such rights, as reserved in Deed from the Irvine Company, a Delaware Corporation, recorded February 1, 2001 as Instrument No. 20010061022, of Official Records.

Parcel 2:

Non-exclusive easements for ingress, egress, access, maintenance, repairs, drainage, encroachment, use, and enjoyment, as described in the Master Declaration of Covenants, Conditions and Restrictions and reservation of easements for Shady Canyon (the "Master Declaration"), recorded March 7, 2001 as Instrument No. 20010128871 and/or in the Notice of Annexation to Shady Canyon (Phase 5 Custom) ("Notice of Annexation"), recorded August 30, 2001 as Instrument No. 20010606069, both of Official Records of Orange County, California.

APN:  464-031-24

(End of Legal Description)

# AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT

Date:        January 27, 2022

File No.:    1569971

Property:    34 Black Hawk, Irvine, CA  92603

From:        Stewart Title of California, Inc.

This is to give you notice that Stewart Title of California, Inc. ("Stewart Title") has a business relationship with Stewart Solutions, LLC, DBA – Stewart Specialty Insurance Services, LLC ("Stewart Insurance"). Stewart Information Services Corporation owns 100% of Stewart Insurance and Stewart Title of California, Inc..  Because of this relationship, this referral may provide Stewart Title a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement services listed.  You are NOT required to use the listed provider(s) as a condition for purchase, sale, or refinance of the subject Property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| *Stewart Insurance Settlement Service* | *Charge or range of charges* |
|---|---|
| Hazard Insurance | $400.00 to $6,500.00 |
| Home Warranty | $255.00 to $  780.00 |
| Natural Hazard Disclosure Report | $  42.50 to $   149.50 |

## ACKNOWLEDGEMENT OF RECEIPT, UNDERSTANDING AND APPROVAL OF STEWART TITLE GUARANTY COMPANY PRIVACY NOTICE FOR STEWART TITLE COMPANIES AND AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT

The undersigned hereby acknowledge receipt of the Stewart Title Guaranty Company Privacy Notice for Stewart Title Companies and the Affiliated Business Arrangement Disclosure Statement that apply to this transaction. The undersigned further acknowledge that he/she/they have received, read, understand and accept these documents in connection with the above described transaction.

The undersigned have received a copy of this acknowledgement as evidenced by the signature below.


Dcm-P3 Llc

By:_____


_____        _____
Michael Kim                                   Elisa Yoo

**CLTA Preliminary Report Form Exhibit A (11-09-18)**

# CALIFORNIA LAND TITLE ASSOCIATION

## STANDARD COVERAGE POLICY – 1990
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:
    a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
    b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    c)  resulting in no loss or damage to the insured claimant;
    d)  attaching or created subsequent to Date of Policy; or
    e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

## EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on  real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the  records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the  land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose,   and which are not shown by the public records

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights,   claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:

    a. building;
    b. zoning;
    c. land use;
    d. improvements on the Land;
    e. land division;
    f. environmental protection.
This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This  Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3.  The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.  Risks:
    a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
    b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c. that result in no loss to You; or
    d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right:
    a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b. in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy,  state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
*        For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.  The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible  Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount or  $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: | 1% of Policy Amount or  $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1% of Policy Amount or  $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1% of Policy Amount or  $2,500.00 (whichever is less) | $5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of  Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

Except as provided in Schedule B - Part II, this policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

### PART I

1.  (a) taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on  real property or by the public records.
    (b) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by  the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land  or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate  and complete land survey of the Land and not shown by the Public Records.

5.  (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims  or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material  unless such lien is shown by the Public Records at Date of Policy.

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss  or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

## 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5.  (a) unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy..

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1.  a.  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations)  restricting, regulating, prohibiting or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions or location of any improvement now or hereafter erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection

    or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or  limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.

    b.  Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c),  13(d), 14 or 16.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a)  created, suffered, assumed or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting In no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk  11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e)  resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-  business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the  Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or  limit the coverage provided in Covered Risk 26.

6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after  the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy.  This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to  Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with  applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating  the lien of the Insured Mortgage, is

    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any  other substances.

File No.:  1569971

# AVAILABLE DISCOUNTS DISCLOSURE STATEMENT

This is to give you notice that Stewart Title of California, Inc. ("Stewart Title") is pleased to inform you that upon proper qualification, there are premium discounts available upon the purchase of title insurance covering improved property with a one to four family residential dwelling.

Such discounts apply to and include:

Property located within an area proclaimed a state or federal disaster area;

Property purchased from a foreclosing beneficiary or successful bidder at a foreclosure sale;

Property being refinanced.

Please talk with your escrow or title officer to determine your qualification for any of these discounts.

# Stewart Title Guaranty Company Privacy Notice
# Stewart Title Companies

## WHAT DO THE STEWART TITLE COMPANIES DO WITH YOUR PERSONAL INFORMATION?

Federal and applicable state law and regulations give consumers the right to limit some but not all sharing. Federal and applicable state law regulations also require us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand how we use your personal information. This privacy notice is distributed on behalf of the Stewart Title Guaranty Company and its title affiliates (the Stewart Title Companies), pursuant to Title V of the Gramm-Leach-Bliley Act (GLBA).

The types of personal information we collect and share depend on the product or service that you have sought through us. This information can include social security numbers and driver's license number.

All financial companies, such as the Stewart Title Companies, need to share customers' personal information to run their everyday business—to process transactions and maintain customer accounts. In the section below, we list the reasons that we can share customers' personal information; the reasons that we choose to share; and whether you can limit this sharing.

| Reasons we can share your personal information. | Do we share | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes**— to process your transactions and maintain your account. This may include running the business and managing customer accounts, such as processing transactions, mailing, and auditing services, and responding to court orders and legal investigations. | Yes | No |
| **For our marketing purposes**— to offer our products and services to you. | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes**— information about your transactions and experiences. Affiliates are companies related by common ownership or control. They can be financial and non-financial companies. *Our affiliates may include companies with a Stewart name; financial companies, such as Stewart Title  Company* | Yes | No |
| **For our affiliates' everyday business purposes**— information about your creditworthiness. | No | We don't share |
| **For our affiliates to market to you** — For your convenience, Stewart has developed a means for you to opt out from its affiliates marketing even though such mechanism is not legally required. | Yes | Yes, send your first and last name, the email address used in your transaction, your Stewart file number and the Stewart office location that is handling your transaction by email to optout@stewart.com or fax to 1-800-335-9591. |
| **For non-affiliates to market to you.** Non-affiliates are companies not related by common ownership or control. They can be financial and non-financial companies. | No | We don't share |

We may disclose your personal information to our affiliates or to non-affiliates as permitted by law. If you request a transaction with a non-affiliate, such as a third party insurance company, we will disclose your personal information to that non-affiliate.  [We do not control their subsequent use of information, and suggest you refer to their privacy notices.]

## SHARING PRACTICES

| | |
|---|---|
| **How often do the Stewart Title Companies notify me about their practices?** | We must notify you about our sharing practices when you request a transaction. |
| **How do the Stewart Title Companies protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer, file, and building safeguards. |
| **How do the Stewart Title Companies collect my personal information?** | We collect your personal information, for example, when you request insurance-related services provide such information to us We also collect your personal information from others, such as the real estate agent or lender involved in your transaction, credit reporting agencies, affiliates or other companies. |
| **What sharing can I limit?** | Although federal and state law give you the right to limit sharing (e.g., opt out) in certain instances, we do not share your personal information in those instances. |

***Contact us:   If you have any questions about this privacy notice, please contact us at:*** Stewart Title Guaranty Company,
**1360 Post Oak Blvd., Ste. 100,  Privacy Officer, Houston, Texas 77056**

File No.: 1569971

Revised 01-01-2020

Effective Date: January 1, 2020

# Privacy Notice for California Residents

Pursuant to the California Consumer Privacy Act of 2018 ("CCPA"), Stewart Information Services Corporation and its subsidiary companies (collectively, "Stewart") are providing this **Privacy Notice for California Residents** ("CCPA Notice").  This CCPA Notice supplements the information contained in Stewart's existing privacy notice and applies solely to all visitors, users and others who reside in the State of California or are considered California Residents ("consumers" or "you").  Terms used but not defined shall have the meaning ascribed to them in the CCPA.

<u>Information Stewart Collects</u>

Stewart collects information that identifies, relates to, describes, references, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer, household, or device.  Most of the information that Stewart collects in the course of its regular business is already protected pursuant to the Gramm-Leach-Bliley Act (GLBA).  Additionally, much of this information comes from government records or other information already in the public domain.  Personal information under the CCPA does not include:

- Publicly available information from government records.
- Deidentified or aggregated consumer information.
- Certain personal information protected by other sector-specific federal or California laws, including but not limited to the Fair Credit Reporting Act (FCRA), GLBA and California Financial Information Privacy Act (FIPA).

Specifically, Stewart has collected the following categories of personal information from consumers within the last twelve (12) months:

| Category | Examples | Collected? |
|---|---|---|
| A. Identifiers. | A real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security number, driver's license number, passport number, or other similar identifiers. | YES |
| B. Personal information categories listed in the California Customer Records statute (Cal. Civ. Code § 1798.80(e)). | A name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information. Some personal information included in this category may overlap with other categories. | YES |
| C. Protected classification characteristics under California or federal law. | Age (40 years or older), race, color, ancestry, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, veteran or military status, genetic information (including familial genetic information). | YES |
| D. Commercial information. | Records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies. | YES |
| E. Biometric information. | Genetic, physiological, behavioral, and biological characteristics, or activity patterns used to extract a template or other identifier or identifying information, such as, fingerprints, faceprints, and voiceprints, iris or retina scans, keystroke, gait, or other physical patterns, and sleep, health, or exercise data. | YES |
| F. Internet or other similar network activity. | Browsing history, search history, information on a consumer's interaction with a website, application, or advertisement. | YES |
| G. Geolocation data. | Physical location or movements. | YES |
| H. Sensory data. | Audio, electronic, visual, thermal, olfactory, or similar information. | YES |
| I. Professional or employment-related information. | Current or past job history or performance evaluations. | YES |
| J. Non-public education information (per the Family Educational Rights and Privacy Act (20 U.S.C. Section 1232g, 34 C.F.R. Part 99)). | Education records directly related to a student maintained by an educational institution or party acting on its behalf, such as grades, transcripts, class lists, student schedules, student identification codes, student financial information, or student disciplinary records. | YES |
| K. Inferences drawn from other personal information. | Profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes. | YES |

Stewart obtains the categories of personal information listed above from the following categories of sources:

- Directly and indirectly from customers, their designees or their agents (For example, realtors, lenders, attorneys, etc.)
- Directly and indirectly from activity on Stewart's website or other applications.
- From third-parties that interact with Stewart in connection with the services we provide.

<u>Use of Personal Information</u>

Stewart may use or disclose the personal information we collect for one or more of the following purposes:

- To fulfill or meet the reason for which the information is provided.
- To provide, support, personalize, and develop our website, products, and services.
- To create, maintain, customize, and secure your account with Stewart.
- To process your requests, purchases, transactions, and payments and prevent transactional fraud.
- To prevent and/or process claims.
- To assist third party vendors/service providers who complete transactions or perform services on Stewart's behalf.
- As necessary or appropriate to protect the rights, property or safety of Stewart, our customers or others.
- To provide you with support and to respond to your inquiries, including to investigate and address your concerns and monitor and improve our responses.
- To personalize your website experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our website, third-party sites, and via email or text message (with your consent, where required by law).
- To help maintain the safety, security, and integrity of our website, products and services, databases and other technology assets, and business.
- To respond to law enforcement or regulator requests as required by applicable law, court order, or governmental regulations.
- Auditing for compliance with federal and state laws, rules and regulations.
- Performing services including maintaining or servicing accounts, providing customer service, processing or fulfilling orders and transactions, verifying customer information, processing payments, providing advertising or marketing services or other similar services.
- To evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of our assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal information held by us is among the assets transferred.

Stewart will not collect additional categories of personal information or use the personal information we collected for materially different, unrelated, or incompatible purposes without providing you notice.

<u>Disclosure of Personal Information to Affiliated Companies and Nonaffiliated Third Parties</u>

Stewart does not sell your personal information to nonaffiliated third parties.  Stewart may share your information with those you have designated as your agent in the course of your transaction (for example, a realtor or a lender).  Stewart may disclose your personal information to a third party for a business purpose.  Typically, when we disclose personal information for a business purpose, we enter a contract that describes the purpose and requires the recipient to both keep that personal information confidential and not use it for any purpose except performing the contract.

We share your personal information with the following categories of third parties:

- Service providers and vendors (For example, search companies, mobile notaries, and companies providing credit/debit card processing, billing, shipping, repair, customer service, auditing, marketing, etc.)
- Affiliated Companies
- Litigation parties and attorneys, as required by law.
- Financial rating organizations, rating bureaus and trade associations.
- Federal and State Regulators, law enforcement and other government entities

In the preceding twelve (12) months, Stewart has disclosed the following categories of personal information for a business purpose:

Category A:  Identifiers
Category B:  California Customer Records personal information categories
Category C:  Protected classification characteristics under California or federal law
Category D:  Commercial Information
Category E:  Biometric Information
Category F:  Internet or other similar network activity
Category G:  Geolocation data
Category H:  Sensory data
Category I:  Professional or employment-related information
Category J:  Non-public education information
Category K:  Inferences

<u>Consumer Rights and Choices</u>

The CCPA provides consumers (California residents) with specific rights regarding their personal information.  This section describes your CCPA rights and explains how to exercise those rights.

**Access to Specific Information and Data Portability Rights**

You have the right to request that Stewart disclose certain information to you about our collection and use of your personal information over the past 12 months.  Once we receive and confirm your verifiable consumer request, Stewart will disclose to you:

- The categories of personal information Stewart collected about you.
- The categories of sources for the personal information Stewart collected about you.
- Stewart's business or commercial purpose for collecting that personal information.
- The categories of third parties with whom Stewart shares that personal information.
- The specific pieces of personal information Stewart collected about you (also called a data portability request).
- If Stewart disclosed your personal data for a business purpose, a listing identifying the personal information categories that each category of recipient obtained.

**Deletion Request Rights**

You have the right to request that Stewart delete any of your personal information we collected from you and retained, subject to certain exceptions. Once we receive and confirm your verifiable consumer request, Stewart will delete (and direct our service providers to delete) your personal information from our records, unless an exception applies.

Stewart may deny your deletion request if retaining the information is necessary for us or our service providers to:

1. Complete the transaction for which we collected the personal information, provide a good or service that you requested, take actions reasonably anticipated within the context of our ongoing business relationship with you, or otherwise perform our contract with you.

2. Detect security incidents, protect against malicious, deceptive, fraudulent, or illegal activity, or prosecute those responsible for such activities.

3. Debug products to identify and repair errors that impair existing intended functionality.

4. Exercise free speech, ensure the right of another consumer to exercise their free speech rights, or exercise another right provided for by law.

5. Comply with the California Electronic Communications Privacy Act (Cal. Penal Code § 1546 *seq.*).

6. Engage in public or peer-reviewed scientific, historical, or statistical research in the public interest that adheres to all other applicable ethics and privacy laws, when the information's deletion may likely render impossible or seriously impair the research's achievement, if you previously provided informed consent.

7. Enable solely internal uses that are reasonably aligned with consumer expectations based on your relationship with us.

8. Comply with a legal obligation.

9. Make other internal and lawful uses of that information that are compatible with the context in which you provided it.

Exercising Access, Data Portability, and Deletion Rights

To exercise the access, data portability, and deletion rights described above, please submit a verifiable consumer request to us either:

- Calling us Toll Free at 1-866-571-9270

- Emailing us at Privacyrequest@stewart.com

- Visiting http://stewart.com/ccpa

Only you, or someone legally authorized to act on your behalf, may make a verifiable consumer request related to your personal information. You may also make a verifiable consumer request on behalf of your minor child.

To designate an authorized agent, please contact Stewart through one of the methods mentioned above.

You may only make a verifiable consumer request for access or data portability twice within a 12-month period. The verifiable consumer request must:

- Provide sufficient information that allows us to reasonably verify you are the person about whom we collected personal information or an authorized representative.

- Describe your request with sufficient detail that allows us to properly understand, evaluate, and respond to it.

Stewart cannot respond to your request or provide you with personal information if we cannot verify your identity or authority to make the request and confirm the personal information relates to you.

Making a verifiable consumer request does not require you to create an account with Stewart.

Response Timing and Format

We endeavor to respond to a verifiable consumer request within forty-five (45) days of its receipt.  If we require more time (up to an additional 45 days), we will inform you of the reason and extension period in writing.

A written response will be delivered by mail or electronically, at your option.

Any disclosures we provide will only cover the 12-month period preceding the verifiable consumer request's receipt.  The response we provide will also explain the reasons we cannot comply with a request, if applicable.  For data portability requests, we will select a format to provide your personal information that is readily useable and should allow you to transmit the information from one entity to another entity without hindrance.

Stewart does not charge a fee to process or respond to your verifiable consumer request unless it is excessive, repetitive, or manifestly unfounded.  If we determine that the request warrants a fee, we will tell you why we made that decision and provide you with a cost estimate before completing your request.

<u>Non-Discrimination</u>

Stewart will not discriminate against you for exercising any of your CCPA rights.  Unless permitted by the CCPA, we will not:

- Deny you goods or services.
- Charge you a different prices or rates for goods or services, including through granting discounts or other benefits, or imposing penalties.
- Provide you a different level or quality of goods or services.
- Suggest that you may receive a different price or rate for goods or services or a different level or quality of goods or services.

<u>Changes to Our Privacy Notice</u>

Stewart reserves the right to amend this privacy notice at our discretion and at any time.  When we make changes to this privacy notice, we will post the updated notice on Stewart's website and update the notice's effective date.  **Your continued use of Stewart's website following the posting of changes constitutes your acceptance of such changes.**

<u>Contact Information</u>

If you have questions or comments about this notice, the ways in which Stewart collects and uses your information described here, your choices and rights regarding such use, or wish to exercise your rights under California law, please do not hesitate to contact us at:

**Phone:**           Toll Free at 1-866-571-9270

**Website:**         **http://stewart.com/ccpa**

**Email:**           Privacyrequest@stewart.com

**Postal Address:**  Stewart Information Services Corporation

                     Attn:  Mary Thomas, Deputy Chief Compliance Officer

                     1360 Post Oak Blvd., Ste. 100, MC #14-1

                     Houston, TX  77056

Documents provided by DataTree LLC via its proprietary imaging and delivery system. Copyright 2005, All rights reserved.



EXHIBIT "3"

1  STEVEN T. GUBNER – Bar No. 156593
   SUSAN K. SEFLIN – Bar No. 213865
2  JESSICA L. BAGDANOV - Bar No. 281020
   JESSICA S. WELLINGTON – Bar No. 324477
3  BG LAW LLP
   21650 Oxnard Street, Suite 500
4  Woodland Hills, CA 91367
   Telephone:  (818) 827-9000
5  Facsimile:  (818) 827-9099
   Email:      sgubner@bg.law
6              sseflin@bg.law
               jbagdanov@bg.law
7              jwellington@bg.law

8  Attorneys for Chapter 11 Debtor
   and Plaintiff DCM-P3, LLC
9
                    UNITED STATES BANKRUPTCY COURT
10
                    CENTRAL DISTRICT OF CALIFORNIA
11
                           SANTA ANA DIVISION
12  In re:                          │ Case No. 8:21-bk-12507-TA
13  DCM-P3, LLC,                     │ Chapter 11
14                                   │
         Debtor.                     │ Adv. No. 8:22-ap-_____-TA
15  ─────────────────────────       │
16                                   │ **COMPLAINT FOR: (1) AVOIDANCE AND**
    DCM-P3, LLC,                     │ **RECOVERY OF FRAUDULENT**
17                                   │ **TRANSFERS; (2) AVOIDANCE AND**
         Plaintiff,                  │ **RECOVERY OF CONSTRUCTIVELY**
18                                   │ **FRAUDULENT TRANSFERS; (3)**
    v.                               │ **PRESERVATION OF LIENS; AND (4)**
19                                   │ **CLAIM DISALLOWANCE**
    GF CAPITAL, INC. dba GF CAPITAL GROUP;
20  ALBERT LISSOY,
21
         Defendants.
22
23
24
25
26
27
28

                                     1

2792472

88

DCM-P3, LLC, the chapter 11 debtor and plaintiff herein ("DCM-P3" or "Plaintiff"),

complaining of defendants GF Capital, Inc. dba GF Capital Group and Albert Lissoy, alleges as

follows:

## STATEMENT OF JURISDICTION, VENUE AND PROCEEDINGS

1.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 151, 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (B), (H), and (K).

2.      The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this

adversary proceeding.  To the extent the Court does not have constitutional jurisdiction to enter a

final judgment, the Plaintiff consents to the Court entering a final judgment in this proceeding.

3.      Venue properly lies in this judicial district in that the civil proceeding arises under

title 11 of the United States Code as provided in 28 U.S.C. §§ 1408 and 1409.

4.      This adversary proceeding arises out of the bankruptcy case entitled *In re DCM-P3,*

*LLC*, Bankr. Case No. 8:21-bk-12507-TA, currently pending in the United States Bankruptcy Court,

Central District of California, Santa Ana Division, before the Honorable Theodor C. Albert.

5.      By and through this Complaint, the Plaintiff seeks to avoid, recover, and preserve

certain transfers for the benefit of this estate, which transfers form the basis of defendants' asserted

liens against DCM-P3's real property located at 34 Black Hawk, Irvine, California 92603 (the

"Property"). Taken together, defendants' purported liens account for well over $8 million in alleged

secured debt against the Property (worth somewhere between $5 million and $6 million), and DCM-

P3 was not a recipient of any of the funds allegedly loaned by defendants. Furthermore, Plaintiff

seeks disallowance of Proofs of Claim No. 8 and 9 filed in its bankruptcy case related to these

fraudulent liens, as neither is a valid claim against DCM-P3.

## THE PARTIES

6.      Plaintiff DCM-P3 is the chapter 11 debtor in the above-captioned bankruptcy case. It

is a Delaware limited liability company with its principal place of business located at 34 Black

Hawk, Irvine, California 92603. Sarina Browndorf obtained exclusive management of control of

DCM-P3 pursuant to a Temporary Emergency (Ex Parte) Order entered in family court on October 19, 2021.

7.      Defendant GF Capital, Inc. ("GF Capital") is a Nevada corporation doing business in California as GF Capital Group. GF Capital is owned and controlled by Scott Lissoy.

8.      Defendant Albert Lissoy is an individual residing in Orange County, California. Albert Lissoy is Scott Lissoy's father and was formerly the CEO of GF Capital.

9.      As described below, both GF Capital and Albert Lissoy are insiders of DCM-P3 (and all of Matthew Browndorf's affiliated entities).

## GENERAL ALLEGATIONS

10.     On October 14, 2021 (the "Petition Date"), DCM-P3 and Ms. Browndorf filed voluntary petitions for relief under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

11.     DCM-P3 manages its financials affairs as a debtor in possession and no trustee has been appointed.

**A.      The Browndorfs Acquire the Property**

12.     Prior to the Petition Date and on or about January 13, 2012, Ms. Browndorf and Matthew Browndorf were married in Las Vegas, Nevada.

13.     In 2014, the Browndorfs moved into their marital home, the Property.  At the time they moved into the Property, it was owned by Norman A. Morales and Cynthia A. Morales, Trustees of the Morales Family Trust Dated April 28, 2004.

14.     Subsequent to Ms. Browndorf and Mr. Browndorf moving into the Property, Mr. Browndorf entered into an agreement with Norman A. Morales and Cynthia A. Morales to purchase the Property for $4,300,000.

15.     Without informing Ms. Browndorf and without her consent, Mr. Browndorf placed title to the Property in the name of DCM-P3.

16.     Both the Property and DCM-P3 have always been and are community property of Ms. Browndorf and Mr. Browndorf. Mr. Browndorf had sole control of DCM-P3 at all times until October 19, 2021.

3

17.    Mr. Browndorf has since testified under penalty of perjury that DCM-P3 was formed solely for estate planning purposes to hold title to the Property. Specifically, on August 18, 2021 in connection with the Dissolution Action (defined below), Mr. Browndorf testified that the Property was placed into DCM-P3 "as part of an estate planning structure," and stated that DCM-P3 has no bank accounts in its own name.

18.    On June 11, 2015, Norman A. Morales and Cynthia A. Morales, Trustees of the Morales Family Trust Dated April 28, 2004 executed a grant deed transferring the Property to DCM-P3, which grant deed was recorded on June 26, 2015 in the Official Records, Orange County, instrument number 2015000333128. Accordingly, title to the Property is held in the name of DCM-P3.

19.    On June 24, 2015 and unbeknownst to Ms. Browndorf, an Interspousal Transfer Grant Deed was allegedly executed (the "Interspousal Deed"). The Interspousal Deed indicates that Debtor's name is Sabine Schneider. However, Ms. Browndorf had legally changed her name to "Sarina Browndorf" on June 14, 2013 shortly after the Browndorfs' marriage.

20.    The Interspousal Deed purports to transfer Ms. Browndorf's community property interest in the Property to Mr. Browndorf, a married man as his sole and separate property. However, the Interspousal Deed is a wild deed as Mr. Browndorf never directly held title to the Property. At the time the Interspousal Deed was executed and recorded, neither Ms. Browndorf nor Mr. Browndorf held legal title to the Property as Mr. Browndorf had initially placed title to the Property in the name of DCM-P3, without informing Ms. Browndorf and without her consent, even though the Property was purchased with community property funds.

21.    Ms. Browndorf has no recollection of ever executing the Interspousal Deed and does not believe that the signature on the deed is her signature. Ms. Browndorf is informed and believes that Mr. Browndorf had copies of her signature in his files and used those copies to forge, among other things, her signature on the Interspousal Deed.

22.    The Interspousal Deed was recorded on June 26, 2015 in the Official Records, Orange County, instrument number 2015000333127.

4

2792472

23.    Ms. Browndorf has resided in the Property consistently since 2014 and during the marriage was a stay-at-home wife and mother. Mr. Browndorf managed the family's finances and Ms. Browndorf had no idea that Mr. Browndorf had taken any of these actions.

**B.    Matthew Browndorf Allows Purported Liens Against the Property Eliminating Any Available Equity**

24.    To assist in the purchase of the Property, on or about June 26, 2015, DCM-P3 executed a deed of trust in the principal amount of $2,795,000 originally in favor of BOFI Federal Bank, presently serviced by Axos Bank (the "First Trust Deed").

25.    DCM-P3 believes that the amount outstanding on the First Trust Deed is approximately $2,523,438.37.

26.    Just four days after entry into the First Trust Deed, on or about June 30, 2015 Mr. Browndorf, on behalf of himself, his family trust and in his capacity as manager of DCM-P3, entered into a short-term loan transaction with Albert Lissoy, whereby Albert Lissoy purportedly loaned DCM-P3 $2,255,287 at 7% interest, for a period of approximately 10 months, with a maturity date of March 31, 2016 (the "Lissoy Loan").

27.    Mr. Browndorf purportedly received Ms. Browndorf's spousal consent for the Lissoy Loan, yet Ms. Browndorf never signed any such spousal consent. Indeed, attached at page 13 to Lissoy's Proof of Claim (Exhibit 1 hereto), the "Consent of Spouse" form, purportedly dated June 30, 2015 and signed by Ms. Browndorf, does not contain Ms. Browndorf's signature. Instead, DCM-P3 is informed and believes that Mr. Browndorf forged Ms. Browndorf's signature on the "Consent of Spouse" form.

28.    Furthermore, the "Consent of Spouse" form does not appear to have been notarized until three months later, on or about September 30, 2015. *See id.,* p. 14. DCM-P3 thus is informed and believes that Ms. Browndorf never consented to the Lissoy Loan, as the notary did not witness Ms. Browndorf sign the "Consent of Spouse" form and Ms. Browndorf's signature appears to have been forged by Mr. Browndorf.

29.    DCM-P3 did not receive any money as a result of the Lissoy Loan.

5

30.     Critically, the Lissoy Loan was not recorded against the Property until four years later, on November 8, 2019 as Instrument No. 2019000446471 (the "Lissoy Lien").

31.     On August 3, 2016, Mr. Browndorf caused DCM-P3 to enter into yet another loan transaction with Michael K. Boone Living Trust and Nancy D. Nashu Living Trust, whereby these trusts purportedly loaned DCM-P3 the principal sum of $850,000. On August 8, 2016, a deed of trust was recorded against the Property as Instrument No. 2016000365199. Ultimately, this loan was assigned to defendant GF Capital, which is controlled by Scott Lissoy, Albert Lissoy's son (hereinafter, the "GF Capital Lien").

32.     DCM-P3 did not receive any money as a result of the GF Capital Lien.

33.     GF Capital and Albert Lissoy are insiders of DCM-P3.

34.     Matthew Browndorf pledged all of his shares of Plutos Sama Holdings, Inc. ("PSH")— his main investment entity—as well as all of its subsidiaries (including DCM-P3) to the Lissoy family. On November 18, 2021 in the Dissolution Action, defined below, Ira Glasky, General Counsel and Vice President of Far West Industries and its related entities (which includes GF Capital), testified that for major decisions taken by Mr. Browndorf regarding PSH and its subsidiaries, GF Capital and the Lissoy Family Trust must agree and consent to those decisions. Specifically, Mr. Glasky testified that the Lissoy family own an interest in Mr. Browndorf's entities, and stated:

> Q [Counsel for Ms. Browndorf]: I'm just -- what is your ownership -- what is GF Capital's ownership interest in Plutos Sama Holdings?
>
> A [Ira Glasky]: Okay. Well, once again, I think we own an excess of 4,000 shares in addition to what's been pledged to us as security for loans.
>
> Q: And what has been pledged to you for security of loans?
>
> A: Well, a hundred percent of any shares and interest that Matthew Browndorf owns.
>
> Q: So you own any interests -- "you," being GF Capital, owns any interest Mr. Browndorf has in these businesses?
>
> A: Well, into Plutos Sama holdings and the related companies.

2792472

Q: Does Mr. Browndorf require agreement from GF Capital and Lissoy family trust for the major decisions that are taken regarding PSH holdings and its subsidiaries?

A: It is our position that he does.

Q: As it stands right now, who owned Plutos Sama holdings?

A: I think Plutos Sama holdings, we've got a significant number of shares, over 4,000 shares, preferred. And then all the shares that are owned by Matthew Browndorf are pledged to us and are being held by us, including their voting rights as security for the loans.

Transcript of Proceedings in Dissolution Action Nov. 18, 2021, pp. 46-49.

35.     In other words, pre-petition and as a result of Mr. Browndorf's actions, GF Capital and Albert Lissoy asserted control of PSH and all of its business ventures and affiliated entities.

36.     Additionally, on November 7, 2016, a Deed of Trust, Security Agreement, Fixture Filing and Assignment of Rents was recorded against the Property, Instrument No. 2016000551301 by Verde Investments, Inc. ("Verde") as part of DCM-P3's purported "secured obligations" arising out of a settlement involving Verde, Matthew Browndorf and his affiliated entities.[1]

37.     In other words, at the time of the recordation of the GF Capital Lien, on or about August 8, 2016, DCM-P3's only asset, the Property, was fully encumbered with over $6 million in purported debt.

38.     Similarly, at the time of the recordation of the Lissoy Lien in 2019, Matthew Browndorf and defendants had over-encumbered the Property by millions of dollars, for which DCM-P3 never received a penny.

**C.     The Browndorf Dissolution Action**

39.     On June 16, 2021, Ms. Browndorf filed a dissolution of marriage petition in the Superior Court of the State of California, County of Orange, commencing Case No. 21D003789 (the "Dissolution Action"), which is currently pending.

---

[1] This transaction and loan is the subject of a separate adversary proceeding.

7

40.     On October 19, 2021, the court in the Dissolution Action entered a Temporary

Emergency (Ex Parte) Order giving exclusive management and control of DCM-P3 to Ms.

Browndorf.

41.     Ms. Browndorf was not aware of any of these transactions and their impact on the

Property until shortly before her bankruptcy case was filed.

42.     At all relevant times, DCM-P3 has been a community property asset of Ms.

Browndorf and Mr. Browndorf.

43.     As of the Petition Date, the family court had not divided assets and liabilities between

Ms. Browndorf and Matthew Browndorf.

**D.     Proofs of Claim**

44.     On April 25, 2022, Albert Lissoy filed Proof of Claim No. 8 in DCM-P3's

bankruptcy case, asserting a claim secured by the Property in the amount of $4,759,545.88 arising

out of the Lissoy Loan and Lissoy Lien. **Exhibit 1.**

45.     Also on April 25, 2022, GF Capital filed Proof of Claim No. 9 in DCM-P3's

bankruptcy case, asserting a claim secured by the Property in the amount of $1,238,549.83 arising

out of the GF Capital Lien. **Exhibit 2.**

**FIRST CLAIM FOR RELIEF**

**Avoidance and Recovery of Lissoy Lien as Actual Fraudulent Transfer**

**11 U.S.C. §§ 548; 550**

46.     Plaintiff realleges and incorporates herein by reference each and every one of the

foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

full.

47.     The Lissoy Lien was recorded against the Property within 2 years of DCM-P3's

bankruptcy filing, on November 8, 2019, and constitutes a transfer of an interest in property by

DCM-P3.

48.     This transfer was put in place during Mr. Browndorf's management and control of

DCM-P3.

8

49.     As of October 19, 2021, when Ms. Browndorf was placed into control of DCM-P3, she discovered Mr. Browndorf's wrongdoing. No one could have prevented or challenged this lien prior thereto, due to Mr. Browndorf's complete control and domination of DCM-P3.

50.     Mr. Browndorf engaged in a pattern and practice of hiding assets as part of an asset protection scheme to avoid collection by creditors, and similarly, to encumber community property assets to delay, hinder, and/or defraud his creditors and Ms. Browndorf.

51.     Defendants and Mr. Browndorf caused the Lissoy Lien to be recorded against the Property as part of a scheme to hinder, delay, and/or defraud Mr. Browndorf's creditors, the creditors of DCM-P3, and the creditors of Ms. Browndorf.

52.     Indeed, the Lissoy Loan allegedly occurred in 2015, four years prior to the Lissoy Lien being recorded against the Property. Thus, the only explanation for such a delay in recordation is that Mr. Browndorf and defendants were attempting to over-encumber the Property to ensure that it had no equity once Mr. Browndorf's marriage to Ms. Browndorf had soured.

53.     Accordingly, the Lissoy Lien is avoidable pursuant to 11 U.S.C. § 548, and DCM-P3 is entitled to recover the Lissoy Lien for the benefit of its estate.

## SECOND CLAIM FOR RELIEF

### Avoidance and Recovery of Lissoy Lien as Constructively Fraudulent Transfer

### 11 U.S.C. §§ 548; 550

54.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

55.     The Lissoy Lien was recorded against the Property within 2 years of DCM-P3's bankruptcy filing, on November 8, 2019, and constitutes a transfer of an interest in property by DCM-P3.

56.     This transfer was put in place during Mr. Browndorf's management and control of DCM-P3.

57.     As of October 19, 2021, when Ms. Browndorf was placed into control of DCM-P3 and other community property entities, she discovered Mr. Browndorf's wrongdoing. No one could

9

have prevented or challenged this lien prior thereto, due to Mr. Browndorf's complete control and domination of DCM-P3.

58.    DCM-P3 received no consideration for this transfer. Indeed, DCM-P3 had no bank account, and did not receive any funds as a result of the original Lissoy Loan. Furthermore, the Lissoy Loan allegedly occurred in 2015, four years prior to the Lissoy Lien being recorded against the Property. Thus, the Lissoy Lien could not have been given in favor of Lissoy as reasonably equivalent value for the Lissoy Loan.

59.    Furthermore, at the time of the Lissoy Lien's recordation, 2019, DCM-P3 was completely insolvent, given that its only asset, the Property, was significantly over encumbered.

60.    Accordingly, the Lissoy Lien is avoidable pursuant to 11 U.S.C. § 548, and DCM-P3 is entitled to recover the Lissoy Lien for the benefit of its estate.

### THIRD CLAIM FOR RELIEF

**Avoidance and Recovery of Lissoy Lien and GF Capital Lien as**

**Actual Fraudulent Transfers**

**11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(1), 3439.05 and 3439.07**

61.    Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

62.    Both the Lissoy Lien and GF Capital Lien, were put in place against the Property during Mr. Browndorf's management and control of DCM-P3, and both are transfers of an interest in the Property belonging to DCM-P3.

63.    As of October 19, 2021, when Ms. Browndorf was placed into control of DCM-P3 and other community property entities, she discovered Mr. Browndorf's wrongdoing. No one could have prevented or challenged these liens and transfers prior thereto, due to Mr. Browndorf's complete control and domination of DCM-P3.

64.    Mr. Browndorf engaged in a pattern and practice of hiding assets as part of an asset protection scheme to avoid collection by creditors, and similarly, to encumber community property assets to delay, hinder, and/or defraud his creditors and Ms. Browndorf.

10

65.     Mr. Browndorf and defendants caused the recordation of the Lissoy Lien and GF Capital Lien as part of a scheme to hinder, delay, and/or defraud Mr. Browndorf's creditors, the creditors of DCM-P3, and the creditors of Ms. Browndorf.

66.     On the Petition Date, there was at least one creditor that held unsecured claims allowable under section 502.

67.     Accordingly, the Lissoy Lien and GF Capital Lien are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code §§3439.04(a)(1), 3439.05 and 3439.07, and DCM-P3 is entitled to recover these for the benefit of its bankruptcy estate.

## FOURTH CLAIM FOR RELIEF

**Avoidance and Recovery of Lissoy Lien and GF Capital Lien as**

**Constructively Fraudulent Transfers**

**11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

68.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

69.     Both the Lissoy Lien and GF Capital Lien, were put in place against the Property during Mr. Browndorf's management and control of DCM-P3, and both are transfers of an interest in the Property belonging to DCM-P3.

70.     As of October 19, 2021, when Ms. Browndorf was placed into control of DCM-P3 and other community property entities, she discovered Mr. Browndorf's wrongdoing. No one could have prevented or challenged these liens and transfers prior thereto, due to Mr. Browndorf's complete control and domination of DCM-P3.

71.     DCM-P3 received no consideration for either transfer. Indeed, DCM-P3 had no bank account, and did not receive any funds as a result of the original Lissoy Loan or GF Capital Lien.

72.     Furthermore, the Lissoy Loan allegedly occurred in 2015, four years prior to the Lissoy Lien being recorded against the Property. Thus, the Lissoy Lien could not have been given in favor of Lissoy as reasonably equivalent value for the Lissoy Loan.

11

2792472

98

73.     With respect to the GF Capital Lien, at the time of its recordation, August 8, 2016, Mr. Browndorf had already entered into loans against the Property totaling over $5 million, rendering DCM-P3 insolvent. While the Lissoy Loan was not recorded at the time, it still constituted a purported obligation of DCM-P3 that contributed significantly to DCM-P3's insolvency.

74.     Similarly, at the time of the Lissoy Lien's recordation, 2019, DCM-P3 was completely insolvent, given that its only asset, the Property, was significantly over encumbered.

75.     Each of the Lissoy Lien and GF Capital Lien was made without DCM-P3 having received reasonably equivalent value in exchange for such transfers.

76.     Furthermore, DCM-P3 (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (d) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

77.     On the Petition Date, there was at least one creditor that held unsecured claims allowable under section 502.

78.     Accordingly, the Lissoy Lien and GF Capital Lien are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07, and DCM-P3 is entitled to recover these for the benefit of its bankruptcy estate.

## FIFTH CLAIM FOR RELIEF

### Preservation of Liens

### 11 U.S.C. §§ 544 and 551; Cal. Civ. Code § 3439.07

79.     Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

80.     The Lissoy Lien and GF Capital Lien are liens avoidable under the Bankruptcy Code.

12

2792472

81.    Accordingly, DCM-P3 is entitled to preserve the Lissoy Lien and GF Capital Lien as avoided liens for the benefit of its estate.

## SIXTH CLAIM FOR RELIEF

### Claim Disallowance

### [11 U.S.C. § 502]

82.    Plaintiff realleges and incorporates herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

83.    Both defendants are transferees of transfers and obligations avoidable under Sections 544 and 548 of the Bankruptcy Code and from whom property is recoverable under Section 550 of the Bankruptcy Code.

84.    Specifically, on April 25, 2022, Albert Lissoy filed Proof of Claim No. 8 in DCM-P3's bankruptcy case, asserting a claim secured by the Property in the amount of $4,759,545.88 arising out of the Lissoy Loan and Lissoy Lien. **Exhibit 1.**

85.    Also on April 25, 2022, GF Capital filed Proof of Claim No. 9 in DCM-P3's bankruptcy case, asserting a claim secured by the Property in the amount of $1,238,549.83 arising out of the GF Capital Lien. **Exhibit 2.**

86.    Pursuant to Section 502 of the Bankruptcy Code, DCM-P3 objects to these claims, and such claims must be disallowed until such time as such the Lissoy Lien and GF Capital Lien are recovered for the benefit of the estate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief on this Complaint as follows:

1.    On the First and Second Claims for Relief, avoidance and recovery of the Lissoy Lien under sections 548 and 550 of the Bankruptcy Code;

2.    On the Third and Fourth Claims for Relief, avoidance and recovery of the Lissoy Lien and GF Capital Lien under sections 544 and 550 of the Bankruptcy Code and applicable state law;

13

3.    On the Fifth Claim for Relief, preservation of the Lissoy Lien and GF Capital Lien as avoided liens;

4.    On the Sixth Claim for Relief, disallowance of Proof of Claim Nos. 8 and 9 filed by the defendants;

5.    On All Claims for Relief,

    a.  Prejudgment and post-judgment interest

    b.  Reasonable attorneys' fees and costs permitted under applicable law; and

    c.  Such other and further relief as is just and proper.

DATED:  May 11, 2022                    BG LAW LLP


By: /s/ Susan K. Seflin
    Susan K. Seflin
    Jessica L. Bagdanov
Attorneys for, Chapter 11 Debtor
and Debtor in Possession DCM-P3, LLC

14

EXHIBIT "4"

STEVEN T. GUBNER – Bar No. 156593
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV - Bar No. 281020
JESSICA S. WELLINGTON – Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:       sgubner@bg.law
             sseflin@bg.law
             jbagdanov@bg.law
             jwellington@bg.law

Attorneys for Chapter 11 Debtors and
Plaintiffs DCM-P3, LLC and Sarina Browndorf

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>DCM-P3, LLC,<br><br>          Debtor.<br>———————————————<br>DCM-P3, LLC; SARINA BROWNDORF,<br><br>          Plaintiffs,<br><br>v.<br><br>VERDE INVESTMENTS, INC.,<br><br>          Defendant. | Case No. 8:21-bk-12507-TA<br><br>Chapter 11<br><br>Adv. No. 8:22-ap-_____-TA<br><br><br>**COMPLAINT FOR: (1) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS; (2) AVOIDANCE AND RECOVERY OF CONSTRUCTIVELY FRAUDULENT TRANSFERS; (3) PRESERVATION OF LIENS; AND (4) CLAIM DISALLOWANCE** |

1

Plaintiffs DCM-P3, LLC, the chapter 11 debtor in possession herein ("DCM-P3"), and Sarina Browndorf ("Ms. Browndorf"), complaining of Defendant Verde Investments, Inc. ("Verde"), allege as follows:

## STATEMENT OF JURISDICTION, VENUE AND PROCEEDINGS

1.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H), and (K).

2.      The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this adversary proceeding.  To the extent the Court does not have constitutional jurisdiction to enter a final judgment, the plaintiffs consent to the Court entering a final judgment in this proceeding.

3.      Venue properly lies in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. §§ 1408 and 1409.

4.      This adversary proceeding arises out of the bankruptcy cases entitled *In re Sarina Browndorf*, Bankr. Case No. 8:21-bk-12506-TA and *In re DCM-P3, LLC*, Bankr. Case No. 8:21-bk-12507-TA, currently pending in the United States Bankruptcy Court, Central District of California, Santa Ana Division, before the Honorable Theodor C. Albert.

5.      By and through this Complaint, the plaintiffs seek to avoid, recover, and preserve certain transfers for the benefit of this estate, which transfers form the basis of Verde's asserted $4 million secured lien against DCM-P3's real property located at 34 Black Hawk, Irvine, California 92603 (the "Property"). On March 3, 2022, Verde filed Proof of Claim No. 3 in DCM-P3's bankruptcy case, and Proof of Claim No. 12 in Ms. Browndorf's bankruptcy case. As detailed herein, these claims should be disallowed as they are not valid claims against DCM-P3 or Ms. Browndorf.

## THE PARTIES

6.      Plaintiff DCM-P3 is the chapter 11 debtor in the above-captioned bankruptcy case. It is a Delaware limited liability company with its principal place of business located at 34 Black Hawk, Irvine, California 92603. Sarina Browndorf obtained exclusive management of control of

2

DCM-P3 pursuant to a Temporary Emergency (Ex Parte) Order entered in family court on October 19, 2021.

7.     Plaintiff Sarina Browndorf is a chapter 11 debtor in her own affiliated bankruptcy case, Bankr. Case No. 8:21-bk-12506-TA.

8.     Defendant Verde Investments, Inc. is a corporation organized under the laws of the State of Arizona, with its principal place of business at 1720 W. Rio Salado Parkway, Tempe, Arizona 85281. On information and belief, Verde regularly conducts business within the State of California.

## GENERAL ALLEGATIONS

9.     On October 14, 2021 (the "Petition Date"), DCM-P3 and Ms. Browndorf filed voluntary petitions for relief under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

10.     DCM-P3 and Ms. Browndorf manage their financial affairs as debtors in possession and no trustee has been appointed in either case.

**A.     The Browndorfs Acquire the Property**

11.     On January 13, 2012, Ms. Browndorf and Matthew Browndorf were married in Las Vegas, Nevada.

12.     In 2014, the Browndorfs moved into their marital home, the Property.  At the time they moved into the Property, it was owned by Norman A. Morales and Cynthia A. Morales, Trustees of the Morales Family Trust Dated April 28, 2004.

13.     Subsequent to Ms. Browndorf and Mr. Browndorf moving into the Property, Mr. Browndorf entered into an agreement with Norman A. Morales and Cynthia A. Morales to purchase the Property for $4,300,000.

14.     Without informing Ms. Browndorf and without her consent, Mr. Browndorf placed title to the Property in the name of DCM-P3.

15.     Both the Property and DCM-P3 have always been and are community property of Ms. Browndorf and Mr. Browndorf.

16.     Ms. Browndorf has at least a 50% equitable ownership interest in DCM-P3.

17.     Mr. Browndorf had sole control of DCM-P3 at all times until October 19, 2021.

3

18.     Mr. Browndorf has since testified under penalty of perjury that DCM-P3 was formed solely for estate planning purposes to hold title to the Property. Specifically, on August 18, 2021 in connection with the Dissolution Action (defined below), Mr. Browndorf testified that the Property was placed into DCM-P3 "as part of an estate planning structure," and stated that DCM-P3 has no bank accounts in its own name.

19.     On June 11, 2015, Norman A. Morales and Cynthia A. Morales, Trustees of the Morales Family Trust Dated April 28, 2004 executed a grant deed transferring the Property to DCM-P3, which grant deed was recorded on June 26, 2015 in the Official Records, Orange County, instrument number 2015000333128.

20.     Accordingly, title to the Property is held in the name of DCM-P3.

21.     On June 24, 2015 and unbeknownst to Ms. Browndorf, an Interspousal Transfer Grant Deed was allegedly executed (the "Interspousal Deed").  The Interspousal Deed indicates that Ms. Browndorf's name is "Sabine Schneider."  However, Ms. Browndorf had legally changed her name to "Sarina Browndorf" on June 14, 2013 shortly after the Browndorfs' marriage.

22.     The Interspousal Deed purports to transfer Ms. Browndorf's community property interest in the Property to Mr. Browndorf, a married man as his sole and separate property. However, the Interspousal Deed is a wild deed as Mr. Browndorf never directly held title to the Property.  At the time the Interspousal Deed was executed and recorded neither Ms. Browndorf nor Mr. Browndorf held legal title to the Property as Mr. Browndorf had initially placed title to the Property in the name of DCM-P3, without informing Ms. Browndorf and without her consent, even though the Property was purchased with community property funds.

23.     Ms. Browndorf has no recollection of ever executing the Interspousal Deed and does not believe that the signature on the deed is her signature.  Ms. Browndorf is informed and believes that Mr. Browndorf had copies of her signature in his files and used those copies to forge, among other things, her signature on the Interspousal Deed.

24.     The Interspousal Deed was recorded on June 26, 2015 in the Official Records, Orange County, instrument number 2015000333127.

4

25.     Ms. Browndorf has resided in the Property consistently since 2014 and during the marriage was a stay-at-home wife and mother. Mr. Browndorf managed the family's finances and Ms. Browndorf had no idea that Mr. Browndorf had taken any of these actions.

**B.      Matthew Browndorf Allows Purported Liens Against the Property Eliminating Any Available Equity**

26.     To assist in the purchase of the Property, on or about June 26, 2015, DCM-P3 executed a deed of trust in the principal amount of $2,795,000 originally in favor of BOFI Federal Bank, presently serviced by Axos Bank (the "First Trust Deed").

27.     Plaintiffs believe that the amount outstanding on the First Trust Deed is approximately $2,523,438.37.

28.     Just four days after entry into the First Trust Deed, on or about June 30, 2015, Mr. Browndorf caused DCM-P3 to enter into a short-term loan transaction with Albert Lissoy, whereby Albert Lissoy purportedly loaned DCM-P3 $2,255,287 at 7% interest, for a period of approximately 10 months, with a maturity date of March 31, 2016 (the "Lissoy Loan").

29.     The Lissoy Loan was not recorded against the Property until four years later, on November 8, 2019.[1]

30.     Then, on August 3, 2016, Mr. Browndorf caused DCM-P3 to enter into yet another loan transaction with Michael K. Boone Living Trust and Nancy D. Nashu Living Trust, whereby these trusts purportedly loaned DCM-P3 the principal sum of $850,000. On August 8, 2016, a deed of trust was recorded against the Property as Instrument No. 2016000365199 (the "Boone Lien"). Ultimately, this loan was assigned to GF Capital, a Nevada corporation controlled by Scott Lissoy, Albert Lissoy's son.[2]

31.     In other words, prior to Verde obtaining a lien against the Property (described in detail below), DCM-P3's only asset, the Property, was fully encumbered with over $6 million in purported debt.

---

[1] This loan is the subject of a separate adversary proceeding.
[2] This loan is also the subject of a separate adversary proceeding.

**C.** **Verde Obtains a Lien on the Property**

32.    Mr. Browndorf is, among other things, a practicing attorney who was the founding and managing partner of Wilson Keadjian Browndorf LLP ("WKB"), a former New York-based law firm with offices in Arizona.

33.    In March 2016, Mr. Browndorf and his firm, WKB, represented plaintiff Diversified Funding Group, LLC ("DFG") and others in an adversary proceeding against Verde and others for fraudulent lending practices, fraudulent transfer, civil conspiracy and related claims arising out of an alleged fraudulent sale of a lucrative car wash business, styled *Diversified Funding Group, LLC et al. v. Daniel Hendon et al.,* Adv. No. 2:16-ap-00127-SHG (Bankr. D. Ariz.) (the "DFG Adversary"). Initially, the DFG Adversary had been commenced in Los Angeles County Superior Court, later removed to the Arizona bankruptcy court as related to the chapter 11 bankruptcy case of Daniel Hendon (2:11-bk-21164-SHG, Bankr. D. Ariz.).

34.    On October 10, 2016, WKB filed a motion to approve a compromise of the DFG Adversary and related litigation pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Settlement Motion"). The Settlement Motion was jointly filed by WKB as well as counsel for the defendants and the liquidating trustee of the liquidating trust (successor to the debtor, Daniel Hendon). Pursuant to the settlement, the following unusual terms were included in exchange for releases of liability in favor of Verde and its related defendants:

    a.  Verde to pay $600,000, $540,000 of which to be paid to DFG, and $60,000 of which to be paid to the liquidating trustee;

    b.  Without any clear disclosure to the Arizona bankruptcy court that the DFG plaintiffs' counsel was the beneficiary of such loan, Verde agreed to loan an additional $2,400,000 at 12% interest to Distressed Capital Management, LLC, for purposes of investing for the DFG plaintiff's benefit (the "Verde Investment Loan"). Distressed Capital Management, LLC (an asset management company represented to specialize in performing and non-performing residential mortgages and owned by Matthew Browndorf) was not a party to the lawsuit, but

1    "committed" to invest Verde's loan proceeds in such a way that the DFG

2    plaintiffs would allegedly receive a return of no less than $1,900,000 after Verde

3    was repaid in full.

4    35.    The Verde Investment Loan was guaranteed by "DCM affiliates" including DCM-P3,

5    Plutos Sama LLC, DCM-P1, LLC, and Matthew Browndorf himself. Such loan was also to be

6    secured against the Property, held in DCM-P3's name.

7    36.    The Arizona bankruptcy court approved the Settlement Motion in an order entered

8    October 21, 2016.

9    37.    On November 8, 2016, Verde and its related defendants were dismissed from the

10    DFG Adversary with prejudice in light of the approved settlement.

11    38.    Nowhere in the Settlement Motion was it disclosed that Matthew Browndorf,

12    managing partner of the plaintiff's counsel, WKB, was obtaining significant financial benefit from

13    the settlement arrangement.

14    39.    Accordingly, on or about November 7, 2016, Verde, Distressed Capital Management,

15    LLC, Mr. Browndorf, Plutos Sama LLC, and DCM-P3 entered into a loan agreement (i.e., the Verde

16    Investment Loan), with Matthew Browndorf signing on behalf of all affiliated entities.

17    40.    Prior to formal entry into the loan agreement (and prior to Arizona bankruptcy court

18    approval of the Settlement Motion), Mr. Browndorf caused DCM-P3 to execute a guaranty of the

19    Verde Investment Loan, which guaranty was purportedly notarized on October 19, 2016 (the "DCM-

20    P3 Guaranty"). A copy of the DCM-P3 Guaranty can be found at **Exhibit 1**, page 38 of 99.

21    41.    Additionally, on November 7, 2016, a Deed of Trust, Security Agreement, Fixture

22    Filing and Assignment of Rents was recorded against the Property, Instrument No. 2016000551301

23    by Verde as part of DCM-P3's purported "secured obligations" arising out of the Verde Investment

24    Loan (the "Verde Deed of Trust"). A copy of the Verde Deed of Trust is attached hereto as **Exhibit

25    3.**

26    42.    DCM-P3 obtained no benefit as a result of entry into the guaranty of the Verde

27    Investment Loan or Verde Deed of Trust, and the transaction only resulted in an encumbrance on

28    DCM-P3's only asset—the Property. Indeed, given that DCM-P3 never held a bank account, it

7

certainly did not receive (nor was it intended to receive) any of the "investment" funds allegedly loaned by Verde.

43.     Ms. Browndorf was never aware that any of this impacted her home. On September 29, 2016—prior to the Settlement Motion being filed, prior to entry into the loan agreement, and prior to the notarization of the guaranties and related documents—Mr. Browndorf instructed Ms. Browndorf to execute a Marital Community Joinder/Disclaimer, which purports to bind all present and future community property for the debts related to the Verde Investment Loan. At no time did Ms. Browndorf ever understand (nor was she told by Mr. Browndorf) that (a) this transaction significantly encumbered her family home, (b) her husband's law firm WKB sued Verde and its insider for, among other things, fraud, and (c) the bizarre circumstances relating to the Settlement Motion and Verde Investment Loan.

44.     Plaintiffs are informed and believe, and based thereon allege, that the borrower under the Verde Deed of Trust did not default until March 31, 2018.

45.     Thus, DCM-P3's obligations under the DCM-P3 Guaranty did not come into effect until March 31, 2018 at the earliest.

46.     On or about February 14, 2019, Verde filed a complaint against Matthew Browndorf, Sarina Browndorf, and the DCM affiliates for all amounts due under the Verde Deed of Trust, styled *Verde Investments Inc. v. Matthew C. Browndorf et al.*, No. CV-19-01055-PHX-SMB (D. Ariz.) (the "Verde District Court Action").

47.     Sometime thereafter, Verde and Mr. Browndorf entered into a stipulated judgment, whereby Mr. Browndorf agreed on behalf of all of the defendants (including Ms. Browndorf without her knowledge or consent), that judgment would be entered against all defendants, jointly and severally, as follows:

    a.  Principal: $2,400,000;

    b.  Accrued default interest through May 14, 2019: $301,325.87;

    c.  Late fees: $77,954.23;

    d.  Attorneys' fees: $43,177,54;

    e.  Additional daily and post-judgment interest at the applicable rates.

8

*See* **Exhibit 2,** p. 101-103. The stipulated judgment was only signed by counsel—not the actual parties – and there is no evidence in the underlying action that Ms. Browndorf participated in the litigation.

48.     Accordingly, judgment was entered against all defendants, including Ms. Browndorf and DCM-P3, on June 24, 2019 (the "Disputed Judgment").

49.     Ms. Browndorf never stipulated to this Disputed Judgment. Ms. Browndorf did not authorize her counsel to agree to the Disputed Judgment. Ms. Browndorf did not know about the Disputed Judgment until her counsel discovered it in connection with her bankruptcy filing.

50.     Yet, on August 9, 2019, an abstract of judgment was recorded against DCM-P1, LLC (a co-guarantor) in Orange County, California in favor of Verde on account of the Disputed Judgment, Instrument No. 2013000293167 (the "Disputed Lien"). Pursuant to Proof of Claim No. 12 filed by Verde in Ms. Browndorf's bankruptcy case, Verde asserts that the Disputed Lien was recorded against Ms. Browndorf.  the A copy of the Disputed Judgment Lien is attached hereto as **Exhibit 4.**

D.     <u>**The Browndorf Dissolution Action**</u>

51.     On June 16, 2021, Ms. Browndorf filed a dissolution of marriage petition in the Superior Court of the State of California, County of Orange, commencing Case No. 21D003789 (the "Dissolution Action"), which is currently pending.

52.     On October 19, 2021, the court in the Dissolution Action entered a Temporary Emergency (Ex Parte) Order giving exclusive management and control of DCM-P3 to Ms. Browndorf.

53.     Ms. Browndorf was not aware of any of these Verde transactions and their impact on the Property until shortly before her bankruptcy case was filed.

54.     At all relevant times, DCM-P3 has been a community property asset of Ms. Browndorf and Mr. Browndorf.

55.     As of the Petition Date, the family court had not divided assets and liabilities between Ms. Browndorf and Matthew Browndorf.

2791253

111

### E.    Verde's Proofs of Claim

56.    On March 3, 2022, Verde filed its proof of claim against DCM-P3, asserting a claim secured by the Property in the amount of $4,033,593.12 (the "DCM Claim"). **Exhibit 1.**

57.    Also on March 3, 2022, Verde filed Proof of Claim No. 12 in Ms. Browndorf's bankruptcy case, asserting a secured claim of $3,009,623.50 arising out of the Disputed Judgment (the "Browndorf Claim"). **Exhibit 2.**

### FIRST CLAIM FOR RELIEF

**Avoidance and Recovery of Guaranty, Verde Deed of Trust, and Disputed Lien as**

**Actual Fraudulent Transfers and Obligations**

**11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(1), 3439.05 and 3439.07**

**(All Plaintiffs Against Verde)**

58.    Plaintiffs reallege and incorporate herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

59.    The DCM-P3 Guaranty was an obligation incurred by DCM-P3.

60.    The Verde Deed of Trust is a transfer of property belonging to DCM-P3. Furthermore, the Verde Deed of Trust constitutes a transfer of property belonging to Ms. Browndorf as well, given that the Property and DCM-P3 are undoubtedly community property.

61.    The Disputed Lien is a transfer of property belonging to both DCM-P3 and Ms. Browndorf.

62.    These transfers, the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien, were put in place during Mr. Browndorf's management and control of DCM-P3.

63.    As of October 19, 2021, when Ms. Browndorf was placed into control of DCM-P3, she discovered Mr. Browndorf's wrongdoing. No one could have prevented or challenged these liens and transfers prior thereto, due to Mr. Browndorf's complete control and domination of DCM-P3.

64.    Mr. Browndorf engaged in a pattern and practice of hiding assets as part of an asset protection scheme to avoid collection by creditors, and similarly, to encumber community property assets to delay, hinder, and/or defraud his creditors and Ms. Browndorf.

10

65. Mr. Browndorf caused the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien as part of a scheme to hinder, delay, and/or defraud his creditors, the creditors of DCM-P3, and the creditors of Ms. Browndorf.

66. On the Petition Date, there were creditors of DCM-P3 that held unsecured claims allowable under section 502.

67. A creditor reviewing the publicly available documents recorded against the Property would not have been able to discover the fraudulent nature of the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien until at least the Petition Date.

68. Accordingly, the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code §§3439.04(a)(1), 3439.05 and 3439.07, and DCM-P3 and Ms. Browndorf are entitled to recover these for the benefit of their bankruptcy estates.

## SECOND CLAIM FOR RELIEF

**Avoidance and Recovery of DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien as Constructively Fraudulent Transfers and Obligations**

**11 U.S.C. §§ 544(b)(1) and 550; Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07**

**(All Plaintiffs Against Verde)**

69. Plaintiffs reallege and incorporate herein by reference each and every one of the foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in full.

70. The DCM-P3 Guaranty was an obligation incurred by DCM-P3.

71. The Verde Deed of Trust is a transfer of property belonging to DCM-P3. Furthermore, the Verde Deed of Trust constitutes a transfer of property belonging to Ms. Browndorf as well, given that the Property and DCM-P3 are undoubtedly community property.

72. The Disputed Lien is a transfer of property belonging to both DCM-P3 and Ms. Browndorf.

73. DCM-P3 received no value, let alone reasonably equivalent value, in exchange for the DCM-P3 Guaranty, Verde Deed of Trust, or Disputed Lien.

11

74.     Similarly, Ms. Browndorf received no value, let alone reasonably equivalent value, in exchange for the DCM-P3 Guaranty, Verde Deed of Trust or Disputed Lien.

75.     Given that DCM-P3 had already incurred debt well in excess of the value of the Property—its only asset—DCM-P3 was insolvent at the time of entry into the DCM-P3 Guaranty and Verde Deed of Trust, or otherwise became insolvent as a result of such transactions.

76.     Ms. Browndorf was also insolvent at the time of these transactions, given that her husband had placed liens on substantially all of their property without her knowledge or consent.

77.     Each of the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien was made without DCM-P3 or Ms. Browndorf having received reasonably equivalent value in exchange for such transfers. Neither plaintiff received any value for any of these transfers.

78.     Furthermore, each plaintiff (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (d) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

79.     On the Petition Date, there were creditors of DCM-P3 that held unsecured claims allowable under section 502.

80.     Accordingly, the DCM-P3 Guaranty, Verde Deed of Trust, and Disputed Lien are avoidable pursuant to 11 U.S.C. § 544, Cal. Civ. Code §§ 3439.04(a)(2), 3439.05 and 3439.07, and DCM-P3 and Ms. Browndorf are entitled to recover these for the benefit of their bankruptcy estates.

/ / /

/ / /

/ / /

2791253

1

**THIRD CLAIM FOR RELIEF**

2

**Preservation of Liens**

3

**11 U.S.C. §§ 544 and 551; Cal. Civ. Code § 3439.07**

4

**(All Plaintiffs Against Verde)**

5       81.     Plaintiffs reallege and incorporate herein by reference each and every one of the

6   foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

7   full.

8       82.     The Verde Deed of Trust and Disputed Lien are liens avoidable under the Bankruptcy

9   Code.

10      83.     Accordingly, DCM-P3 and Ms. Browndorf are each entitled to preserve the Verde

11  Deed of Trust and Disputed Lien as avoided liens for the benefit of their estates.

12

**FOURTH CLAIM FOR RELIEF**

13

**Claim Disallowance**

14

**[11 U.S.C. § 502]**

15      84.     Plaintiffs reallege and incorporate herein by reference each and every one of the

16  foregoing paragraphs, from paragraph number 1 to this instant paragraph, as if set forth herein in

17  full.

18      85.     Verde is a transferee of transfers and obligations avoidable under Section 544 of the

19  Bankruptcy Code and from whom property is recoverable under Section 550 of the Bankruptcy

20  Code.

21      86.     On March 3, 2022, Verde filed its claim against DCM-P3, asserting a claim secured

22  by the Property in the amount of $4,033,593.12. **Exhibit 1.**

23      87.     Also on March 3, 2022, Verde filed the Browndorf Claim, asserting a secured claim

24  against Ms. Browndorf related to the Disputed Lien. **Exhibit 2.**

25      88.     Pursuant to Section 502 of the Bankruptcy Code, DCM-P3 objects to the DCM Claim

26  and Ms. Browndorf objects to the Browndorf Claim, and such claims must be disallowed until such

27  time as such the DCM Guaranty, Verde Deed of Trust, and Disputed Lien are recovered for the

28  benefit of the estates.

13

1
## **PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiffs pray for relief on this Complaint as follows:

3       1.      On the First Claim for Relief, avoidance and recovery of the DCM-P3 Guaranty,

4  Verde Deed of Trust, and Disputed Lien;

5       2.      On the Second Claim for Relief, avoidance and recovery of the DCM-P3 Guaranty,

6  Verde Deed of Trust, and Disputed Lien;

7       3.      On the Third Claim for Relief, preservation of the Verde Deed of Trust and Disputed

8  Lien as avoided liens;

9       4.      On the Fourth Claim for Relief, disallowance of the DCM Claim and Browndorf

10 Claim;

11      5.      On All Claims for Relief,

12              a.   Prejudgment and post-judgment interest

13              b.   Reasonable attorneys' fees and costs permitted under applicable law; and

14              c.   Such other and further relief as is just and proper.

15 DATED:  May 10, 2022                     BG LAW LLP

16
                                           By: /s/ Susan K. Seflin
17                                            Susan K. Seflin
                                              Jessica L. Bagdanov
18                                         Attorneys for Chapter 11 Debtors
                                           and Plaintiffs DCM-P3, LLC and Sarina
19                                         Browndorf

20

21

22

23

24

25

26

27

28

2791253

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**

A true and correct copy of the foregoing document entitled: **DEBTOR'S MOTION TO: (1) APPROVE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES WITH SUCH LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES TO ATTACH TO PROCEEDS PURSUANT TO 11 U.S.C. §§ 363(B) AND (F); (2) APPROVE OVERBID PROCEDURES; (3) DETERMINE THAT BUYER IS ENTITLED TO PROTECTION PURSUANT TO 11 U.S.C. § 363(M); AND (4) PROVIDE RELATED RELIEF; DECLARATIONS OF SARINA BROWNDORF AND GREGORY BINGHAM IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 11, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Anerio V Altman**    LakeForestBankruptcy@jubileebk.net, lakeforestpacer@gmail.com
- **Greg P Campbell**    ch11ecf@aldridgepite.com, gc@ecf.inforuptcy.com;gcampbell@aldridgepite.com
- **Marc C Forsythe**    kmurphy@goeforlaw.com, mforsythe@goeforlaw.com;goeforecf@gmail.com
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Aaron J Malo**    amalo@sheppardmullin.com, clopez@sheppardmullin.com;abilly@sheppardmullin.com
- **Eric S Pezold**    epezold@swlaw.com, knestuk@swlaw.com
- **Susan K Seflin**    sseflin@bg.law, ecf@bg.law
- **Andrew Still**    astill@swlaw.com, kcollins@swlaw.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **David Wood**    dwood@marshackhays.com, dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On **May 11, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 11, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.
**VIA EMAIL**
**Debtor's Broker**: William Friedman, Billfried@earthlink.net
**Debtor's Broker**: Gregory Bingham, Gregory.Bingham@camoves.com
**Buyer's counsel**: John S. Cha, jcha@raineslaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 11, 2022 | JESSICA STUDLEY | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                    **F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL:**

Hon. Theodor C. Albert, Chief Judge
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and
Courthouse
411 West Fourth Street, Suite 5085 /
Courtroom 5B
Santa Ana, CA 92701-4593

**Buyer's Counsel**
John S. Cha
Raines Feldman
18401 Von Karman Avenue,
Irvine, CA 92612

**Buyer**
Michael Jim and Elisa Yoo
c/o Hannah Park
Keller Williams Realty Irvine
4010 Barranca Parkway
Suite 100
Irvine, CA 92604

**Lienholder**
County of Orange Treasurer – Tax
Collector
PO Box 4515
Santa Ana, CA 92702-4515

**Lienholder**
Orange County Tax Collector
601 North Ross Street
Santa Ana, CA 92701-4091

**Lienholder**
Axos Bank
c/o Greg P. Campbell
Attn: Greg P. Campbell
**(VIA NEF)**

**Alleged Lienholder**
Verde Investments, Inc.
c/o Snell   Wilmer
Attn: Eric S  Pezold
 **(VIA NEF)**

**Alleged Lienholder**
GF Capital
c/o Sheppard, Mullin, Richter &
Hampton LLP
Attn: Aaron J. Malo
**(VIA NEF)**

**Alleged Lienholder**
Albert Lissoy
c/o Sheppard, Mullin, Richter &
Hampton LLP
Attn: Aaron J. Malo
**(VIA NEF)**

**Homeowner's Association**
Shady Canyon Community
Association
c/o First Service Residential
15241 Laguna Canyon Road
Irvine, CA 92618-3146

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**